# James W. Crosby M.S., PhD.
# Canine Aggression Consulting LLC

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Darryl Abbas, Esq.
Upper Charles Law Group, LLC
81 Hartwell Avenue, Suite 101
Lexington, MA 02421

8 June 2023

Re: Goode v. Smith

# PRELIMINARY EXPERT REPORT

INCIDENT NARRATIVE

Reports provided by the Boston Police Department (BPD) in discovery state that on 4 July 2018 Officer Daniel Smith of the BPD was present at an incident that occurred at or near the intersection of Dunkeld St. and Fayston St. in the City of Boston, Massachusetts. While present on the site Officer Smith was detailed to set up a perimeter to secure possible evidence from a shooting that had occurred earlier that same day.

According to reports, while performing his duties, Smith saw a dog running toward him. Smith perceived the dog as a threat. Smith did not attempt to use less- or non-lethal force and instead immediately drew his issued sidearm and shot several times, striking the dog more than once. The dog died on the scene, apparently as a result of the gunshots.

The dog was removed from the scene by Boston Animal Services and disposed of. No necropsy of the dog is reported.

MATERIALS EXAMINED

National Institute of Justice Evaluation of Pepper Spray (1997)
Digital file labelled D92-D124.FDITphotos.pdf
Digital file labelled Final_pages.pdf
Digital file labeled Officer Smith's Answers to Interrogatories.PDF
Digital files labeled as follows: Pages1-16pdf, Pages20-51.pdf, Pages 52-60.pdf, Pages61-71.pdf, Pages_72-84
Digital file labeled Scan10292019-4

# James W. Crosby M.S., PhD.
# Canine Aggression Consulting LLC

1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

Transcript of deposition of Officer Smith
Transcript of deposition of T. Lewis
Transcript of deposition of W. Lewis
Transcript of deposition of Shirley Goode
Transcript of deposition of Sean Good

EXAMINATION OF STATEMENTS AND EVIDENCE

Examination of the statements and reports provided revealed the following:

1) All officers present state that the scene of this incident was chaotic due to the number of persons present and the repeated detonation of fireworks due to the Fourth of July holiday. Officer Giraldo estimated the crowd to be between 30 and 80 persons. Smith stated (depo, p.37) that he was amongst 10 to fifteen children as they were exchanging "high-5s".
2) Smith was reported by Detective Sergeant Perkins, as written in Perkins' report, to have said that Chyna was "…charging at him in an aggressive manor (sic)." Smith restated and described the motion of Chyna toward him as "aggressive" in repeated portions of his Deposition.
3) In addition to Officer Smith, six (6) officers (Taylor, Riley, Davis, Williams, Lantaigne and Crager) stated they saw the dog Chyna "charging" at Smith. Giraldo stated that he only heard the shots. Officer Crager specifically mentions that he was approximately 50 feet from Smith when he saw Chyna "charging" at Smith. None of these six officers ever stated that Chyna "tried to bite" Officer Smith.
4) All police statements indicate that the dog Chyna emerged from the porch at 73-75 Fayston St. Smith reported that he first saw Chyna as Chyna was descending the porch stairs from 73-75 Fayston St., before Chyna crossed the street to near his position (depo p.40 et al.).
5) Smith stated in his initial interview that Chyna charged in "an aggressive manner". In his interrogatory answers he added that he heard Chyna "snarling, growling and panting" as she approached from across the street. During his deposition he stated for the first time that Chyna tried to bite him. He reiterated several times that he never stated that he heard Chyna barking (depo, p.49).
6) All other officer witnesses stated they heard Chyna barking, no matter what their position was at the time of the incident.
7) Smith stated in his deposition and in other reports that he heard a "door open" to his left (towards 75 Fayston) and someone state loudly "no, no, no" from his right (away from 75 Fayston) just before he saw Chyna approaching.
8) Smith indicated that he was standing on the sidewalk on Fayston when he saw Chyna approaching from the porch on the opposite side of Fayston St. His answers regarding Chyna's location when he first saw her varied from the top of the porch, the stairs, and the bottom of the porch.

9) Smith said that when Chyna was approximately 5 feet away, running at what he perceived to be full speed (depo, p.15), when he (Smith) drew his sidearm from the secure position in his holster. He then reportedly scanned the scene for possible persons at risk and then fired once at Chyna, while she was still located on the street.
10) Smith said that the first shot did not stop Chyna and that she "tried to bite" him (p. 44, line 19). Smith said he then fired two more shots that caused Chyna to fall to a recumbent position, stationary, still within the confines of the street and where she was documented in the crime scene photographs.
11) Perkin's report states in contrast that Smith fired two shots at the approaching dog, and then, when the dog did not stop, fired a third round targeting the dog's head. The third shot, according to Perkins' report, stopped Chyna.
12) Two non-police witnesses stated that Chyna was stationary, not charging, when Smith fired.
13) Smith stated that he did not deploy O.C. (oleoresin capsicum) spray at any time as a less-lethal alternative to deadly force. Smith did not reveal during his initial interview by Perkins that he (Smith) was carrying O.C. spray at the time of the shooting.
14) In her deposition, Shirley Goode stated that Chyna was sensitive to sound and when exposed to fireworks or thunderstorms she would start shaking in fear (p.23).
15) Ms. Goode also stated that, from her observation from her porch, she observed Chyna stop running before reaching Smith. She said that "All of a sudden she stood still. Her ears were down. She was barking. Her tail was wagging. And Officer Smith pulled out his gun. He stood there, watched her, pow, she went down."

OPINIONS

1) The following opinions are based on my experience and training in dog behavior, dog aggression, Veterinary Forensics, police procedures, police policy, practical line- and command-level supervision of police officers over a full career, participation is use-of-force reviews, control and capture of domestic pets as an Animal Control executive officer, and in my analysis of the behavior of thousands of domestic dogs. That behavior analysis includes, but is not limited to, several hundred fighting dogs from illegal dog fighting rings, nearly 60 dogs that have killed humans, and innumerable dogs that have bitten, threatened or otherwise negatively impacted humans. My experience also includes having trained police, animal control officers, behavior consultants, Veterinarians, Veterinary Behaviorists, and others internationally and across the U.S. in the assessment of risk and understanding of aggression and body language in dogs and means by which to protect themselves and others from perceived threat by domestic dogs.
2) Officer Smith did, in my professional opinion, use excessive and needless force in shooting the dog Chyna.
3) Officer Smith, by failing to use any form of less- or non-lethal force toward Chyna before escalating to deadly force by using his firearm, failed to meet the requirements of Boston Police Department Policy that states in part "The discharge of a firearm by a member of the

Department is permissible only when: A. There is no less drastic means available to defend oneself from an unlawful attack which an officer has reasonable cause to believe could result in death or great bodily injury." The risk of death by dog attack is extremely minimal and not a rational basis for the use of deadly force by a healthy adult in the company of other persons. In the general population only approximately 35 people per year die from dog attack in the U.S. out of a population of at least 330 million people, and of those, a much smaller fraction of fatality victims are healthy adults. Specifically, only one police officer has died from a dog attack since 1932 in the United States, and he died of anaphylactic shock from the post-exposure rabies vaccine administered at the hospital after the incident. The officers who died from dog attack before 1932 died from either secondary infection or rabies infection.

4) Smith did not reveal to Perkins in his interview that he (Smith) was carrying O.C. spray at the time of the shooting. This omission appears to have misled Perkins to conclude that there was no lesser method of deterrence of the perceived threat from Chyna and that Perkins was misled to conclude that the discharge was in accord with BPD policy. Smith did, in fact, possess an alternative to deadly force, that is proven to be safe and effective in deterring a dog encounter, in his possession and available for deployment as quickly as he was able to draw his sidearm and address Chyna's approach.

5) Smith's use of deadly force, in the midst of the "chaotic scene" and among between 30 and 80 people, and in the close company of "ten to fifteen" children, was reckless and was likely to cause injury to a civilian or other officer.

6) The question arises as to why the dog Chyna would ignore all of the many people present and "lock on" to Smith in an offensive manner, especially when the dog had to completely cross the street, "charging" from her porch steps, and ignoring all of the other people to do so. Smith stated that he heard a door open from his right (towards 73-75 Fayston) and heard someone say "no, no, no" from his left (away from 73-75 Fayston). This would rather be consistent with a person to Smith's left (away from 73-75 Fayston) calling "no" toward the dog from Smith's left. The dog's running across the street would have been consistent with a dog that was running toward a familiar person, past Smith, on the street, rather than in a manner of attack toward Smith. This would be consistent with and explain the fact that Chyna ignored all of the crowd, and would be consistent with Chyna simply trying to get to a familiar, trusted person amongst the chaotic scene and the loud, frequent fireworks. This would explain why Chyna never diverted toward any of the other officers, most of whom were attired in a similar fashion to Smith, wearing plain clothes, tactical vests and BPD placards.

7) In her deposition, Shirley Goode stated (p. 49, line 1) that when she saw Chyna run that "It wasn't a normal, fast run. I believe she was looking for me." Such panicked seeking behavior is consistent with a dog that is frightened and looking for a familiar, safe person.

8) A fearful reaction by Chyna to the crowd, noise, and chaotic actions at the scene would be consistent with Shirley Goode's testimony that Chyna was sensitive to loud noises including fireworks, and that when exposed to such loud noises she would "start shaking".

9) Smith's descriptions of Chyna "growling, panting, and breathing heavily" would be

consistent with the situation if Chyna was exceptionally frightened and seeking a familiar person among the "chaos" of the fireworks and large gathering. Rapid and heavy respiration is common in highly stressed domestic dogs and can be accompanied by labored breathing sounds that could be mistaken for growling.

10) Smith was clear that he never stated that Chyna was trying to bite him, and Smith did not receive any injury from contact with Chyna. None of the six police witnesses claimed that Chyna tried to bite Smith. This belies Smith's use of deadly force as a first response to seeing a running dog.

11) Smith stated he saw Chyna who he "immediately identified as a pit bull (depo, p. 15) and appears to have used that perception as part of his assessment of Chyna as "aggressive". Yet Smith is not a dog owner, a dog handler, nor does he have any qualifications that would enable him to "immediately" identify a dog as a pit bull. In research, dog and veterinary professionals, not to mention civilians, are incorrect nearly 75% when visually identifying dogs as "pit bulls". Thus, Smith's assumption of the breed of dog that Chyna was, based on such a quick visual appraisal, should not have been even a partial basis to his decision to use deadly force. In fact, scientific studies have indicated that "pit bulls" have no special levels of force or behavioral characteristics that make them any more, or any less, likely to cause significant injury or death.

12) Smith stated repeatedly in his deposition that he never received animal encounter training from the Boston Police Department. Yet best professional standards issued by major police departments had indicated and recommended such a need well before 2018. Chicago Safe Humane, supported by the US Department of Justice Officer of Community Policing developed and freely disseminated a training course for police in 2011, accompanied by a written guide to encounters and training. As early as 2007 the Los Angeles Police Department established policy regarding dog encounters by its officers (Memorandum 7). In 2014 I assisted as a subject matter expert in the development of a dog encounter training curriculum and video by the California Commission on Peace Officer Standards and Training. That curriculum was freely distributed in 2015. The Boston Police Department and its administration, as a major and progressive police department, should have not only been aware of these programs but incorporated them into training and policy long before this incident in 2018.

13) Smith also states that, since the incident in 2018, he has received no training from the Boston Police Department regarding dog encounters despite this shooting. The above listed courses have been available since the dates noted. Further, since 2019 a full curriculum of police dog encounter training (Law Enforcement Dog Encounter Training) has been available for free through and approved by the U.S. Department of Justice Office of Community Policing. That training is also endorsed by a number of major police organizations, including but not limited to the National Sheriffs' Association. Yet the Boston Police Department has failed to provide or require any of the available trainings. This lack of action fails to meet the BPD's obligation and responsibility to the public to exercise good judgement and follow best professional practices.

# James W. Crosby M.S., PhD.
# Canine Aggression Consulting LLC
1435 Oak Haven Rd. * Jacksonville, Florida 32207 * 904-476-7655 *
canineaggression@gmail.com

This is a **preliminary report**, and I explicitly reserve the right to amend, change, vary, or otherwise modify my opinions and more, or more detailed, information or evidence is presented in this case. I may also add or amend further opinions within the scope of my experience and training as such amendment may be necessary.

Respectfully submitted,

Dr. James W. Crosby M.S., PhD, CBCC-KA