## Page 1

```
                                              1

 1              UNITED STATES DISTRICT COURT

 2                District of Massachusetts

 3            Civil Action No. 1:21-CV 11457-GAO

 4

 5   SHIRLEY A. GOODE and SEAN GOODE,   )
                Plaintiffs             )
 6                                     )
              VS.                      )
 7                                     )
     DANIEL SMITH and CITY OF BOSTON,  )
 8              Defendants             )

 9

10           ZOOM DEPOSITION OF JAMES W. CROSBY,

11   called on behalf of the Defendants, taken pursuant to

12   the provisions of the Federal Rules of Civil Procedure,

13   before Patricia M. Haynes, a Certified Shorthand

14   Reporter and Notary Public in and for the Commonwealth

15   of Massachusetts, CSR No.: 146202F, at the law division

16   of the City of Boston, 1 City Hall Square, Room 615,

17   Boston, Massachusetts, on Friday, June 23, 2023,

18   commencing at 10:00 a.m.

19

20

21              ELLEN M. FRITCH & ASSOCIATES
22                   363 SILVER STREET
                 BOSTON, MASSACHUSETTS 02127
23                     617-269-5448

24
```

## Page 2

```
                                              2

 1   APPEARANCES:

 2

 3   CITY OF BOSTON
       (By: Bridget I. Davidson, Esquire)
 4   1 City Hall Square, Room 615
     Boston, Massachusetts 02201
 5   Counsel for the Defendants
     Bridget.davidson@boston.gov

 6

 7   UPPER CHARLES LAW GROUP
       (By: Daniel Abbas, Esquire)
 8   81 Hartwell Avenue, Suite 101
     Lexington, Massachusetts 02421
 9   Counsel for the Plaintiff
     Dabbas@uclawgroup.com

10

11

12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
                                              3

 1                  I N D E X

 2   Witness      Direct  Cross  Redirect  Recross
     JAMES W. CROSBY
 3
     (By Ms. Davidson)   4            140
 4
     (By Mr. Abbas)           136
 5

 6               E X H I B I T S

 7   Exhibit No.                    Page

 8   1  Law Enforcement Dog Encounter      20
        Training Manual
 9
     2  Expert report                      57
10
     3  Photograph                         98
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
                                              4

 1                P R O C E E D I N G S

 2              JAMES W. CROSBY,

 3   of lawful age, being first properly and satisfactorily

 4   identified by the production of driver's license, and

 5   duly sworn by a Notary Public to tell the truth, the

 6   whole truth, and nothing but the truth, deposes and says

 7   as follows in answer to direct interrogatories by Ms.

 8   Davidson.

 9   DIRECT EXAMINATION BY MS. DAVIDSON:

10      Q.  Good morning, Mr. Crosby.

11      A.  Good morning.

12      Q.  My name is Bridget Davidson, and I represent

13   Officer Smith in this matter Goode versus Smith.  Can

14   you state your full name for the record, please?

15      A.  Yes, Doctor James W. Crosby, C-R-O-S-B-Y.

16      Q.  I'm just going to go over the ground rules and

17   normal stipulations.

18          MS. DAVIDSON:  Are you good with that?

19          MR. ABBAS:  Yes.

20          MS. DAVIDSON:  So for the record, reserve

21   all objections, except as to form, and all motions to

22   strike until the time of trial.  The witnesses shall

23   read and sign the transcript under the pains and

24   penalties of perjury within 45 -- is that what we've
```

1    been doing in this case?

2         MR. ABBAS:  We have been doing 60.

3         MS. DAVIDSON:  So within 60 days of

4    receiving it.  And failure to do so will indicate that

5    all testimony is truthful and accurate, and we will

6    waive the signing of the notary.

7    BY MS. DAVIDSON:

8    Q.    With that being said, Doctor Crosby, of course

9    you understand that you're under oath today, correct?

10   A.    Yes.

11   Q.    And is there anything that would prevent you

12   from testifying honestly today?

13   A.    No.

14   Q.    According to your CV, you've been a certified

15   behavior consultant expert witness from 2013 to the

16   present.  Is that correct?

17   A.    That's approximately correct, yes.

18   Q.    Is being a certified behavior consultant

19   expert witness your full-time job right now?

20   A.    I'm a retired police lieutenant from the

21   Jacksonville, Florida, sheriff's office.  In

22   Jacksonville, we are a combined department, so it's the

23   office of the sheriff but we are the municipal police

24   department also.  I retired as a lieutenant from there,

1    so that forms the majority of my income.  I do expert

2    witness and expert consultations on both dog aggression,

3    specifically fatal dog attacks but dog bites in general.

4         I also do consulting and investigations on

5    police use of force regarding encounters with domestic

6    dogs.  And I'm the author of the current curriculum

7    approved by the U.S. Department of Justice on law

8    enforcement dog encounters.

9         So that legal consulting is a portion of my

10   income, but my primary income is from my retirement as a

11   police officer.

12   Q.    Okay.  And you've been retained by the law

13   firm Upper Charles Group on behalf of their clients

14   Shirley and John Goode in this case, correct?

15   A.    That's correct.

16   Q.    And when were you retained in this case as an

17   expert?

18   A.    I would have to look at the records to find

19   the date of the first e-mail from Mr. Abbas.

20   Q.    Do you know what year?

21   A.    Last year?  It's been a bit of awhile.  I

22   think, I'm guessing probably last year.

23   Q.    What are your rates as an expert in this case?

24   A.    My hourly rate is $200 per hour.  My flat rate

1    for handling a case is $5,000 plus travel and expenses

2    if necessary, plus $1,000 per day of trial if I'm

3    required to travel for trial.  And if I am kept on site

4    to simply witness days of trial but I'm not testifying,

5    that's $500 per hour.

6    Q.    Without getting into any communications you've

7    had with your attorney, Attorney Abbas, what is your

8    understanding of what you are retained to do in this

9    case?

10   A.    I was retained to examine the encounter and

11   circumstances around it between Officer Smith and the

12   dog known as Chyna that occurred during a police action

13   at, I don't know right off the top of my head, remember

14   the name of the two streets, I don't know Boston, but

15   during a police action there and to examine the reported

16   behavior of the dog, Chyna, to examine the use of force

17   by Officer Smith, to look at the options that were

18   available to him at the time for other actions.

19        And to determine in my opinion as to whether

20   the dog, Chyna, presented a valid threat of death or

21   serious injury and whether Smith's responses to Chyna's

22   presence were, I'm not going to say reasonable because

23   that's a legal definition, but if they were appropriate

24   proportionate to the situation.

1         And if there were other effective and safe

2    methods by which he could have safely maintained space

3    between himself and the dog, Chyna.

4    Q.    How many hours have you worked on this case?

5    A.    Probably 15 to 20 so far.

6    Q.    Have you ever worked with the law firm The

7    Upper Charles Group before?

8    A.    No, I have not.

9    Q.    Have you ever worked with Attorney Abbas

10   before?

11   A.    No, I have not.

12   Q.    Were you familiar with this case before you

13   were retained by the plaintiffs?

14   A.    No, I was not.

15   Q.    Had you formed any personal opinions about

16   this case before you were retained?

17   A.    No.

18   Q.    Have you testified before as an expert

19   certified behavior consultant at trial or deposition?

20   A.    Many times.

21   Q.    About how many times?

22   A.    My CV would show the actual number, but I have

23   testified quite a few times in municipal state, superior

24   and federal districts and have been accepted as an

1 expert in canine aggression, canine bites, the behavior
2 of dogs, use of force by police regarding dogs
3 specifically, and other associated -- for instance, use
4 of less nonlethal force methods in those cases.
5 Q. About how many times have you testified in
6 Massachusetts?
7 A. Three or four on dangerous dog cases. Those
8 have been in municipal and county courts to date.
9 Q. Were any in the federal court?
10 A. Not yet.
11 Q. What types of clients typically hire you?
12 A. I've been hired both by plaintiffs and
13 defendants in cases, in some cases where police have
14 deployed less lethal or lethal force against domestic
15 companion dogs.
16 I've testified in federal court on dog attacks
17 and dog fatalities. I've testified in federal court on
18 dog behavior as it applies to breed perceptions and the
19 scientific basis behind breed assumptions that are made
20 based on physical appearances.
21 Q. Have you ever been disqualified as an expert
22 witness by the court in which you had been retained?
23 A. No.
24 Q. In all the times that you've testified in the

1 past, how many occasions have you testified for the
2 plaintiff's side?
3 A. It breaks about 50-50 over time. Sometimes,
4 for instance, I am retained on the side of the dog
5 owner, sometimes I'm retained by a person who was
6 attacked or bitten by a dog.
7 I have been consulted, although not retained,
8 by police departments to review cases that they have had
9 officers involved -- for instance, one case was
10 evaluating the bites received by a police K-9 dog in a
11 deployment where there was a question as to whether the
12 officer had properly deployed the dog or not.
13 Q. I know you do different types of dog cases, so
14 kind of honing in the type of dog case we are on here
15 for today, how many for the use of force have you
16 testified on behalf of plaintiffs?
17 A. I think it's eight or ten, maybe a dozen at
18 this point. That would be both in state and federal
19 courts.
20 Q. Can you give me the details of some of those
21 cases?
22 A. Certainly. For instance, a case in Colorado.
23 A police officer, police officers responded to a case of
24 an uncontrolled dog. The animal control officer was

1 there and took the dog onto a catch pole and secured it
2 and one of the officers then improperly and needlessly
3 reached around, literally around the animal control
4 officer and shot the dog that was contained six times
5 from behind killing the dog.
6 Officers in Texas searched a house on an alarm
7 using it as a training exercise and the two
8 unexperienced officers on sight of the dog who was
9 presenting no threat shot the dog repeatedly and killed
10 it on its bed.
11 Federal officials in New York City were
12 serving an arrest warrant and from a position of safety
13 they shot a dog in the backyard with which they did not
14 have to have any contact at all.
15 Similarly in Nevada, there have been several
16 cases where the SWAT team in more than one jurisdiction
17 have gone in and in one case, for instance, from the top
18 of a fence looking over a fence from an adjoining yard
19 to where they were operating needlessly shot a
20 neighbor's dog because it barked.
21 Q. Do you know the names of any of those cases?
22 A. All of the names of those cases are in my CV.
23 Q. Okay. Have you testified on behalf of
24 defendants in a use of force case involving an animal?

1 A. Testified on behalf of the defendant, you mean
2 the shooting officer?
3 Q. Yes. So for a police department or individual
4 officer?
5 A. No, I have not had to testify in those. There
6 have been a number of cases that I have refused to take
7 when my review of the case showed that the officer was
8 acting what I felt was reasonably appropriately and was
9 doing what had to be done to save lives.
10 Q. Can you describe your education for me,
11 please?
12 A. Yes. I have a bachelor's degree with a major
13 in psychology. I have a master of science degree from
14 the College of Veterinary Medicine at the University of
15 Florida in veterinary medical science, specifically
16 veterinary forensics. And I also have a doctoral
17 degree, a Ph.D., from the College of Veterinary Medicine
18 at the University of Florida in veterinary medical
19 science.
20 My particular topic was investigating the
21 physical evidence and the behaviors involved in dog
22 bite-related fatalities to humans.
23 Q. Can you please list for me the licenses and
24 certifications that you currently hold?

1     A.   I am certified as a certified behavior
2 consultant canine by the Council for Certification of
3 Professional Dog Trainers. I am certified as a
4 certified dog behavior consultant by the International
5 Association of Animal Behavior Consultants. I am an
6 evaluator for the American Kennel Club's Canine Good
7 Citizen Program.
8     I'm thinking of certifications versus courses
9 and so forth. As far as licensing, I have a business
10 license in the state of Florida as a consulting
11 business. That's pretty much the official
12 certifications.
13     I have attended a lot of seminars and so forth
14 that give certificates, but I wouldn't necessarily say
15 that they certified me and so forth. I was until my
16 retirement a certified police officer in the state of
17 Florida.
18     I am also, I have been certified as an animal
19 control officer by the state of Florida, which status I
20 believe is still open even though I'm not actively
21 working as an animal control officer at this time.
22     Q.   Do you hold any other licenses or
23 certifications that have since expired besides the
24 police one you just referred to?

1     A.   I was a certified professional dog trainer. I
2 was certified by the Counsel for Certification of
3 Professional Dog Trainers. But I let that expire and
4 proceeded to the more involved certification as a
5 behavior consultant.
6     Q.   Can you list the professional organizations
7 that you're a part of?
8     A.   Yes. I belong to the Association of
9 Professional Dog Trainers. I belong to the
10 International Veterinary Forensic Science Association.
11 I'm a member of the American Academy of Forensic
12 Scientists. I'm a member of the Animal Behavior
13 Society.
14     I'm a member of -- let me look. There's a
15 bunch of organizations and I want to -- it's in my CV.
16 I don't want to miss a whole lot here. Just one moment.
17 Sometimes it's hard to keep track of everything. So
18 let's see.
19     The American Academy of Forensic Sciences,
20 International Veterinary Forensic Science Association.
21 I'm a Board of Directors member of the Council for
22 Certification of Professional Dog Trainers. I'm a
23 member of the National Sheriff's Association and a
24 member of the President's Committee on Animal Abuse for

1 the National Sheriff's Association. I was a member of
2 the National Animal Care and Control Association,
3 although I think my dues may have expired there.
4     I'm a member of the International Association
5 of Animal Behavior Consultants, the Animal Behavior
6 Society, the Animal Behavior Management Alliance, the
7 Florida Association for Behavior Analysis.
8     I am one of the co-chairs of the Police Dog
9 Encounter Training section of the National Coalition
10 Against Violence Against Animals. I have served on the
11 Board of Directors of the Florida Animal Control
12 Association.
13     I am a member and past president of the Curly
14 Coated Retriever Club of America. That's the parent
15 breed club for my breed of dogs within the AKC. And I
16 used to belong to the Professional Retriever Trainers
17 Association.
18     Q.   I see that you're referring to a specific
19 document. What specific document are you referring to?
20     A.   That's the CV that Mr. Abbas has on file for
21 me.
22     Q.   Are there any other documents that are in
23 front of you today for you to refer to during this
24 deposition?

1     A.   I have a copy of the report I sent in dated 8
2 June 2023. As far as paperwork, I don't have anything
3 else in front of me, although I do have immediate access
4 to the discovery materials in this case and can open any
5 of those documents to which I'm directed.
6     Q.   Do you currently hold any teaching positions?
7     A.   I do teach various classes online and travel
8 to various seminars and conferences. I'm not attached
9 to the staff of any university or educational
10 institution at this time.
11     Q.   What type of classes are those that you
12 generally teach?
13     A.   I teach, I've taught repeatedly a class called
14 the Forensics of Aggression. I teach classes to police
15 departments on the curriculum law enforcement dog
16 encounter training as approved by the Department of
17 Justice that was sponsored by the National Sheriff's
18 Association.
19     I teach classes on dog bite investigation. I
20 teach classes on dog aggression and on working with and
21 dealing with aggressive and dangerous dogs. I teach
22 classes to animal control officers on determination of
23 dangerous dogs and investigation of dog bites in
24 response to dog bite complaints.

1    I've taught obedience classes to both owners
2  and to other trainers.  I've presented seminars on
3  various topics regarding, to trainers and trainer
4  conferences regarding dealing with aggressive dogs,
5  forming treatment plans and rehabilitation for
6  aggressive or allegedly aggressive animals.
7    I've taught police officers on how to
8  investigate police-related dog encounters and use of
9  force.  I've taught smaller classes on the use of less
10  and nonlethal methods in dealing with dogs for police
11  officers.  And also I've taught police officers on the
12  interpretation of canine behavior, body language and so
13  forth, towards keeping them and the dog safe.
14    Q.   What police departments have you taught these
15  trainings to?
16    A.   The most recent department was to the training
17  staff of the Miami Dade Metro Police Department.  I've
18  taught various others, including the Las Vegas police,
19  the Nevada police, groups of police officers and at
20  various conferences from multiple departments.
21    I've taught to a group of police officers at a
22  couple of jurisdictions in Georgia.  I've taught in two
23  jurisdictions in Louisiana.  We are talking about
24  training in Maryland.  I've also taught to police and

1  animal control officers in Australia, in the United
2  Kingdom and in Canada.
3    Q.   You just mentioned that you're currently
4  working on teaching in Maryland.  Have you taught in
5  Maryland yet?
6    A.   No.  That's an upcoming class that we are
7  putting together.
8    Q.   Have you taught any police officers out of
9  Massachusetts?
10    A.   I have not taught in Massachusetts.  I don't
11  know if officers from Massachusetts may have attended
12  trainings elsewhere.
13    Q.   Fair enough.  Have you written any articles or
14  publications in the last ten years?
15    A.   Yes, and those are listed under the
16  publication section of my CV.  But the high points, if
17  you would, would be the Law Enforcement Dog Encounter
18  Training.  And the manual for that is produced for the
19  National Sheriff's Association and DOJ.
20    My doctoral thesis on dog bite related
21  fatalities against humans.  My master's thesis, which is
22  available both through the University of Florida's
23  library on the use of evidence procedures and evidence
24  in investigating fatal dog attacks.

1    I have blog posts that are out there and are
2  referenced.  I've written a few articles, for instance,
3  for the Florida Animal Control Association, their
4  publication.  A couple of others.  As I said, they are
5  listed on the CV.
6    Q.   Is your CV updated to everything that you
7  published?
8    A.   Yes.  Although to include this case, I'll
9  probably be sending Mr. Abbas an updated, up to the
10  minute CV.
11    Q.   Did you co-author a publication known as The
12  Law Enforcement Dog Encounter Training?
13    A.   I was the author of that publication, yes.
14  There was some editing input from another person, and
15  the review of literature contained some input from my
16  co-author for that publication, if you will.  But the
17  curriculum and manual and so forth I was the author of,
18  yes.
19    Q.   When did you write that publication?
20    A.   It was written between about 2017 and 2019 and
21  was released, approved by the Department of Justice and
22  released widely in 2019.
23    Q.   I'm going to share my screen with you.  Can
24  you see the screen?

1    A.   Yes.
2    MS. DAVIDSON:  I'll mark this as Exhibit
3  1.
4    (Document marked for identification as
5  Exhibit No. 1.)
6  BY MS. DAVIDSON:
7    Q.   Is this The Enforcement Dog Encounter Training
8  that you referred to that you published?
9    A.   This is part of the package.  This is the tool
10  kit that contains the review of the literature.  This is
11  a separate document from the primary course and is a
12  separate document from the course manual.
13    This contains work by myself and as I said
14  with the review of literature and some of the guidelines
15  -- or not guidelines -- but there was some contribution
16  in this portion of the program by Chelsea Rider who was
17  an employee of the National Sheriff's Association who is
18  now doing something else.
19    Q.   Do you agree with everything in this tool kit
20  publication?
21    A.   As far as I know, yes.  Everything I looked
22  over prior to publication.  The things I wrote I
23  definitely agree with.  The information contributed by
24  Ms. Rider, I don't remember having any disagreements

1  with her.  So as far as I can tell without, I haven't
2  read over this document in quite awhile, but as far as I
3  can tell, unless some other evidence has come up to
4  change my opinion on something, I stand behind this
5  document.
6      Q.    Are you aware if Massachusetts has any current
7  legislation on police officers receiving training on
8  animal encounters?
9      A.    I don't believe that requirement has been
10 passed.  I know that in multiple states there are bills
11 in progress.  I'm not sure what the progress is at this
12 moment in the state of Massachusetts.
13     Q.    Are you aware if any of that current
14 legislation, does it involve dogs or is it specific to
15 dogs?
16     A.    I haven't looked at the current session
17 documents from Massachusetts.  I don't know what's going
18 on right now.
19     Q.    Do trainings involving animal encounters
20 generally include dogs?
21     A.    Most trainings that I'm aware of regarding
22 animal encounters are focused primarily on dogs.  In
23 rural areas, they may be teaching officers how to safely
24 deal with cattle or horses or snakes and spiders, I

1  don't know.  But the training I'm aware of almost
2  exclusively focuses on dog encounters.
3      Q.    Shifting gears a little bit.  Do you have a
4  background as a police officer?
5      A.    Yes.
6      Q.    When did you first start as a police officer?
7      A.    I started as a police officer in Jacksonville,
8  Florida, in 1977.  I went through the police academy
9  there, served as a patrolman for several years.  And
10 then after about ten years, I was promoted to sergeant
11 in which case I was still out on the street.  And I was
12 in charge of a squad in various positions that ranged
13 from six or seven officers to ten or 12 plus.
14         I was a field training officer supervisor.  So
15 we also had the responsibility for officers in the field
16 training program.  After that, I was promoted to
17 lieutenant and served about 6-1/2 years as a watch
18 commander, which meant I had up to four sergeants and 40
19 officers, plus whatever rookies in the field training
20 program were assigned to my officers during that time.
21 And I retired with full benefits in 1999.
22     Q.    You took care of the next question.  Have you
23 trained any police officers on the use of force?
24     A.    Quite a few.  Since we have been doing this

1  with the law enforcement dog encounters training, I've
2  probably maybe run a couple of hundred officers through
3  that training.
4      Q.    What were the name of those classes?
5      A.    The law enforcement dog and training encounter
6  training classes, along with seminars I gave at various
7  animal control/police conferences and seminars before
8  that.  Plus the pilot trainings during the development
9  of the LEDT class for DOJ.
10         And other particular trainings for individual
11 departments, like the Holly Hill, Florida, police
12 department and Nye County sheriffs.  I've taught in a
13 couple of their academies.
14         The training in the academies in Nevada was in
15 addition to having trained the deputies, all the
16 deputies in that department so that their oncoming
17 officers would receive adequate training during their
18 academy time.
19     Q.    Roughly about how many officers do you think
20 you've trained in the use of force when it comes to
21 dealing with animals?
22     A.    Directly?  Probably about 200, plus or minus a
23 few.  And probably more than that because I also did an
24 online course that's still available for Justice

1  Clearing House, which is available to police officers.
2  And I don't honestly know how many officers they have
3  had complete that training.
4      Q.    Is that a training that's just for police
5  officers?
6      A.    To the best of my knowledge, yes.  It's
7  through a company called Justice Clearing House, and
8  they focus on the police community.
9      Q.    Is it fair to say that your trainings in the
10 use of force have been basically specific to dealing
11 with animals?
12     A.    Oh, yeah.  The classes I've taught on the use
13 of force, although I used comparisons to human
14 situations so that officers understand since they have
15 typically had so much training in use of force against
16 humans so they understand the parallels and they
17 understand that many of the same techniques and less
18 nonlethal tools are just as or more effective with pets,
19 particularly dogs, as they are with humans.
20     Q.    Do you roughly know about how many hours you
21 spent training officers in this area?
22     A.    I couldn't even make an educated guess at this
23 point.  The law enforcement dog encounter training
24 course, for instance, is eight hours on its own.

1    Q.    Does the training consist of classroom and an
2    interactive component?
3    A.    Yes, it does.  The classroom, I do demonstrate
4    techniques during the class, in the classroom.  And a
5    portion of the course is available to departments that
6    own a simulator system by a company called Virtra.  And
7    as part of that segment of the simulator situations, the
8    dog can directly interact or --
9          Sorry, the officers, dogs do too, but the
10   officers can directly in real time interact with live
11   scenarios of different kinds and deploy and make choices
12   based on the situation presented.
13         And those situations can, they do range from
14   responses that are, range from vocal direction.  In
15   other words, "Dog, no, sit," or, "Get your dog," to the
16   actual justified use of deadly force.
17   Q.    Based on your experience, is it fair to say
18   that you have an understanding when police officers are
19   allowed to use force?
20   A.    Yes.
21   Q.    And can you walk me through that a little bit?
22   A.    The use of deadly force is typically across
23   the United States restricted to those incidents where
24   there is a credible and reasonable perception of the

1    threat of severe injury or death to the officer or to
2    another person.
3          Less lethal force deployment varies across
4    jurisdictions, but it's typically recommended as the
5    preferred manner of dealing with threats whenever
6    possible because the mission focus is whatever you're
7    doing to use the minimal force necessary to complete
8    your mission safely.
9    Q.    Have you trained officers when they can use
10   deadly force?
11   A.    During the dog training classes, yes, I
12   explain very clearly that there are times where deadly
13   force, depending on their department's rules and
14   regulations and state and local laws, deadly force may
15   be the appropriate response.
16   Q.    And what did you teach police officers in
17   terms of when they can use deadly force in those dog
18   encounter situations or animal encounter situations?
19   A.    A specific illustration of such a situation
20   would be if the officer comes around the corner and
21   there is a dog directly engaged with a victim that is
22   seriously injured and the attack is continuing.
23         For instance, they run up yelling at the dog
24   and the dog isn't diverting.  If they have a safe shot,

1    if they have a proper backdrop and if it is within their
2    department's policies, that would be a situation where
3    it would be perfectly reasonable to, in my opinion, use
4    deadly force to cease the attack and to save the
5    person's life.
6    Q.    Would that situation change if that victim was
7    being attacked by the dog was a police officer?
8    A.    No.  If the dog was actively attacking and
9    engaged with one of their officers and, you know, a
10   quick response yelling or whatever didn't deflect
11   officer, then again if it's appropriate within their
12   department's rules and the laws of their jurisdiction
13   and if they have a safe shot where the possibilities of
14   ricochet or hitting an innocent civilian or whatever are
15   minimized, then absolutely take the shot.
16   Q.    And in your capacity as a police officer,
17   other than when you were at the range, did you ever have
18   to discharge your firearm?
19   A.    Yes.
20   Q.    And when was that, what were the circumstances
21   of that?
22   A.    All of them were involving human targets.
23   Actually, one was disabling a fleeing vehicle that had
24   hit and run from an encounter with a police officer

1    injuring the officer.  Three of them were in
2    self-defense against armed suspects that were actively
3    deploying force towards me.
4          And two date back to the early days as a
5    police officer when in the state of Florida it was legal
6    and actually kind of trained to shoot people running
7    from felonies.
8    Q.    About how many times do you think in your law
9    enforcement career you discharged your firearm other
10   than at the range?
11   A.    Five.
12   Q.    Have you trained police officers on
13   de-escalation tactics?
14   A.    With animals, yes, that's an essential part of
15   the dog encounter training is how to not only interpret
16   a dog's body language but how to use the officer's own
17   body language, positioning, expressions and so forth to
18   de-escalate a contact between themselves and a dog.
19   Q.    About how many officers have you trained on
20   the de-escalation tactics when dealing with an animal?
21   A.    Going back to the previous number, probably
22   plus or minus 200.
23   Q.    And about how many hours?
24   A.    Again, that class is varying lengths.  The

1    LEDT class itself is eight hours.  The officers that
2    I've worked with directly have gotten probably at least
3    two to three hours of de-escalation training based on
4    their encounters with dogs.
5    Q.    Is that in addition to the eight hours of the
6    LEDT training?
7    A.    That's an essential part of the LEDT training.
8    That would be incorporated in that, along with a
9    continual review at the end of each module of both dog
10   body language and perception of threats and also actions
11   the officers can take to de-escalate the various
12   scenarios, ranging from frightened dog to offensive dog
13   to defensive dog and so forth.
14   Q.    So about how many hours altogether is that
15   training to officers?
16   A.    The full training module is eight hours.  Out
17   of that, we probably spend close to three hours of that
18   one way or the other addressing the de-escalation.
19   Q.    I appreciate that.  Are there any other
20   trainings other than the law enforcement dog encounters
21   training that you've given to police officers about
22   interacting with animals?
23   A.    It all centers around the processes and what
24   became the final product of the LEDT training.  I have

1    again at conferences, for instance, when they have asked
2    me to speak, whether it be the National Sheriff's
3    Association or animal control conferences where police
4    are in attendance, also at legal CLE conferences with
5    prosecutors and police officers.
6    I've taught bits of those techniques to those
7    officers present and to the people present.  So that
8    both the officers and the prosecutors and whoever else
9    attends those legal CLE conferences are aware of the
10   techniques and the trainings that are out there.
11   Q.    Does this training include training police
12   officers on how to interact with aggressive animals?
13   A.    Yes, it includes not only how to properly
14   perceive a dog's behavior as to whether indeed it is
15   showing dangerous behavior and also how to de-escalate
16   those situations and the use of less and nonlethal
17   methods to protect themselves and the public.
18   Q.    And that training does include aggressive
19   dogs, correct?
20   A.    Yes.  It includes -- and the word aggressive
21   is kind of, technically aggression is a set of behaviors
22   that a dog uses to affect its environment.  But what's
23   commonly called aggressive, yes, we very much focus on
24   dogs displaying behaviors that officers may perceive,

1    either correctly or incorrectly, as threat behavior.
2    Q.    Is that the same types of trainings as we had
3    described and gone over earlier?
4    A.    Yes.
5    Q.    And would that be considered wrapped in that
6    training the amount of hours, same amount of police
7    officers trained?
8    A.    Right.  It's all -- an essential part of that
9    training, like I said, is the recognition of an
10   evaluation quickly of a dog's behavior and then the
11   knowledge and understanding of the strategies they can
12   use to de-escalate to avoid or to terminate any kind of
13   a threatening behavior.
14   Q.    Have you worked for an internal affairs
15   division of a police department when you were a police
16   officer?
17   A.    No.  As a lieutenant, I was responsible for
18   investigating complaints about the officers under my
19   command.  Unless they rose to the point of being
20   potentially criminal and then it was turned over to
21   internal.
22   So I've investigated many complaints,
23   including the use of force.  I was not directly assigned
24   to the Jacksonville sheriff's office internal affairs

1    division.
2    Q.    Other than use of force complaints, what other
3    types of complaints with the police officers that you
4    supervised did you investigate?
5    A.    Use of force, interactions with the public.
6    The appropriateness and legality of arrests they made.
7    Their conduct in public.  Use of their vehicles, things
8    like speeding or having accidents.
9    Basically anything that anybody would complain
10   about first would go through me and then based on our
11   guidelines at the time some things had to be referred
12   directly to internal.
13   For instance, if an officer was accused of
14   robbing a Minute Market, that would go directly to
15   internal.  You know, criminal behavior like that, you
16   know.  Less than that, much of that was handled at the
17   mid management level, my level, where I would interview
18   the officers, interview supervisors, interview witnesses
19   and complainants and so forth and then make disciplinary
20   recommendations up the line.
21   Q.    Were you ever involved in, I'm not sure how it
22   was in Florida so let me know if I need to rephrase
23   anything, were you ever involved in any firearm
24   discharge investigations?

1    A.    Yes, I was.  Typically when officers under my
2  command or who were acting, even though they may have
3  been someone else's officer, acting within the area that
4  I was responsible for, I was most often the first or one
5  of the first supervisory personnel on site.
6        And it was my job to make sure that things
7  like the scene was properly being secured, that
8  witnesses were identified and sequestered for interview.
9        To check for injuries, to anyone other than
10  those directly involved, to review the officer's actions
11  initially to be able to guide those that arrived, the
12  detectives and so forth, to those parts of the
13  investigation they needed to be aware of.  Of course,
14  they would work on top of that.
15        But to make sure that if there were any
16  wounded people that they had been appropriately
17  addressed or transported to the hospitals.  And if they
18  were transported, that there were officers present and
19  overseeing them to make sure of their condition and they
20  were getting appropriate aid.
21        Any time a shooting happened involving the
22  police, whether they were the shooters or were the ones
23  being shot at or, heaven forbid, shot, I was one of the
24  first people who was going to be there.

1    Q.    Were you ever one to be the head of an
2  investigation and do interviews of that sort?
3    A.    Investigations on less than criminal
4  complainants.  And then shooting complaints, yes, I ran
5  those in my area all the time.  As far as shootings, I
6  was only the head of such an investigation until the
7  period of time that internal investigations and my
8  commanders got on the scene.  And then they took command
9  of the investigation.
10        MS. DAVIDSON:  I don't know what time
11  exactly you need to go?  Let's go off the record.
12        (Morning recess.)
13  BY MS. DAVIDSON:
14    Q.    Do you have any background as a dog trainer?
15    A.    Yes.
16    Q.    Can you describe that background for me,
17  please?
18    A.    Before I retired from the sheriff's office, I
19  started training dogs obedience and basic manners and so
20  forth when I got a dog and started working with my own
21  dogs.
22        That proceeded to getting involved in
23  obedience competition and dog shows and then eventually
24  field competitions.  And then at the request of others,

1  I started training other people's dogs for competition
2  and did that for several years.
3        I continued doing obedience training for quite
4  a number of years and still do a little bit of that now.
5  So that's about 23, 24 years ago that I started that.
6        As I said, I was a member of the Professional
7  Retriever Trainer's Association because I was competing
8  at national level with my own, with clients' retrievers
9  for competitions.
10        And also during that period of time, I took
11  quite a number of different seminars on dog training,
12  dog behavior, training methods, various subjects within
13  the field.
14        I became a certified professional dog trainer
15  and continued to improve my education, experience.  I've
16  worked as the chief, although the titles were different,
17  the chief of two different animal control agencies.
18        And during that period of time, I worked with
19  some of the dogs that came into our various, into the
20  agencies that had severe problems.  I started with
21  working with aggression problems.
22        But I became interested in and started
23  focusing on and investigating both higher levels of
24  behavior training and also the fatal dog attacks to

1  humans, first in the United States and then the United
2  States and other countries.
3    Q.    Your dog training when it comes to dog
4  obedience and while you were doing, while you were a
5  police officer, were any of those considered K-9s or
6  dogs that were considered officers in the police
7  department?
8    A.    No, they were not.
9    Q.    Do you have any background conducting
10  evaluations of a dog's behavior?
11    A.    Extensive, yes.
12    Q.    Can you describe that background for me,
13  please?
14    A.    I've evaluated, hands-on behavior evaluated
15  approximately 60 dogs who have been involved in killing
16  human beings after the attack looking for causation,
17  contributing behaviors.
18        I've evaluated hundreds of dogs for various
19  rescue groups as far as helping diagnose problems and
20  recommending retraining or recommending frankly whether
21  the dog was likely to be rehabilitatable or not.
22        I've worked several major dog fighting cases,
23  one where we seized 107 dogs from a fighting ring.  One
24  that was in the Caribbean that had 30 or 40.  One out of

1    Canada that was like 34 dogs. Several in a couple of
2    jurisdictions in Florida. I worked with evaluating,
3    that was probably 100 dogs that a rescue had out in
4    Arizona a number of years back.
5            And that doesn't count the many dogs that I
6    either did an evaluation on or was asked to take a look
7    at in the two animal control agencies that I ran. For
8    instance, one of those agencies we took in --
9            For the three years I was there, we took in
10   about 13,000 dogs a year. And I had contact in one way
11   or the other with the vast majority of those. I can't
12   say that I saw absolutely every one.
13           So that right there is probably close to
14   30,000 dogs that I've had experience taking a look at
15   either for adoptability or for safe handling for my
16   staff or any of those sorts of situations. So yeah,
17   I've evaluated more than just a few dogs over the years.
18       Q.    And in evaluating the dogs, does your
19   background involve dealing with aggressive dogs?
20       A.    Oh, yeah. I think you can probably classify
21   all those 60 dogs that have killed people at least as
22   allegedly aggressive. Dogs don't just kill people by
23   just sitting at their feet and taking treats.
24           And then there's several hundred fighting dogs

1    from fighting rings that would at various levels be
2    identified as aggressive. And then in the shelter and
3    rescue environment.
4            Most of the time when I'm asked by an
5    organization or a person to look at a dog, including
6    private clients too, it's because they are having
7    aggression problems.
8        Q.    Have you rehabilitated any aggressive dog?
9        A.    Yes. We have successfully rehabilitated quite
10   a number of, both myself working with clients' dogs,
11   setting up the protocols for others to work with dogs
12   from these cases.
13           Making recommendations and training plans.
14   Working with fighting dogs. The dogs that kill people
15   don't get rehabilitated because most states require they
16   be destroyed. But, yeah, I've rehabilitated and worked
17   with a lot of aggressive dogs.
18       Q.    Regarding training that deals with dogs
19   mainly, I know we talked about the law enforcement one a
20   little bit in detail earlier, but do you deal with any
21   training dealing with dangerous dog cases?
22       A.    I have taught on the subject of dangerous dogs
23   on a number of occasions for animal control officers in
24   various places, including for the National Animal

1    Control Association, the Florida Animal Control
2    Association, the Southeastern Animal Control
3    Association, the Alabama Animal Control Association, the
4    Colorado Animal Control Association. But a number of
5    states, I won't go through them all.
6            But teaching officers how to assess those
7    dogs, how to look at their particular local laws and
8    ordinances as to what behaviors or standards their
9    investigation is held to. All kinds of related subjects
10   around that.
11       Q.    What exactly is a dangerous dog case?
12       A.    It depends on where you live. Dangerous dog
13   is a designation that is established by either state law
14   or local ordinance. So since those are legally defined,
15   it varies from place to place.
16           I don't use dangerous dog as a blanket for a
17   dog that is doing something we don't like. Again, it's
18   a legal standard that has to be met. Some places it's
19   dangerous, some places it's vicious, some places it's
20   potentially dangerous.
21           But that term, again since it's legally
22   defined in most places, it depends on the jurisdiction.
23       Q.    So when you're training on dangerous dog
24   cases, what does that type of training entail?

1        A.    It entails going over the local jurisdiction
2    or the applicable jurisdiction's laws, explaining how
3    those laws would apply to normal and abnormal dog
4    behavior and then instructing the officers on how to
5    interpret and appreciate the dog's body postures,
6    actions, the behaviors, all of those factors so that
7    they can use their observations and investigations to
8    determine whether the animal's actions met the statutory
9    requirements of their jurisdiction.
10       Q.    And have you trained police officers in the
11   area of dangerous dog?
12       A.    Yes. An assortment of them over the years
13   have been part of that. And understand also that in
14   both of the animal control agencies that I ran, I was
15   in --
16           The first one I was the issuer of the legal
17   finding of dangerous. So I would look at my officer's
18   information and then I would determine if the dog was
19   dangerous.
20           And in the second one in Jacksonville, I
21   actually, although the officers did the investigations,
22   I kind of handled it a step back because I was the
23   statutory hearing officer to evaluate the arguments both
24   of the dog's owner and any victim involved and the

1    officers involved to determine whether that dog met the
2    criteria of being legally dangerous.
3         Q.    Have you done any training in relation to
4    criminal cruelty dog cases?
5         A.    Yes, an assortment of that.  Again, many
6    seminars, everything from legal CLE courses to animal
7    control agencies to speaking to public gatherings about
8    animal cruelty and what is animal cruelty and the
9    important maintenance of it.
10         And also with not only police on how to
11    investigate them but on the relationship between animal
12    cruelty and human violence.
13         Q.    So what are criminal cruelty animal cases?
14         A.    Again, it depends on where you are.  Animal
15    cruelty is generally defined by its jurisdiction.
16    Typically it centers around the question of overwork,
17    physical abuse, deprivation of sustenance, shelter and
18    the other requirements for a dog's proper welfare and
19    keeping.
20         The denial, for instance, of veterinary
21    treatment for a dog.  Again, failing to meet its needs,
22    food, water and shelter and so forth.  So the
23    non-accidental -- it's called non-accidental injury
24    within veterinary forensic circles, NAI, so the

1    non-accidental injury or damage to a dog or to another
2    animal.
3         Q.    What does the training in criminal cruelty
4    cases entail?
5         A.    It entails recognizing when an animal may be
6    being treated cruelly.  I teach the proper collection of
7    evidence, things like photographic documentation.
8    Getting documentation and examination by a veterinarian,
9    documenting the crime scene.
10         Interviews with owners, witnesses, actual
11    physical examination of the dog for things like the
12    visible presence or absence of injuries.  The conditions
13    under which the animal was kept, what is called the body
14    condition index, which means is the dog underfed,
15    overfed, properly fed.
16         There's a lot of different things that come
17    together.  And with my work, it intersects very closely
18    over time with veterinary examinations by veterinarians
19    licensed in whatever jurisdiction I'm operating in.
20         Q.    Are police officers trained in this area?
21         A.    The ones that I deal with are.  And the ones
22    that I'm aware of, trainings including our master's
23    program at the University of Florida which has had a lot
24    of both police and animal control officers attend

1    various parts of the class or various classes.
2         So there is extensive training available and
3    it's being presented on a regular basis to police
4    officers and police officers in other states.
5         Q.    What is the proper use of force training in
6    canines?
7         A.    To use the minimum amount of force necessary
8    to protect one's self and others from serious or deadly
9    harm.
10         Q.    Does that training entail what we had
11    discussed earlier in the law enforcement dog encounters
12    training?
13         A.    Yes.  It's also included in the training
14    provided by Chicago Safe Humane back in 2011.  It's also
15    included in the training that I actively participated in
16    in California for the California Committee on Police
17    Officers Standards and Training in 2015.
18         And those other courses around the country
19    that I've been exposed to all seem to center very much
20    on that subject.
21         Q.    So what does the training of use of force in
22    canines entail with all that together?
23         A.    Training the officers to assess the situation,
24    to assess whether the dog is a credible threat to

1    themselves or someone else.  And then the application of
2    the less lethal and nonlethal tools and techniques they
3    already know and possess in order to use the minimum
4    force necessary to defend themselves or another person.
5         Q.    Have you taught police officers on this?
6         A.    Oh, yes.
7         Q.    When have you taught them?
8         A.    Any time I've given the LEDT class or done
9    presentations in seminars for police departments.  And
10    that includes indirectly a number of thousands of
11    officers.
12         Because, for instance, when I trained in Miami
13    Dade, I trained their academy trainers who then turned
14    around and took the presentation, the manual and the
15    training I had given and trained their 6,000 street
16    officers or police officers there.
17         I've trained the officers out in, with the Las
18    Vegas Metro Police Department, with sheriff departments
19    and police departments around the country.  And in a lot
20    of those cases, they then have taken that material that
21    they have been given and passed that along.
22         The course is also available online for free.
23    I don't have a record of how many times that course has
24    been downloaded and deployed.  Perhaps the National

1    Sheriff's Association could give you an idea on that.
2            But police departments are free to take that
3    resource.  It was funded by the NSA and the Department
4    of Justice and dispersed to their officers as they see
5    fit.
6        Q.    Are police officers taught this in the
7    academy?
8        A.    It depends on where you are.  In some places,
9    they are.  In some places, they are not.  That's a
10   department by department decision.  I personally think
11   all academies should be required to teach some form of
12   animal encounter training.
13       Q.    Some police departments, are you aware if it's
14   an extra training they are given outside of academy,
15   like when they have to complete extra trainings
16   throughout the year sometimes?
17       A.    Yes.  For instance, Miami Dade's expressed
18   intentions to me was they were going to train all of
19   their active police officers over a period of time
20   through in-service training and also incorporate that in
21   their academy.
22           In Nye County, since it's a smaller
23   department, it's not 6,000 people, the Nye County
24   sheriff's office, I trained all their officers and their

1    academy staff, who then trained and incorporated it into
2    in their academy training.  They had me come out one
3    time to actually train an academy class.  But since
4    then, their training personnel have taken over that job.
5    So it's in their academy.
6            In states like California, Tennessee, Colorado
7    and some of the others where this training is mandated
8    by the legislature, to the best of my knowledge most of
9    the departments incorporate it in their academy and in
10   their in-service training.
11       Q.    What exactly is a certified behavior
12   consultant?  What exactly do you do?
13       A.    What I do is to use scientific knowledge and
14   so forth to interview, for instance, owners or other
15   people involved to interact with the dog or dogs
16   involved.  To do my best to determine not only what
17   behaviors are problematic for the owners but what
18   behaviors the dog may be showing that perhaps the owner
19   doesn't recognize as being initially a problem but are
20   going to be problems.
21           Then to work with the owners and the dogs to
22   form behavior modification programs.  Pointing the dog
23   basically in the right direction, reinforcing proper
24   behaviors, aiding the owners to set the dog up to reduce

1    or cease problematic behaviors.
2            To analyze, for instance, the relationship
3    between the dog and the human and to advise them on
4    better ways of safely interacting with their dogs.  It's
5    quite a large range of things that we do.
6        Q.    Typically do you do regular consulting as a
7    behavior consultant outside of your expert case work?
8        A.    Oh, yes, absolutely.
9        Q.    Are you still considered a consultant for the
10   Animal Care and Protective Services Department for the
11   city of Jacksonville?
12       A.    I honestly don't know.  We are in the
13   process -- we just had an election.  The mayor is
14   changing.  That status is at the pleasure of the mayor.
15   She will be inaugurated in July.  Right now it's a
16   matter of transition.
17           The initial contracted period was over I think
18   like a year ago, but they still have the ability to call
19   me.  I'm not sure technically what my status is.  For
20   about a year, I was actually, although I was labeled the
21   division management consultant, I was the acting chief.
22           The reason it wasn't called that is because as
23   a retired police officer from the Jacksonville Sheriff's
24   Department, there are local statutory limits to a city

1    being able to take a retired technically city employee
2    and rehiring them for another position.  So we had to
3    make it as a consultant.
4        Q.    Understandable.  When you were consulting for
5    the Animal Care and Protective Services Department for
6    the city of Jacksonville, what did your work there
7    entail?
8        A.    For the first year, it included overseeing all
9    animal control operations, overseeing all shelter
10   operations.  Working with and technically overseeing,
11   although I defer to their professional status, my
12   veterinarians and the processes of our rather large
13   fraternity hospital and practice there within the city's
14   animal control division.
15           I oversaw the field officers.  I did
16   additional training for the field officers when I
17   realized they had deficits in their previous experience
18   or training.  For instance, guiding them through dog
19   fighting and a major cock fighting investigation and
20   charges and convictions.
21           Making sure that they were properly trained in
22   search and seizure and when they could and could not
23   just simply take someone's dog or the process for doing
24   so.  I trained them more additionally in dog bite

1 investigations. I guided their dangerous dog
2 investigations.
3 And again, I sat as the hearing officer
4 whenever such a determination was appealed. I
5 interacted with the city council, the mayor's office,
6 the news, on animal issues. I worked with the local
7 Humane Society and other Humane Societies and rescues
8 and so forth around the country in trying to assist
9 getting our dogs and their dogs adopted when safe.
10 Basically the spectrum of animal control and
11 shelter operations. I worked with the veterinarians
12 when we had cruelty cases come in to make sure that we
13 were gathering the proper evidence and assessment and
14 properly documenting that and presenting it to the state
15 attorney's office.
16 And then after I was, after they replaced me
17 with a permanent chief, then I was still available and
18 conducted assistance on complicated investigations,
19 complicated cruelty cases. I did some more training for
20 their staff as needed. So a lot of stuff.
21 Q. What are animal crime investigations?
22 A. Any investigation that deals with an animal
23 being the victim of some sort of unlawful activity.
24 Q. Do you do any trainings in that area?

1 A. That's kind of what all the cruelty and dog
2 fighting and so forth investigations are. I mean, those
3 are all animal-related crimes. If someone has tortured
4 an animal or killed an animal or abused an animal or is
5 using dogs for fighting or using chickens for fighting
6 or, heaven for bid, they are fighting horses or
7 something, yeah, those were all animal crimes.
8 Q. What is your experience in animal fighting
9 cases?
10 A. Again, I have assisted in the investigation of
11 quite a few. Before that, I've been through repeated
12 trainings from groups as disparate as the ASPCA, the
13 Humane Society of the United States, attorneys,
14 prosecuting groups and national experienced personnel
15 and people, including courses presented by the then
16 assistant attorney general of Virginia and others,
17 judges and so forth.
18 And then I have been actually on scene with
19 the police on probably a dozen animal fighting cases.
20 The complaints we got in Jacksonville while I was the
21 division management consultant there, I would go in with
22 the police and basically guide their investigation
23 saying we need to do this, no, we can't do that, this is
24 evidence that we need to collect and so forth. I've

1 been very, very heavily involved in that.
2 Q. Do you train in that area?
3 A. Yes, I do train in that area. I have taught
4 and continue to teach classes to both animal control and
5 to police departments on what dog fighting is, what they
6 should be looking for and principles such as gathering
7 the totality of evidence to establish the dog fighting
8 is actually or was actually occurring.
9 Q. I know you said that you trained officers on
10 how to use excessive force on animals, specifically
11 dogs. How are the officers trained?
12 A. We discuss --
13 MR. ABBAS: Can you rephrase that
14 question? Can you repeat it?
15 MS. DAVIDSON: I said I know he testified
16 that he has trained officers on how to use excessive
17 force on animals or how not to use excessive force on
18 animals.
19 MR. ABBAS: Thank you.
20 BY MS. DAVIDSON:
21 Q. How do you train the officers to not use or --
22 A. We start with training them to understand the
23 likely purpose of the dog's behavior and to recognize
24 the difference between threat behavior and non-threat

1 behavior. And then we start with the same principles we
2 use with human use of force.
3 That is the use of mere presence and what you
4 can do simply presenting yourself, body positioning,
5 body language, where to look, how to stand and so forth
6 to de-escalate or prevent a negative encounter. We then
7 wrap in the use of voice presence, which is the next
8 step on the force continuum. "No. Sit. Go home."
9 Those sort of direct statements.
10 From there, I also teach the use and the
11 awareness of, for instance, physical barriers. Like if
12 the dog is behind the fence, close the gate. Then you
13 don't have a problem. If you need to or if you think
14 you're going to need to, look around for objects and
15 strategies to block yourself from contact from the dog.
16 Then step up to using less and non-lethal
17 tools, such as using a baton to maintain space between
18 yourself and the dog. Because the dog if it's going to
19 bite typically will bite the closest object to it.
20 So whether it's a standard baton or
21 collapsable baton, by extending it out in front of you,
22 you can use that object to keep the dog way from you and
23 perhaps to guide it into a more controlled situation.
24 We then proceed with using things -- the next

1 step up would be pepper spray or Oleoresin Capsicum. OC
2 spray is the common term within law enforcement. And we
3 explain the high effectiveness of that when dealing with
4 dog encounters as established by studies such as the
5 Baltimore police department.
6 They found it was nearly 100 percent effective
7 in deterring aggressive encounters or aggressive dog
8 encounters. How to deploy it. Show videos actually of
9 its effectiveness and that it does work. And cautioning
10 the officers on how to deploy it without contaminating
11 themselves unnecessarily or at all if possible.
12 And then proceed from that to the conducted
13 electronic weapons or TASERs and the methods for
14 deploying those and the extreme effectiveness of those
15 not as a capture but as a defensive tool.
16 Because typically, and I've never seen them do
17 otherwise, when a dog is tased, its first response is to
18 drop immediately like a sack of bricks. And as soon as
19 the electronic impulse is discontinued, the dog
20 typically heads for the horizon in whatever direction it
21 can find to absent itself from the situation.
22 And then if those don't work, I explain the
23 safety concerns with and the proper deployment of
24 firearms, including the fact that they should not be

1 shooting at a head because that is a rapidly moving,
2 very heavily armored target, a dog's skull can be very
3 thick, but to aim for center of mass and to be aware of
4 backdrop. Because the dog is a smaller organism, so
5 there's a higher possibility of a pass-through shot.
6 And then they have to worry about a ricochet
7 or the disposition of the round once it goes through the
8 dog. I warn them that gunfire may or may not be
9 effective in turning the dog, especially immediately
10 because, like with people, there are plenty of dogs who
11 have been shot and continue for varying periods of time
12 with the ability to threaten or injure someone.
13 So I teach them shot placement and what
14 reasonable expectations of using the firearm are and the
15 risk to civilians, to other animals and to other police
16 officers and so forth.
17 Q. I know we have discussed the word aggressive
18 earlier and you made a comment about it. What did you
19 mean when you were describing aggressive behavior of a
20 dog?
21 A. Aggression is technically a cluster of
22 behaviors that an animal, in this case a dog, uses to
23 affect its environment. It's often related to survival
24 or defense against a perceived threat or involving the

1 protection of resources of one sort or another, which
2 could be a location, a person, its puppies, its food
3 bowl. But the protection of resources.
4 There is not a single aggressive behavior.
5 Barking, for instance, is not by itself aggressive.
6 Barking is communication. It's how a dog vocalizes. It
7 may be saying I'm a threat or it might be saying, Hi,
8 dad, can we go play, can you throw the ball for me.
9 Growling is a vocalization that in itself is
10 not a threat, it's communication. The dog may be saying
11 I'm uncomfortable, I don't feel good, don't touch me
12 there. Or it may be saying I perceive you as a threat
13 or as a social rival when dealing with another dog.
14 They are transmitting the message I want this
15 situation to de-escalate, please check your guns at the
16 door and let's discuss this. Showing teeth may be, in
17 some cases may be part of the progression of threat
18 behaviors by a dog or in the case of some dogs they may
19 be just smiling.
20 I've had several dogs that when they are doing
21 something they enjoy, they just show their teeth and
22 smile. We have to be able to pick that single behavior
23 out of the circumstances around the dog's action.
24 Running in a particular direction, running at

1 someone, it may be part of the aggressive cluster or it
2 may be part of the associative and affiliative behavior
3 of a dog wanting to come play. Hackles up usually
4 displays an uncomfortable mental state for that
5 particular dog but that may be offensive or defensive.
6 Tails in various positions.
7 None of those behaviors by themselves are
8 necessarily dangerous or only show aggression. Even
9 putting teeth on someone doesn't necessarily show
10 aggression. For instance, you can have a dog that sees
11 your toddler heading out the door and runs over and
12 grabs them by the coat or grabs them by the arm with
13 their teeth under control to pull them away from
14 something they perceive as a threatening situation.
15 Q. *Do you train police officers to be able to
16 determine if an animal is showing aggressive tendencies?
17 A. Yes. Your output volume is a little low. Can
18 you turn up the mic or bring it a little bit closer to
19 you?
20 Q. It could also be my voice because my allergies
21 are bothering me.
22 A. I understood. I've turned you up, but I want
23 you to understand so that the court reporter, for
24 instance, doesn't go, "What?"

1    Q.   I appreciate that.

2    **A.   Go ahead and run the question by me again.**

3          MS. DAVIDSON:   Pat, can you read that one

4   back?

5          (*Court reporter reads back noted

6   testimony as recorded.)

7   BY MS. DAVIDSON:

8    **A.   The answer to that is absolutely yes. And**

9   **that includes using videos to show the differences**

10   **between threatening behavior and nonthreatening behavior**

11   **that might be confused by someone. It includes in one**

12   **portion of the class and I've used it outside of the**

13   **class a video of a dog charging directly at a police**

14   **officer that's very brief, but by that time in the**

15   **class, the officers are very skillful in interpreting**

16   **whether that's a threat in half a second or less.**

17    Q.   You answered the next question. You have your

18   report. I'm going to share my screen again to ensure

19   that it is and mark it as an exhibit.

20          (Document marked for identification as

21   Exhibit No. 2.)

22   BY MS. DAVIDSON:

23    Q.   Can you see the screen?

24    A.   Yes, I can.

1    Q.   Normally I would ask what your opinions are in

2   this case, but it appears that you have many of them

3   that were listed. I think that the most efficient way

4   to go through this is to go through your report in a

5   way. I'm going to take it down, but if you want it up

6   to refer to it, I'm happy to do so.

7          First, I did notice on your report that you

8   marked it's a preliminary expert report. I was

9   wondering why that is?

10    **A.   Due to the fact it's always possible that**

11   **between the date I issued the opinion and the date that,**

12   **the day or date that we go to trial or firm things down**

13   **or whatever, if substantial evidence is introduced that**

14   **I did not have the opportunity to examine, you know, for**

15   **instance, Oh, by the way, there was also three people**

16   **shooting at the officer from on top of a roof and we**

17   **forgot to mention it to you, any additional information**

18   **I reserve the right to consider both for or against the**

19   **officer's actions.**

20    **And if something like that, you know,**

21   **hypothetically if someone had claimed this was a dog and**

22   **suddenly we find out it was a 200 pound tiger instead of**

23   **a dog, that they just misspoke, then I would potentially**

24   **change my opinion. That's why I say preliminary. It's**

1   not over until the whatever sings. So anything that's

2   introduced later that might affect those opinions in

3   fairness I'm going to consider.

4    Q.   Have you done any other reports in this case

5   besides this one?

6    **A.   Not at this point, no. That's just the report**

7   **I've completed.**

8    Q.   And to be clear, is this report that we have

9   marked as Exhibit 2 the report that you've done in this

10   case?

11    **A.   This is the report that I've submitted in this**

12   **case to date, yes.**

13    Q.   Just for the record to be clear, do you recall

14   the name of the dog that was involved in this incident?

15    **A.   The name that I was given was Chyna. And that**

16   **was represented as the name of the dog involved in the**

17   **incident, the name of the dog that was featured in the**

18   **photographs provided by the Boston police department.**

19   **And as best I can determine, that is the name of the dog**

20   **involved.**

21    Q.   As per your first opinion, is it your opinion

22   that Officer Smith used excessive force when he shot

23   Chyna?

24    A.   Yes.

1    Q.   And is it your opinion that Officer Smith used

2   needless force when he shot Chyna?

3    A.   Yes.

4    Q.   And when you say needless, what do you mean by

5   that?

6    **A.   What I mean by that is that there were other**

7   **effective and safe options that would have produced at**

8   **least as good a response as the use of deadly force did.**

9   **And that as such, he did not need to use that force as**

10   **it was not his only option and was not even necessarily**

11   **the best option.**

12    Q.   What is your basis for this opinion that you

13   believe that Officer Smith used excessive and needless

14   force?

15    A.   Yes.

16    Q.   What is the basis for that opinion?

17    **A.   The basis? There were other options that were**

18   **available that he was in possession of, including OC**

19   **spray. There were other strategies he could have**

20   **followed, such as using verbal direction to the dog as**

21   **to perhaps -- it was right next to his vehicle, so maybe**

22   **jumping up on his car, getting in his vehicle.**

23    **Other strategies such as -- he hasn't**

24   **mentioned it, but if he had a clipboard in his hand or a**

1  flashlight that he could have used to establish space
2  between him and the dog. There were a number of other
3  strategies that he did not even try to deploy.
4         And I also have questions that he may have due
5  to the lack of training and experience misinterpreted
6  the actions of Chyna as being aggressive when they were
7  simply a natural and normal response to the situation
8  that was present then.
9    Q.   In your review of documents in this case, did
10  you review the Boston police department Defensive
11  Tactics Manual?
12    A.   I believe that was provided. I don't remember
13  the document specifically as being presented as a
14  separate manual.
15    Q.   Did you review the Boston police department
16  Defensive Tactics Manual?
17    A.   I reviewed whatever portion of that was
18  included in discovery. There was not a document that
19  was titled Boston police department Defensive Tactics
20  Manual. There was, there were various groups, and I'm
21  looking through right now to double check.
22         There were Officer Smith's answers. There was
23  an extensive set of scans that included some policies.
24  I'll tell you just a second here which policies were

1  included. But I did not receive in discovery a file
2  identified as the Boston police department Defensive
3  Tactics Manual.
4    Q.   Okay.
5    A.   So apparently the department did not provide
6  that manual.
7    Q.   That would have been whatever your attorney
8  gave you. That's not on me. What facts are you --
9         MR. ABBAS: To clarify, I don't represent
10  the witness.
11         MS. DAVIDSON: Right. Let's go off the
12  record for a second.
13         (Off the record discussion.)
14  BY MS. DAVIDSON:
15    Q.   What facts are you relying on to form your
16  opinion that Officer Smith used excessive, needless
17  force when he shot Chyna?
18    A.   I'm relying on the fact that no one was
19  injured. Officer Smith did not seem to have been in
20  imminent danger of serious bodily injury or death. That
21  he had other strategies to use, such as the OC spray
22  that he did not disclose to the initial Boston police
23  department internal investigator.
24         That there were other less catastrophic

1  tactics that could have been used and should have been
2  used and that as such not only do I believe that it was
3  needless for him because he was not credibly in that
4  threat of serious injury or death, but he also had not,
5  as the segment of the Boston police department policy
6  that was provided to me stated, had not exhausted all
7  other options before using deadly force.
8         He did not -- again, based on the reports, he
9  did not present the fact to the internal investigator
10  that he was in possession of another effective and safe
11  means of intervening in this case.
12    Q.   How long should it take a police officer to
13  assess whether a dog has any aggressive tendencies?
14    A.   Based on my experience with the videos that I
15  run, the typical response of officers is around or
16  slightly less than half a second.
17    Q.   To be clear, can a police officer sense
18  whether a dog is aggressive or showing aggressive
19  tendencies in a matter of seconds?
20    A.   Absolutely. There are very, and we teach it,
21  there are very easy what I call checkpoints regarding
22  the position and what the dog is doing with eyes, ears,
23  mouth, tail, body movement and so forth. So that can
24  all be done, just like with human threats, in a very,

1  very brief moment.
2    Q.   Would you agree with me in every circumstance
3  it may not always be possible for a police officer to
4  assess whether a dog is aggressive in a matter of
5  seconds?
6    A.   I would have to say that in the vast majority,
7  I can't say all because there's no such thing as all,
8  but I would say that in the large, vast majority of
9  situations, it's possible for a police officer or any
10  other reasonable person to very, very rapidly make an
11  initial assessment of what a dog's behavior is showing.
12    Q.   And you would expect that initial assessment
13  to be done in a matter of seconds?
14    A.   A matter of seconds or less. Again, it's
15  very, very quick.
16    Q.   If someone was not trained to determine that,
17  do you still think a normal, reasonable person should be
18  able to determine if a dog is expressing aggressive
19  tendencies in a matter of seconds?
20    A.   I think that a reasonable person can and very,
21  very often does make a quick determination on the
22  behavior of a dog. I think that a professional such as
23  a police officer who has been trained in interpreting
24  threats from humans should be able to analogously

1 transfer that behavior to an animal.
2     And since the police officer practices threat
3 assessment over and over and over in their training,
4 they should probably be able to assess that potential of
5 threat more quickly than a simple member of the public.
6     Q.   But it could potentially take a police officer
7 a minute or a little bit longer than seconds to realize
8 he may be dealing with an animal that is aggressive,
9 right?
10     MR. ABBAS: Objection to form.
11 BY MS. DAVIDSON:
12     A.   A police officer should not be making
13 assessments that are that incorrect. It is simple and
14 easy, even with simply having observed pet dogs walking
15 around the street or in the pet food store, whatever,
16 the basic principles of appreciating dog behavior should
17 be recognized by just a reasonable person.
18     After all, over 60 percent of the households
19 in the United States are listed as having dogs present
20 in the household. The police officers go to houses
21 where there are dogs and/or cats or whatever all of the
22 time.
23     Walking down the street as a breathing human
24 being, we encounter pets all the time. So that

1 assessment should be very quick no matter what training
2 was not provided appropriately by the police agency.
3     Q.   Would you agree with me that there are some
4 circumstances that a police officer might not ever know
5 that they are dealing with an aggressive animal?
6     A.   I can't imagine such a circumstance. I mean,
7 unless the officer was asleep or with their eyes closed
8 and couldn't hear anything, I can't imagine a situation
9 where a living, breathing, adult human being in our
10 society would not have some idea of the difference
11 between or to misappreciate the difference between an
12 aggressive dog and a nonaggressive dog.
13     Q.   In your experience, are aggressive animals,
14 specifically dogs, capable of harming police officers?
15     A.   Yes.
16     Q.   Based on your experience, if a dog is charging
17 at a police officer from 5 feet away, does that police
18 officer have a right to use deadly force?
19     A.   In such a hypothetical where a dog is only 5
20 feet away when initially seen and the dog is presenting
21 behaviors, an officer has the responsibility to
22 appreciate whether the behavior is aggressive or not.
23 An officer always has the right to defend themselves.
24     It's a matter of whether that defense is

1 predicated on a reasonable assessment and knowledgeable
2 understanding of the situation. The standard that's
3 currently been applied in federal courts in my
4 experience has been, What should a well-trained,
5 reasonable police officer have done? It's a higher
6 standard that civilians.
7     Q.   I want to use the hypothetical a little bit.
8 Let's say it's a dog that's showing aggressive
9 tendencies charging at a police officer from 5 feet
10 away, does that police officer have a right to use
11 deadly force?
12     A.   A police officer always has a right to defend
13 themselves. The amount of force used that is considered
14 reasonable, proper or needed varies from situation to
15 situation. And as I've said, aggression is not a single
16 behavior. So the act of simply approaching a person
17 rapidly is not by itself a sign of aggression.
18     Q.   So if there were aggressive tendencies as we
19 have discussed today on top of the charging, would a
20 police officer -- if the dog was charging at the police
21 officer from 5 feet away, would they have a right to use
22 force?
23     MR. ABBAS: Objection. Form. That's open
24 ended. I'm having trouble following it.

1 BY MS. DAVIDSON:
2     Q.   If the dog displayed aggressive tendencies,
3 more than one aggressive tendency I should say, and was
4 charging at the police officer from 5 feet away, would
5 that police officer have the right to use excessive
6 force?
7     MR. ABBAS: Are you assuming that the dog
8 is not a lap dog, like a poodle?
9     MS. DAVIDSON: If the dog has aggressive
10 tendencies.
11 BY MS. DAVIDSON:
12     A.   I'm going to have to break that into pieces to
13 adequately answer. No. 1, aggressive tendencies is not
14 something that has a definition. There are no nets in
15 which to catch aggressive tendencies. There are
16 behaviors that are included in the aggressive cluster of
17 behaviors.
18     Secondly, the question, a very applicable
19 question would be you're saying at 5 feet. Are you
20 saying that the officer did not see and had no awareness
21 of the dog before it was 5 feet away?
22     Third, you asked if the officer could use
23 excessive force. Officers can never use excessive
24 force. They can use proportional and appropriate force.

1  So do you want to try to say the question a little bit
2  differently?
3       Q.    If a dog was growling and showing its teeth
4  and charging an officer from 5 feet away and that's the
5  first time the officer had seen the animal, would that
6  officer have the right to use deadly force?
7       A.    The officer would be better served by using
8  some other sort of intervention due to the inherent
9  risks that all of us police officers are taught when
10  engaging in deadly force.
11            In that situation, the chance of the officer
12  being killed by a dog, being a healthy adult person with
13  other people around, is nearly zero.  No one, no police
14  officer has ever been killed due to the injuries
15  received by a dog biting them in that situation.
16            Nor has any police officer died from a dog
17  attack with any complications since 1932 except for one
18  officer who did not die from the dog bite but died from
19  an allergic anaphylactic reaction to the vaccine.
20            So ruling it as a threat of deadly force is
21  completely and totally unreasonable and unsupported by
22  data.  As far as injury, the department has to establish
23  and has in the case of Boston a standard for using
24  deadly force and states clearly in their policies that

1  that may only be used when other forms of protection
2  have been exhausted.
3            So I would say that under the situation, even
4  the hypothetical, had it happened in the city of Boston
5  by someone controlled by the Boston police department's
6  policy, that would be excessive and improper.
7       Q.    Based on your experience, if a dog is charging
8  at a police officer from 5 feet away, does that police
9  officer first have to assess whether the dog is showing
10  any aggressive tendencies?
11            MR. ABBAS:  Objection as to form.
12  BY MS. DAVIDSON:
13       A.    Yes.  And as I've said, that could take a very
14  short period of time.  So an initial simply eyeball
15  assessment provides important and essential information
16  in making an assessment of why that dog and if the dog
17  is even "charging" at them.
18       Q.    Do you train police officers to assess whether
19  the dog is aggressive or not before they use force?
20       A.    Yes.
21       Q.    How much time should an officer spend in
22  analyzing whether the dog is aggressive before defending
23  himself?
24       A.    As I've said, the appreciation of threat

1  behavior from a dog can be conducted in less than a
2  second.  So that seems to be a reasonable period of
3  time.
4       Q.    You've been trained on how to use a gun as a
5  police officer, correct?
6       A.    Extensively.
7       Q.    About how long does it take to pull the
8  trigger of a gun generally?
9       A.    Pulling the trigger, if the gun is already
10  unholstered and is pointed in the general direction,
11  takes fractions of a second.
12       Q.    *Would you agree with me that in the amount of
13  time an officer spends assessing whether a dog is
14  aggressive or not, that that dog could have already bit
15  the officer?
16            MR. ABBAS:  Objection as to form.
17  It's calling for speculation and it's a hypothetical
18  already without describing -- I understand you're going
19  for examples, but without any context, it's calling for
20  more speculation.
21            (*Court reporter reads back noted
22  testimony as recorded.)
23  BY MS. DAVIDSON:
24       A.    From a distance that was in your hypothetical

1  5 feet, no.
2       Q.    Is it your opinion Officer Smith failed to
3  consider whether Chyna was aggressive or not?
4       A.    It's my opinion that in the period of time
5  that he had to observe the dog coming as he described,
6  away from the staircase, crossing the sidewalk, crossing
7  the street and approaching him within 5 feet, it's my
8  opinion that he failed to adequately and properly assess
9  the dog's behavior and instead reverted to what was
10  probably an habitual response in going for immediate
11  deployment of deadly force even though it was
12  unnecessary and excessive.
13       Q.    Are there any circumstances under which there
14  may not be time for an officer to assess whether a dog
15  is aggressive?
16       A.    Certainly.  A dog, for instance, could be
17  standing directly next to or in contact with an officer
18  and suddenly show threatening behavior.  And at that
19  distance, you know, there would be no time for the
20  officer to assess that dog's change in behavior.
21       Q.    Are there any other circumstances?
22       A.    I can't think of one that would apply to this
23  circumstance, no.  We have a dog that was observed from
24  some distance away and that took a period of time to

1 close the distance to the officer. And that period of
2 time gave the officer time to not only assess the dog's
3 behavior but to form an alternate safer and reasonable
4 response.
5     Q.   So in your view, at what point should Officer
6 Smith have considered whether Chyna was displaying
7 aggressive tendencies?
8     A.   From the very moment he saw it.
9     Q.   How would he have determined whether Chyna was
10 displaying aggressive tendencies?
11     A.   By examining all the factors, including what
12 her face was doing, what her tail was doing, how she was
13 moving, whether she was actually coming at him or going
14 past him. All of those factors should have added into
15 the assessment of whether force, much less deadly force,
16 was necessary.
17     Q.   Is it your opinion that Officer Smith's
18 decision to discharge his firearm at Chyna -- is it your
19 opinion that Officer Smith's decision to discharge his
20 firearm at Chyna was inconsistent with police practices?
21     A.   It's my opinion that in this situation,
22 Officer Smith's decision to discharge his firearm was
23 inconsistent with what I have been provided as the
24 Boston police department's policy.

1     Q.   And why do you think that?
2     A.   Because the Boston police department policy
3 stated, I can find my note right here, the discharge of
4 a firearm by a member of the department is permissible
5 only when there is no less drastic means available to
6 defend one's self or another from unlawful attack.
7 That's pretty clear.
8     Q.   So I believe I have listed opinion two. I put
9 them together in some weird way. I think this is
10 probably item three. In your opinion, is it your
11 opinion that Officer Smith failed to use any form of
12 less or nonlethal force towards Chyna before escalating
13 to deadly force?
14     A.   Yes.
15     Q.   And what is the basis for that opinion?
16     A.   In the reports by the other officers, in his
17 interview with the internal investigators and even his
18 deposition, he never once mentions trying to use the OC.
19 In fact, he omitted mentioning that to the initial
20 investigators, that he was carrying it.
21     He never mentions that he tried to use a baton
22 or OC. The only thing he states is that he stepped
23 backwards. But that in itself is not an adequate
24 intervention.

1     Q.   What do you train officers to do when they
2 encounter a dog?
3     A.   First, stand still. Because most times a
4 rapidly approaching dog -- dogs have personal space just
5 like people do. Those of us who are police officers
6 probably have a little bit bigger space than someone who
7 is a civilian who is all huggy and friendly. Dogs have
8 a personal space.
9     Typically when a dog does rapidly approach
10 someone, especially if its in a position where the dog
11 perceives a threat or is trying to protect resources,
12 the dog typically comes up to four or 5 feet away and
13 stops and barks and threatens and displays that warning
14 behavior.
15     Because it would be contraindicated for
16 survival for dogs to, especially with a perceived threat
17 larger than them, to automatically engage. A dog's
18 purpose in displaying those behaviors is to gain space
19 from whatever it's protecting or its own self or
20 whatever, to gain space and to make the threat go away.
21     The next response to a dog, if the threat is
22 perceived as more virulent, if you will, or bigger than
23 them would be if the dog can't make the threat go away,
24 typically it then tries to find a way to get out of the

1 situation depending on the value of what it's
2 protecting, if you will.
3     So any animal, including humans, is using good
4 judgment and doesn't have to do something else, if
5 something bigger and scarier than it comes at it, its
6 preferential response is to run away. If it's
7 protecting a resource, then the animal has to decide
8 whether the resource is worth the survival risk of
9 getting injured or killed.
10     And as such, the dog typically runs out and
11 stops to see if less than direct contact is going to
12 drive the potentially perceived threat away. And then
13 the dog using the progression of force will most often
14 engage briefly, in other words quick, limited, moderated
15 bite and then back up to see if they have succeeded in
16 making the scary thing go away.
17     Q.   Does the training of officers encountering an
18 aggressive dog differ from the training given when they
19 are just encountering a dog?
20     A.   I believe -- in my experience, the training on
21 encountering dogs is pretty much assuming that the dog
22 could potentially be a threat. And the training is or
23 should be focused on perceiving that threat correctly
24 and methods less than lethal force to address that

1  potential problem.

2  Q.    Do you teach officers defensive tactics when

3  they are encountering a dog?

4  A.    Yes, I teach the use of a baton to gain space.

5  I teach the method and use of deployment of OC spray.  I

6  teach them the mechanics and appropriateness of the use

7  of the conducted electrical weapon.  And as I said, I

8  also teach the best recommendations on use of deadly

9  force if necessary.

10  Q.    What type of force is recommended to use on a

11  hostile animal?

12  A.    If the animal is actually hostile, then just

13  like with humans when they are hostile, one uses the

14  least amount of force necessary to either defend one's

15  self or to in the case of a human to effect an arrest,

16  for instance.

17       We don't shoot people -- if we tell someone to

18  put their hands behind their back and they slow down

19  just a minute, we don't automatically shoot them.  We

20  instead use the minimum force necessary to effect that

21  arrest.

22       With a dog, we use the minimum force necessary

23  to make the dog run away since -- unless you're an

24  animal control officer and then your job is to capture

1  the dog, not to kill it.

2  Q.    Does the type of force that is used differ per

3  animal?

4  A.    Absolutely.

5  Q.    So when we are talking about it, you're mainly

6  referring to dogs, correct?

7  A.    Yes.  For instance, I don't know if OC spray

8  would work on a charging rhinoceros.  No idea.

9  Q.    I want to go through all of the types of force

10  that you have mentioned or the de-escalation tactics.

11  You teach officers to use verbal commands?

12  A.    Yes.

13  Q.    And how do you teach them to use verbal

14  commands?  Can you explain that type of training?

15  A.    Very simply, the first place to start would be

16  to tell the dog no or go away or go home.  Also very

17  effective sometimes is just looking at the dog and

18  telling them to sit.  Because lots of times dogs have

19  been trained by their owners to sit.

20       And if the dog is doing one thing and you tell

21  it to sit, it's very likely if the dog has been trained

22  to sit and then try to figure out what's going on.

23  Because you've just changed the complexion of the

24  situation from them perceiving you as a stranger and

1  maybe a threat, maybe not, to someone that's telling

2  them to do something they no longer do.  Okay, I'll sit.

3       So, yeah, using just like we would use with a

4  human being, Sir, you're under arrest, put your hands

5  behind you, or Raise your hands, or Comply with what I'm

6  telling you.  That's the easiest, lowest force way of

7  doing something.

8  Q.    Just so the record is clear since it's not

9  going to pick up on how you're saying things

10  unfortunately, when you teach officers how to use verbal

11  commands, are you using I guess your voice in more of a

12  stern tone?

13  A.    Yes.  Within the police environment, the use

14  of what is called the command tone or command voice is

15  very widely known and used by probably most police

16  officers most days in most places.

17       It's kind of like the mom voice that you know

18  between the time mom asking you to do something and

19  telling you, Do it now, usually accompanied by your full

20  name.  Police officers know that.

21       So, yes, I teach them keep your command brief,

22  make them stern if you will, use your command presence

23  and make them specific.  Don't have two officers

24  standing there one saying sit, one saying down, like

1  officers standing there and saying, "Raise your hands,

2  put them down, don't move, move."  We don't want to

3  confuse things.

4  Q.    What is the next tier, the next tactic that

5  would be used?

6  A.    As part of that verbal command, I also teach

7  the awareness of and the changing of body position.  For

8  instance, if you are directly facing a dog frontally,

9  that to a dog can present a threat posture.

10       But if the officer turns or blades their body

11  45 degrees like they are taught to do in many, many,

12  many situations, such as speaking to a potential

13  suspect, dealing with a noncompliant person, if they use

14  that, it happens that that change of body position is

15  the change that dogs also use and understand in that it

16  sends what we generally call an appeasement or

17  de-escalation signal.

18       It says in dog terms I don't want to challenge

19  you.  I don't want to fight.  I'm not necessarily going

20  away, but I don't want to escalate this.  In fact, let's

21  start negotiating a de-escalation.

22       At the same time, I teach the officers to not

23  look the dog directly in the eyes because that is a

24  challenge between dogs and other creatures, but to look

1  perhaps at their shoulder or just past them so the dog
2  does not perceive a threat there.
3          I also teach them if their hands were up or
4  moving around to keep them closer to their body.  A, so
5  they can deploy less lethal tools if needed; but B, so
6  they present both a smaller target and a less
7  threatening appearance to the dog.
8          So those tactics kind of go at the same time
9  as the verbal.  Things like making sure that you're not
10 deliberately showing your teeth, that you're not making
11 forward movements or really moving at all but instead
12 you are standing your ground and you are telling the dog
13 in terms the dog understands that you're not intending
14 to be a threat.
15     Q.    What would be the next tactic that is taught?
16     A.    If you have an object such as a baton or a
17 clipboard or you can reach the top of a garbage can or a
18 piece of something in the area, use that as an
19 intervention between yourself and the dog and by doing
20 so keep distance from the dog.
21     Q.    What would be next after the baton or use of
22 an object?
23     A.    Next after that, my preference is to go to the
24 deployment of OC or pepper spray.  Again, a two or three

1  second blast in the face of the dog is extremely
2  effective.  It typically -- in every instance I've seen
3  it deployed, it stops the dog in their tracks.  The
4  dog's response is confusion and discomfort from the
5  contact of the active ingredients of the OC spray with
6  their eyes, their mucus membranes in their nose, the
7  membranes in their mouth, the surface of their face.
8          It's painful.  I've been sprained many times.
9  It hurts.  Typically they stop, and the typical response
10 at that point is to retreat and try to find some place
11 or something to try to wipe the painful substance from
12 their face.
13     Q.    Have you ever seen or heard of a dog becoming
14 aggressive after they have been sprayed with OC spray?
15     A.    No.
16     Q.    What is the next tactic after OC spray?
17     A.    If the officer is in possession of a conducted
18 electrical weapon and has been trained on the use of it,
19 then that would be the next step up the ladder of force
20 escalation, if you want to use that term.
21          If they don't have that, then at that point I
22 would if they have an object, again like a baton, at
23 that point then instead of using it as a target or an
24 intervention to gain space, then I would say they would

1  be fully justified in using the baton to strongly strike
2  or use, whether it's a baton or a garbage can or any
3  kind of an object, at that point impact weapon,
4  aggressive use of an impact weapon would be fully
5  understandable and within expected practices.
6      Q.    Are you referring to TASERs when you refer to
7  the electronic --
8      A.    Yes, conducted weapons, the brand name is
9  TASER.  I don't know if anyone else makes them, but
10 yeah.  Technically it's a conducted electrical weapon.
11     Q.    And then as it continues up the ladder as we
12 go, what would be the next thing?
13     A.    The next step at that point would be to use
14 whatever means necessary, including a firearm if
15 necessary to protect one's self or to protect a member
16 of the public directly.
17     Q.    Are officers taught to kick an animal or a dog
18 to de-escalate the use of force?
19     A.    As far as I know, we don't actively kick,
20 teach directly kicking because that places the officer
21 on one foot and off balance.  And then potentially if
22 the dog grabs the kicking foot, the officer could fall
23 down.
24          However, kicking would be an option if the dog

1  has closed that far and you're busy trying to get
2  another tool into play.  I prefer they didn't.  Most
3  officers are wearing boots of one sort or another that
4  will protect some.  But again, I don't want a dog
5  grabbing someone's foot and them going down and perhaps
6  maybe they hit their head, maybe they accidently deploy
7  another tool at uninvolved or nonthreatening parties.
8          You fall down, there's a lot that can go
9  wrong.  Officers have killed people unintentionally when
10 they fall down.
11     Q.    What about using a bean bag shotgun?
12     A.    If you've got one, it's a great option.  That
13 would be somewhere around the same level as using the
14 TASER, as using an actual impact weapon to strike a dog.
15 Bean bags are great tools.  Especially if one plans in
16 advance to use them, for instance, such as in a search
17 warrant.
18     Q.    Have you trained any officers to use fire
19 extinguishers?
20     A.    Yes.  And in fact, the use of fire
21 extinguishers is, for instance, standard policy for the
22 Los Angeles police department and has been for a bunch
23 of years.  When their officers go into homeless camps
24 because there are often loose and stray dogs that are

1   protective of their territory, they are actually, the
2   last I knew, required of one of the two officers to go
3   carry a fire extinguisher. They are extremely
4   effective.
5           They make a loud noise. They make a visual
6   barrier. And in the case of using a carbon
7   dioxide-based fire extinguisher, it's also a sudden
8   blast of cold. It tends to make the dog run away. The
9   dog doesn't know what it is, so they want to be
10  somewhere else.
11      Q.   Are there any other types of tactics you train
12  police officers on to de-escalate?
13      A.   The use, like I said before, the use of
14  improvised objects to intervene between themselves and
15  the dogs. And that can be anything from a hose with
16  water to shoot. If you've got a cup of coffee in your
17  hands, throw the coffee in the dog's face.
18          Improvising those tools that are highly
19  unlikely to cause death or serious injury are very often
20  effective. Especially in my time, not only as a police
21  officer, I was able to deter dogs and in 2-1/2 years
22  never once shot a dog.
23          In my time as an animal control officer,
24  animal control director, we weren't armed. Just like

1   most of the animal control officers in the United States
2   are not armed and authorized to use firearms. And yet
3   they deal with everything from injured puppies to
4   blatantly aggressive dogs with dog bite histories all
5   over the country multiple times every day and none of
6   them shoot dogs. There's a lot of ways to deal with
7   them.
8       Q.   And in what instances do you train police
9   officers to use deadly force when encountering a dog?
10      A.   If there is no other way to protect themselves
11  or to protect someone who is immediately engaged. The
12  example I use, and I think I mentioned it before, if the
13  officer walks around the corner and there's a dog that
14  is actively engaged, whether it's an adult or a child,
15  in biting and dragging and shaking and injuring this
16  person, clearly then if they have a clear shot and if
17  their department's policies allow them to do so to save
18  a life, take the shot.
19      Q.   In what instances do you train officers to use
20  deadly force when encountering a dog that may be
21  aggressive? Does it differ from what just stated?
22      A.   No. If the dog has come up and has grabbed
23  onto the officer. For instance, in an extreme case has
24  grabbed the officer and is shaking him, pushing him

1   down, a situation that with protective gear I have been
2   involved in, if it's clear and you can safely do so, do
3   whatever you have to do to survive and go home at the
4   end of the day.
5       Q.   Do you believe that officers are only entitled
6   to use deadly force as a last resort when encountering a
7   dog that may be aggressive?
8       A.   Yes.
9       Q.   In other words, officers are required to use
10  less than lethal force first?
11      A.   A situation sometimes can be immediately
12  developing. But in general, yes. As the Boston police
13  department policy says, they should have exhausted all
14  other methods of intervening. There should be no less
15  drastic means available to defend one's self.
16      Q.   In the incident that we are here about today
17  regarding Chyna, what do you believe that Officer Smith
18  should have done?
19      A.   The first thing he should have done is when he
20  saw the dog, instead of drawing his side arm
21  immediately, he should have availed himself of his
22  pepper spray. And then as the dog got closer, held his
23  position, changed his body stance slightly to a less
24  threatening and be prepared to spray.

1           And then when the dog -- I wouldn't have a
2   problem if he sprayed the dog 15 or 20 feet away, which
3   is the recommended effective range of pepper spray.
4   Because even if the dog was not objectively threatening
5   him at that time, the very worse outcome would be the
6   dog would run home yelping.
7           The department might have to pay for a bath
8   for the dog or at least have the dog's owner bring the
9   dog over and take a bottle of water and wash their face
10  off and nobody would have been hurt.
11      Q.   Do you believe that there's anything else that
12  Officer Smith could have done other than deploy his OC
13  spray?
14      A.   He could have yelled at the dog to stop. He
15  could have given the dog commands. Instead of
16  retreating backwards, he could have moved sideways to
17  see if the dog was actually running to someone or
18  somewhere else.
19          Remember, according to Officer Smith's
20  testimony, he was facing to the front left of the
21  residence from which Chyna allegedly emerged. His right
22  side was towards the house. His left side was towards
23  what the photographs reveal is Staston Street.
24          But there's a street that ran besides him and

1 away. I find it very possible that the dog due to the
2 fireworks and the chaos and all the other people that
3 all the officers have testified were running around, the
4 dog may have just been looking to get out of Dodge and
5 run down to the street.
6     Maybe it saw someone it recognized. Maybe it
7 just wanted to be anywhere else at the time. So by
8 holding his ground, preparing to deploy less lethal
9 force and observing for a bit longer, the dog may have
10 just run past him.
11     Especially considering the fact that both
12 rounds he fired were from above and on the dog's left
13 side, which means the dog was moving past him at the
14 time the shots were fired.
15    Q. Is it your opinion that Officer Smith mislead
16 Sergeant Detective Perkins by not disclosing that he had
17 OC spray?
18     MR. ABBAS: Objection. Calls for
19 speculation.
20 BY MS. DAVIDSON:
21    A. I'm going to say that I have not heard any
22 recording of that conversation, nor have I seen a word
23 for word transcript of that conversation. However, in
24 the report, the investigating officer does not say that

*12:57:48PM* (line 5)
*12:58:06PM* (line 10)
*12:58:28PM* (line 15)
*12:58:43PM* (line 20)

---

1 Smith made any such statement.
2     So my only conclusion based on that limited
3 information is that Smith failed to inform the officer
4 or that the officer omitted to record such a statement,
5 which would have been essential for the accuracy of the
6 investigation.
7    Q. What are you basing this opinion off of?
8    A. I'm basing it on reading the report of the
9 investigating officer. He never says anything in the
10 written report about the presence of OC. None of the
11 other officers mention in their initial reports that
12 Officer Smith had OC, whether they knew or not.
13     But yet without hearing the actual testimony
14 or hearing the recording of the testimony, I don't know
15 whether the investigating officer omitted that statement
16 or whether Smith never made that statement.
17    Q. Did you review or are you aware if you
18 reviewed the entire Boston police firearm discharge
19 investigation file?
20    A. Yes, I did. I was provided that and so I
21 reviewed all the information in that file as provided in
22 discovery.
23    Q. And did you listen to Officer Smith's IO
24 interview with the firearm discharge investigation team?

*12:59:27PM* (line 5)
*12:59:47PM* (line 10)
*01:00:10PM* (line 15)
*01:00:28PM* (line 20)

---

1    A. No, I did not.
2    Q. Were you aware of what Boston police officers
3 are required to carry on their belt?
4    A. I have not seen an explanation of what the
5 uniform requirements are for a Boston police officer,
6 and/or if there is any difference between uniformed
7 officers, plain clothes officers that are wearing
8 tactical equipment and/or SWAT officers or detectives or
9 whatever.
10    Q. What would you do to advise a police officer
11 to deter the threat of a dog charging at them?
12    A. As I've said repeatedly, first thing is stand
13 your ground, watch your body language, assess what the
14 dog is doing. Prepare yourself immediately to use less
15 or nonlethal means of deterrence with the understanding
16 that firearms is a last option.
17    Q. Why --
18    A. Don't run.
19    Q. Why do you think Officer Smith should have
20 disclosed that he had OC spray on him?
21    A. I believe that for a use of force
22 investigation and in my experience in the investigations
23 I conducted, I always asked what tools were present.
24 No. 1, to make the sure the officer was in compliance

*01:01:06PM* (line 5)
*01:01:25PM* (line 10)
*01:01:44PM* (line 15)
*01:02:03PM* (line 20)

---

1 with department rules and regulations. No. 2, to see if
2 they had other options available to them that they
3 should have deployed first.
4     So Officer Smith should have, if he did not,
5 revealed all of the tools present, whether he had OC,
6 whether he had a collapsable baton stuck in his pocket
7 or on his vest, whether he had any other means of
8 intervention.
9    Q. Do you not think Sergeant Detective Perkins
10 would be aware that Officer Smith had OC spray on him?
11    A. I don't know if he was aware or not. I know
12 he should have asked that specifically to ensure that it
13 was part of the record.
14    Q. Do you think that Sergeant Detective Perkins'
15 outcome of his investigation would have been different
16 if Officer Smith disclosed that he had OC spray on him?
17    A. I can't speculate as to what Perkins' opinion
18 would have been. I know that as a sergeant in the same
19 position, presented with the same facts, I would have
20 determined that Smith should have gone to less lethal
21 force in order to fulfill the requirements of the Boston
22 PD's policy.
23     MS. DAVIDSON: Let's go off the record for
24 a second.

*01:02:46PM* (line 5)
*01:03:07PM* (line 10)
*01:03:28PM* (line 15)
*01:03:45PM* (line 20)

1          (Lunch recess.)

2     BY MS. DAVIDSON:

3     Q.     Mr. Crosby, is it your opinion that Officer

4     Smith's use of deadly force was reckless and likely to

5     cause injury to a injury to a civilian or other officers

6     in the midst of a chaotic seen?

7     A.     In the scene as it was described, yes, I

8     believe the use of the firearm in that environment was

9     reckless.

10    Q.     And what's your basis for that opinion?

11    A.     There's too much going on.  He had poor

12    backdrop.  Even shooting down, he was shooting at the

13    hard surface of the road, which could have easily caused

14    ricochet in any a number of directions.

15          If the bullet went higher than he intended,

16    there were houses behind in his line of fire that they

17    did not know at the time if they were or were not for

18    certain occupied.

19          There were a minimum of six other police

20    officers standing around in various positions.  He had

21    testified that he just had a group of somewhere between

22    five and 15 young people that he had been high fiving.

23          Those people were all potentially within the

24    field of ricochet or within the line of fire had he

1     missed his target.  And as I mentioned, dogs are not as

2     thick and dense because they are not the same size as

3     human beings.  And based on my experience, it is not at

4     all unusual for an officer's shots to through and

5     through, pass through a target of an animal the size and

6     nature of a dog.

7     Q.     When you were reviewing documents in this

8     case, did you review Officer Smith's deposition

9     transcript?

10    A.     Yes.

11    Q.     In the deposition, do you recall if you saw

12    where he had stated that he scanned to make sure there

13    were no civilians around him?

14    A.     Yes, I did read that.

15    Q.     Based on your experience as a police officer,

16    do you know what an officer is supposed to do before

17    discharging their firearm?

18    A.     It depends on the department's policies.  At

19    the very least, the officer needs to scan for other

20    objects or people in the line of fire, be aware and try

21    to minimize the exposure of anybody in the backdrop of

22    the line of fire.

23          For instance, shooting at someone in front of

24    a school bus full of children would be a really bad

1     choice.  To be aware of the possibilities of ricochets.

2     There are a lot of factors that you have to very quickly

3     determine as to whether it's safe enough to engage the

4     target and whether the danger presented by the target

5     rises to such a level that it's basically worth the

6     risks.

7     Q.     Based on your experience as a police officer,

8     were you ever faced with a chaotic scene where you had

9     to use force of any kind?

10    A.     Force of any kind, yes.  In the incidents in

11    which I chose to deploy deadly force in defense of

12    myself or the other situations, all of those were in

13    situations where there was not a chaotic scene.  And I

14    did over my career make many, many assessments not to

15    use and discharge my firearm in a situation because of

16    the chaotic nature of the scene, the lack of safe

17    backdrop and the possibility of injury to another

18    civilian or another officer.

19    Q.     Given that there was a chaotic scene, is it

20    still your opinion that Officer Smith should have

21    deployed his pepper spray?

22    A.     Absolutely.  Because the effects of pepper

23    spray, the targeting of the pepper stray is very limited

24    even if there is wind.  It doesn't, you don't use it

1     like spraying all over like a room deodorant.  Instead,

2     you target the object or person you are spraying it at.

3     And if worse comes to worse and someone, be it yourself,

4     another police officer or a civilian, get contaminated

5     with the pepper spray, the studies have all shown that

6     there is negligible to effectively zero risk of any

7     permanent significant injury and that the remedy for

8     anybody else who gets sprayed is you have EMS or someone

9     in their front yard wash their face off and just tell

10    them basically don't rub your eyes or anything for the

11    next 30 to 45 minutes and you'll be fine.

12          That's my experience with having been sprayed.

13    You wash your face off.  It's painful but you wash your

14    face off, you rinse your eyes out and you're fine in

15    about 45 minutes.

16    Q.     Do you think if Officer Smith deployed pepper

17    spray in this instance that anyone else at the chaotic

18    scene could have been affected by the pepper spray?

19    A.     Not in the way he described the proximity

20    location as much as he did of the other people.  I can't

21    say that there's zero possibility because there's always

22    a possibility of anything.

23          But even in, even if that possibility had

24    arisen, the odds or likelihood of that having caused any

1 significant anything to the people involved is very
2 small too.
3     Q.   Where should an officer aim when they use
4 deadly force on an animal?
5     A.   With an animal, a dog --
6     Q.   A dog specifically, yes.
7     A.   Center of mass in the chest or thorax. The
8 heads of dogs, the skull bones are extremely thick. I
9 have seen even significant rounds such as the standard
10 40 caliber police issue bullets hit at even a slight
11 angle and be deflected from the dog's head. I teach
12 body center.
13     Q.   In your review of documents in this case, did
14 you review the photographs of Chyna that were taken by
15 the Boston police department firearm discharge
16 investigation team?
17     A.   Yes. I reviewed the photographs I was
18 provided, the color photographs and scans that I was
19 provided in discovery.
20     MR. ABBAS: If I may interject? Would it
21 be appropriate to perhaps show the witness the
22 photographs? He was provided a copy of the color photos
23 that were used in Officer Smith's deposition, but for a
24 clean record --

1     MS. DAVIDSON: I'll take it they are the
2 one that I produced to you. Those are the ones that I
3 used in Officer Smith's?
4     MR. ABBAS: Yes.
5 BY MS. DAVIDSON:
6     Q.   Can you see this?
7     A.   Yes.
8     (Photograph marked for identification as
9 Exhibit No. 3.)
10     MR. ABBAS: I think this was an exhibit.
11     MS. DAVIDSON: I'm probably only going to
12 use one or two.
13 BY MS. DAVIDSON:
14     A.   I think this is labeled D 109 on what I'm
15 seeing here. Is that what you've got?
16     Q.   The one on my screen?
17     A.   Yes.
18     Q.   Yes, that's correct. So this will be marked
19 as Exhibit 3 of your deposition. Where do you see
20 bullet wounds on the dog, on Chyna, in this picture?
21     A.   Having seen all of the pictures I was provided
22 but also seeing this, what I'll call defect No. 1 or
23 entry wound No. 1, for description the dog is recumbent
24 on the dog's own right side.

1     We are looking at the left side of the dog.
2 And if in this picture you take a line from where the
3 dog's left foreleg makes the 90 degree bend upward and
4 the apparent hump, or the visible hump at the top of the
5 dog's shoulder that's probably the scapular or the spine
6 underneath there, along that line approximately
7 two-thirds of the way up there is a generally circular
8 defect or wound that shows some patent blood around it
9 and then blood that has apparently traveled from the
10 wound downwards ventrally towards the legs.
11     And there's like a red band of I believe it's
12 either blood or tissue that bisects that light colored
13 hole in the tissue. From there, from that defect if you
14 go cranial or forward from that slightly at an upward
15 angle, just visible here behind the back end of the
16 dog's left external ear where it's folded over, you can
17 barely see what's not clear but is a defect in this
18 photograph.
19     And that is the second visible entry wound
20 that is roughly circular and is consistent as far as
21 shape and beveling and so forth with a bullet entry
22 wound.
23     Q.   Do you know how many times Officer Smith
24 discharged his firearm?

1     A.   All the testimony seems to reflect three
2 discharges.
3     Q.   Looking at this picture marked as Exhibit 3,
4 would you agree with me that Officer Smith aimed at
5 Chyna's body center as you referred to it?
6     A.   On this side, yes. Unfortunately, the
7 documentation of Chyna's body is incomplete and
8 inadequate. There should have been pictures taken of
9 both sides of the dog, the dorsal and ventral or top and
10 bottom surfaces of the dog, a head-on shot of the dog's
11 head, face and teeth and a shot from the rear of the
12 dog.
13     So I can't say if there is another entry wound
14 on the nonvisible portions of the dog's body. So I
15 can't tell from this whether all of his rounds were
16 aimed at the same side and place of the dog.
17     Q.   Understandable. Given the two rounds that
18 were entry rounds that we are looking at in this picture
19 marked as Exhibit 3, you would agree with me that
20 Officer Smith did aim at Chyna's body center as you
21 describe it?
22     A.   I would actually say that one of the shots was
23 aimed generally at body center and the other shot seems
24 to be consistent with what Officer Smith described as

1  shooting at the dog's head.

2  Q.  Is it your opinion that Chyna was trying to

3  get to a familiar, trusted person among the chaotic

4  scene with fireworks and that is why she did not divert

5  towards any other officers?

6  A.  It's my opinion that that is a possibility

7  that has to be seriously weighed because of the fact

8  that Chyna did not appear to divert, change path or be

9  interested in anyone other than Officer Smith.

10  That is a conclusion that is consistent with

11  the physical evidence and testimony given, that she was

12  going, whether to another person or simply to a point of

13  refuge away from the chaos.

14  Q.  What is the basis for that opinion?

15  A.  The fact that she did not engage with anybody

16  other than Smith.  She did not run at anyone other than

17  Smith.  None of the other officers present stated that

18  she ran at or even noticed anybody but Smith.

19  And Smith does not say that her attention was

20  diverted, attracted to or otherwise focused on anybody

21  else, including the raft of children that he said were

22  with him moments before that he said ran away.

23  Q.  Do fireworks tend to scare dogs?

24  A.  Absolutely.

1  Q.  Why?

2  A.  They are sharp, irregular in spacing,

3  unexpected.  The dogs don't know that it's a holiday

4  where people are going to be making loud noises.  It's

5  very widely known that fireworks scare an awful lot of

6  dogs.

7  Q.  How do dogs typically react to loud noises

8  such as fireworks?

9  A.  In my experience, dogs either actively hide or

10  try and run away.

11  Q.  Can you describe a dog's behavior when

12  reacting to loud noises such as fireworks?

13  A.  Again, they either hide -- in the case of one

14  of my dogs, they try to crawl under the bed.  Otherwise,

15  they may be very uneasy and may even sit there and shake

16  or whine and cry or look for reassurance.

17  Or what is common and is well known in animal

18  control circles is that dogs will panic and will

19  suddenly run off in a direction that they may well

20  perceive as being safer than where they are in an effort

21  to simply get away from the scary noises.

22  Q.  Can loud noises such as fireworks allow a dog

23  to become aggressive or have aggressive tendencies?

24  A.  In my observation and experience, it's not,

1  that is an unusual and uncommon reaction to show

2  aggression.  Instead, they are most likely to show fear,

3  avoidance, displacement, behaviors calculated to remove

4  them from the scary situation.

5  Q.  Would a chaotic scene such as the one in this

6  case affect a dog's behavior?

7  A.  As I just said, they are likely to become

8  frightened, which means they are likely to try to run

9  away.

10  Q.  And can a chaotic scene make a dog have

11  aggressive tendencies?

12  MR. ABBAS:  Objection.  Form.  A chaotic

13  scene can be --

14  BY MS. DAVIDSON:

15  Q.  Can a chaotic scene such as the one in the

16  case of the documents you reviewed make a dog seem

17  aggressive or have aggressive tendencies?

18  A.  That's not my experience.  My experience is

19  mostly that the dog will show fear, avoidance and

20  displacement behavior.  They are going to want to run

21  away.

22  Q.  Would a dog facing a chaotic scene like the

23  one in this case and fireworks together, those two

24  factors, become aggressive?

1  MR. ABBAS:  Objection.  Form.  I think

2  fireworks is what helped make the scene chaotic.  It's

3  not like it's chaotic and then you have fireworks.  It's

4  the fireworks and the amount of civilians around.

5  MS. DAVIDSON:  I think that's your view.

6  MR. ABBAS:  That's what the fire discharge

7  report says.

8  MS. DAVIDSON:  I think with all the people

9  around and then the fireworks on top of it and given

10  what happened that night it can all be put together.

11  BY MS. DAVIDSON:

12  Q.  Do you want me to repeat the question?

13  A.  Go ahead and repeat the question.

14  Q.  Would a dog facing a chaotic scene such as the

15  one we are here about today and fireworks make a dog

16  aggressive?

17  A.  Aggressive most likely not.  Fearful, very,

18  very, very likely.

19  Q.  What makes dogs consider a person familiar?

20  A.  A variety of things.  Either someone they have

21  met before, someone that looks like someone they have

22  met before, someone who is acting in an accepting and

23  affiliative manner.

24  There's plenty of times that, for instance, I

1  deal with dogs and call them over to me and they come
2  over and they are very friendly and accepting. They can
3  tell that I seem to not present a threat. Dogs are
4  defined in the literature as an affiliative and
5  gregarious creature, which means they like each other's
6  company and they like human company.

7    So it's not necessarily a matter that a dog
8  might perceive you as familiar, they might perceive you
9  as a nonthreatening human that's worth checking out to
10  see if you got cookies.

11    Q.   Do you think Chyna was approaching Officer
12  Smith as a familiar, trusted person to her?

13    A.   I'm not convinced that Chyna was intentionally
14  approaching Smith in any way. I think, I believe that
15  Chyna based on the evidence we have was simply running
16  away seeking a means to avoid or dispel the fear she was
17  feeling.

18    Q.   Why do you think Chyna was crossing the street
19  away from her home?

20    A.   Because based on what has been said and based
21  on the testimony of Officer Smith and the others, I
22  think the door was closed. I think she was out on the
23  porch. She reached a point where she was uncomfortable
24  to the level that she had to do something in her mind.

1    And instead of running into the crowd or
2  running to the house across the street or next door, she
3  bolted for the only open space she had, which was across
4  the street. She just wanted to get away as fast and far
5  as possible.

6    Q.   And why do you think Chyna did not approach
7  any other officer?

8    A.   Because she wasn't focused on the officers at
9  all. She wanted to run away.

10    Q.   Why do you think Chyna did not approach any
11  other person that was outside?

12    A.   Same reason. She was not going out to
13  approach anybody, at least that we are aware of, that
14  was present there. She was just simply trying to run
15  away from a scary situation.

16    Q.   Have you ever seen a dog hold eye contact with
17  someone for a long time?

18    A.   Yes.

19    Q.   What typically does that behavior mean?

20    A.   In my experience, the holding of eye contact
21  for, you know, an extended period of time is when a dog
22  is either unwilling to back down from a challenge or is
23  issuing its own challenge.

24    Q.   Based on your experience, when a dog is

1  charging at someone, can that be seen as an aggressive
2  tendency?

3    A.   By whom?

4    Q.   To that person that they are charging at?

5    A.   People can perceive actions in a number of
6  different ways. Is that behavior by itself indicative
7  of an aggressive response by a dog, no.

8    Q.   Based on your experience, when a dog is
9  panting, snarling and growling, is that dog displaying
10  aggressive tendencies?

11    A.   That's actually very common from a stressed
12  dog, a dog that is highly uncomfortable in the situation
13  they are in. It does not necessarily and does not only
14  occur as aggression, as part the aggressive complex. In
15  fact, the panting part of it makes me think much more
16  strongly that it was a stress response.

17    A dog panting is showing very rapid
18  respiration. The growling sounds, if there were any
19  that accompanied that, could have been from a dog
20  breathing very hard and very quickly. We don't know if
21  Chyna -- for instance, I've known dogs that when they
22  are asleep and snoring it sounds like they are growling.

23    I think in this situation considering the
24  fireworks and the chaos of the scene, it's far, far more

1  likely this was evidence of stress, not of any
2  aggressive action.

3    Q.   So based on your experience, when a dog is
4  stressed, is that dog displaying aggressive tendencies?

5    A.   No. A stressed dog is not displaying
6  aggressive tendencies. It may be showing some of the
7  behaviors, like, for instance, having its mouth open.
8  But having the mouth open itself is not an indication of
9  aggression. Breathing heavily is more related with
10  stress than it is with the aggressive behaviors. So,
11  no, this sounds much more like a stressed, frightened
12  dog.

13    Q.   Based on your experience, when a dog is
14  frightened, do they display aggressive tendencies?

15    A.   No, they display fearful behaviors. Some of
16  those may intersect with some of the behaviors from
17  aggression but typically not. Then again, panting,
18  breathing heavily, those kind of, even if they are
19  vocalizing because of the rapid, panicked breathing,
20  those are all consistent with a fearful dog.

21    Fearful dogs also growl to ask people in their
22  terms to get out of their way. Please, leave me alone.
23  I don't want to be bothered. I'm scared stupid here.

24    Q.   Based on your experience, when a dog is

1   feeling threatened, do they display aggressive
2   tendencies?
3       A.      They may display defensive type behaviors as
4   warnings to not approach any further.  That's not
5   aggression.  That is communicating with another party
6   please leave me alone, I'm stressed, I'm frightened, go
7   away.
8       Q.      What are the behaviors that a dog shows when
9   it is feeling frightened?
10      A.      The dog will avert its eyes, turn its head,
11  may turn its body orientation.  It's very common if
12  given room and unable to seek shelter in a familiar,
13  safe place to flee very rapidly and actively towards
14  anything that looks like a way to get somewhere else
15  where they are not going to be trapped in.
16          If they are stationary and, for instance, they
17  get up against an object or a corner, they will lower
18  their body posture.  People typically call it cowering
19  down.  Fearful dogs will pant.  Fearful dogs increase
20  their respiration.
21          You will see their pupils are highly dilated
22  because they are going into fight or flight mode,
23  preferring flight.  And as such, their pupils dilate to
24  gather as much data from their surroundings as possible.

1       Q.      When dogs are feeling frightened, what is
2   their mouth doing?
3       A.      Maybe anything from -- if they are frightened
4   and exerting themselves running away, it's probably
5   going to be open so they can breathe better.  If they
6   are stationary and have retreated into a corner, it's
7   most likely they will be tight and closed.
8          They may even when frightened and backed into
9   a corner show their teeth in a bit of a warning to try
10  to gain space and may growl slightly -- again, to gain
11  space so they can run away.
12      Q.      What about when a dog wags their tail?
13      A.      It depends on the dog.  It's often down but --
14      Q.      Given a dog has a tail?
15      A.      If they have a tail, it tends to be down or
16  sticking out behind them.
17      Q.      And what about their fur when they are feeling
18  frightened?
19      A.      Probably nothing special, although if they are
20  in the mode of warning someone away because they are
21  trying to gain space, the hackles may come up.
22      Q.      Do any of these behaviors change if a dog is
23  feeling threatened?
24      A.      Well, the reason it would be fearful is

1   because somehow it perceives either the situation or
2   something in the situation is being threatening.  And
3   I'm sure that dogs probably perceive fireworks as some
4   sort of a threat they can't identify.
5       Q.      So I believe you just testified that when a
6   dog is feeling threatened, they might display more
7   defensive type behaviors.  Would any of the behaviors
8   change if they were feeling threatened and were showing
9   defensive behaviors?
10      A.      Those defensive behaviors are much more likely
11  to be shown in a situation where the dog has no room to
12  flee.  Once they shift into flight, they just want to be
13  gone.  The defensive behaviors indicative of fear are
14  typically a dog that can't go anywhere.
15          Hypothetically if someone had cornered Chyna
16  in the corner of the porch and she couldn't jump over
17  the porch railing or squeeze between the uprights of the
18  porch, that would have been a place where you would have
19  more likely seen those defensive fear behaviors.
20      Q.      Are the behaviors that a dog displays with
21  their eyes, ears, mouth, tail and fur, is that similar
22  to that of when they are feeling frightened?
23      A.      Is what similar to when they're being
24  frightened?

1       Q.      The behaviors they display when they are
2   showing defensive behaviors from feeling threatened
3   similar to the ones, to the behaviors they display when
4   they are feeling frightened?
5       A.      If they are fleeing, then they are not going
6   to have the lower posture and the face turning and so
7   forth.  They are simply focusing on running away.  So
8   they are going to display whatever behaviors are common
9   for that dog when it's running way.
10          So it's probably going to be standing up more
11  rather than crawling on its belly.  It's going to be
12  looking around for a place to run.  It's going to do
13  everything it can to avoid the frightening situation.
14      Q.      Does a dog wag its tail when it's feeling
15  frightened?
16      A.      It depends a little bit on the dog but not
17  typically.  If the dog is fleeing, then the tail may be
18  moving as the dog's gate affects the location of the
19  tail as it's running rather than standing there and
20  wagging its tail back and forth.
21      Q.      Based on your experience, what is a dog's
22  posture like when it's feeling threatened?
23      A.      Again, if it's trapped and stationary and
24  can't go anywhere, it drops its posture, shows wide

1    eyes, usually showing the sclera or white area around it
2    much more than normal, it looks away, it diverts its
3    body.  If it's running away, it's simply showing
4    whatever posture it has to rapidly move itself away from
5    the situation.
6         Q.    And based on your experience, what is a dog's
7    posture like when it's feeling scared?
8         A.    It's not engaging with any particular person
9    unless it's running to that person.  It's moving
10   rapidly.  The tail may be moving with its gate or not.
11   Its head may be down somewhat as it's seeking to push
12   itself through a position of safety.
13         It's unlikely to be showing a closed mouth
14   because it's breathing heavily.  But it's also unlikely
15   to be deliberately showing the upper and lower teeth in
16   a posture of threat.
17         Q.    Is it your opinion that a child's behavior is
18   consistent with a dog that is frightened and looking for
19   a familiar safe person?
20         A.    Safe person or safe place, yes.
21         Q.    What do you mean by a safe person or safe
22   place?
23         A.    A safe person could be someone that the dog
24   knows or has had positive interactions with.  A safe

1    place basically means anywhere other than where it
2    perceives a threat.
3         Q.    And what is your basis for that opinion?
4         A.    That's from observation and experience over
5    many years.  Dogs don't know what's typically happening
6    other places.  So, for instance, they wouldn't
7    understand that perhaps the entire city of Boston was
8    firing off fireworks, but they do know that the place
9    they are at presents what they perceive to be a threat.
10   So they would just as soon be anywhere else.
11         Q.    What behaviors do dogs typically display when
12   they are looking for a safe person or a safe place?
13         A.    Actively leaving wherever it is or whoever
14   they are around to find such a position or person of
15   safety.  If it's a person they are going for, they will
16   typically run as directly at them as possible to get
17   over to someone that offers perceived safety or comfort.
18         Q.    Did you review plaintiff Shirley Goode's
19   deposition when you reviewed documents in this case?
20         A.    Yes.
21         Q.    And she believed Chyna was looking for her.
22   Is that correct?
23         A.    I did read and account for that.  I can't say,
24   for instance, that she was looking for Shirley or not

1    looking for Shirley.  I think she was simply looking for
2    something or someone safe.  I'm going to change a plug
3    here in a second, I'm losing my power.
4         Q.    Why would Chyna not have stopped after she ran
5    through Shirley's arms on the porch if she was looking
6    for her?
7         A.    I think that perhaps Chyna may have been
8    simply getting away from the area rather than seeking
9    Shirley.  The whole situation was threatening enough
10   that -- owners like to think that their dog is going to
11   come looking for them if they are frightened enough.
12         But the dog may not have perceived, due to the
13   chaos at the scene and fireworks may not have perceived
14   being around Shirley safe enough.
15         Q.    What types of things cause a dog to shake?
16         A.    A number of things.  Fear.  Shaking is the
17   result of a physiological state of arousal.  That's one
18   manifestation of it.  Fear can cause shaking.  Medical
19   conditions can cause shaking.  Seizure disorders cause
20   shaking.
21         Sometimes dogs will shake as a stress response
22   prior, for instance, trying to get away from whatever is
23   stressing them out or scaring them.
24         Q.    And what types of things cause a dog to

1    display behaviors of growling?
2         A.    Growling is communication.  Sometimes you have
3    dogs that habitually growl just because that's how they
4    like to vocalize.  It's typically a warning behavior or
5    it can be a sign of extreme distress or extreme fear.
6    It just wants to get some place away from the threat.
7         Q.    And what types of things would cause a dog to
8    be panting?
9         A.    Mostly stress and fear unless the dog had
10   already been running a significant distance.  I mean, on
11   a hot day, five mile run, mile and a half, my dog is
12   probably going to be panting by then.
13         Q.    What types of things would cause the dog to
14   breathe heavily?
15         A.    Again, it can be stress, it can be exertion.
16   Those are the most common.  It could be from something
17   like a medical, underlying medical condition like
18   congestive heart failure.  But most typically stress or
19   fear.
20         Q.    What situation would cause a dog to be
21   displaying behaviors of growling, panting, breathing
22   heavily and shaking?
23         A.    Stress and fear would be the first one I go
24   for.

1     **Q.**    You state in your report that rapid and heavy
2 respiration is common in highly stressed domestic dogs
3 and can be accompanied by labored breathing sounds that
4 could be mistaken as growling. Why is growling
5 considered different in this situation?
6     **A.**    I'm not sure that it is different. It's a
7 lower rumbling sound that people tend to label as
8 growling. But breathing heavily in a dog, just like
9 breathing heavily in a person, can apparently from my
10 experience cause activation of the vocal cords that may
11 give a similar sound.
12     **Q.**    Would a highly stressed dog show any other
13 behaviors?
14     **A.**    Besides running away and panting?
15     **Q.**    Besides the ones we just went over, yes.
16     **A.**    It might if it was -- again, if it was a dog
17 that was highly stressed and retreated into a corner
18 seeking shelter, you would see very similar symptoms.
19 You might see a little bit more.
20     For instance, if you closed, despite the
21 warning behaviors, and got too close and reached for the
22 dog, it might engage in snapping behavior in order to
23 get you to stay away.
24     **Q.**    Could a highly stressed dog with these types

1 of behaviors be described as aggressive?
2     **A.**    It's possible if someone was improperly or
3 inadequately trained, they might have mistaken those
4 behaviors. But a person that had any training at all
5 should have seen the difference between fear behavior
6 and any sort of offensive behavior.
7     **Q.**    How do you train officers to deal with a dog
8 described as having rapid, heavy respirations with
9 labored breathing sounds that sound like growling?
10     **A.**    Stand still and/or back away slightly or
11 simply get out of their way.
12     **Q.**    I will put this up for you to take a look at.
13 I just want to confirm this. This is one of your
14 opinions that I kind of -- I'm going to pull up Exhibit
15 2.
16     Looking at Exhibit 2, your report, we just
17 went over 6, 7 and 8 as being your opinion that Chyna's
18 behavior is consistent with a dog that is frightened and
19 looking for a familiar, safe person. Would you agree
20 with me that those three kind of fold into together as
21 one opinion?
22     **A.**    Yes. He's seeking a familiar, safe person or
23 simply seeking to flee the situation that has frightened
24 him.

1     **Q.**    To make sure we are on the same page, is it
2 your opinion that Officer Smith did not have enough
3 experience to identify Chyna as a pit bull?
4     **A.**    That is correct. The identification of pit
5 bull as a breed is fraught with all kind of problems,
6 including the fact we can't all agree between two people
7 what a pit bull is or isn't.
8     I don't think he had enough qualification to
9 place any kind of assignment of breed or predominant
10 breed on a dog.
11     **Q.**    Is it your opinion that Officer Smith only
12 used deadly force because Chyna was a pit bull?
13     **A.**    I think that Officer Smith used deadly force
14 because he had not been trained how to properly use
15 anything else. He had not been trained how to perceive
16 a dog's behavior, and he had not been trained that the
17 modern and common myth about pit bills as somehow being
18 super dogs or something different from other dogs, he
19 had not received training that was in fact factually and
20 scientifically incorrect.
21     **Q.**    What is the basis for that opinion?
22     **A.**    The fact that he tries to say that somehow
23 having, that Chyna being what he perceived as a pit bull
24 and that that resulted in or caused the decision to use

1 deadly force showed me that he is sadly uneducated and
2 trained in actual dog realities. The fact that --
3     If indeed he used that perception, then he,
4 No. 1, I still don't know and can't tell you what breed
5 Chyna is. And if his reaction is that he needs to shoot
6 anything that has that general look, then again he's
7 sadly misinformed and critically undertrained and
8 improperly informed.
9     **Q.**    Connected with this opinion, is it your
10 opinion that Officer Smith factored in Chyna being more
11 aggressive because she was a pit bull?
12     **A.**    Due to his statements, I think it is, he was
13 not, I don't remember him being specifically asked, but
14 I find it at least somewhat likely that his opinion of
15 Chyna's behavior affected by his unknowledgeable and
16 improper assignment of behavioral characteristics to
17 Chyna based on what he thought she looked like.
18     **Q.**    Do you train officers to identify the breeds
19 of dogs?
20     **A.**    We discuss breed, but I do not train them to
21 identify it because the science says in multiple studies
22 that visual identification of breed or even predominant
23 breed, both in professionals and in civilians, is only
24 accurate approximately 26 percent of the time.

1    In other words, when people look at a dog and
2  try to decide what breed it is, unless of course you're
3  in a dog show, they are wrong three times out of four.
4  And so what I do inform the officers is visual
5  identification is highly problematic.
6    When it comes to mixed breed, it's all over
7  the map and appearance genetically is not linked to
8  the genes that establish behavior. And so even if
9  something -- for instance, if the dog looks like a pure
10 bred Labrador and you throw a ball for him, he may look
11 at you and go, You want the ball, you go get it.
12   Q.  What makes someone capable of identifying a
13 specific breed of a dog?
14   A.  The possession of a documented pedigree.
15 Other than that, again according to the studies, and I
16 was part of one of them, even canine professionals such
17 as veterinarians, such as myself, such as trainers, such
18 as behavior consultants, such as genetic researchers,
19 animal control officers, we cannot reliably identify a
20 breed based on taking a look at the dog.
21   Breed is identified only by pedigree. And
22 even the genetic testing that is out there is mostly for
23 the purposes of entertainment. In most jurisdictions,
24 if you have a breakdown that says your dog is 5 percent

1  pit bull, 5 percent Great Dane and 90 percent Chihuahua,
2  that's generally not acceptable in court as being
3  definitive proof.
4    Q.  Do you know what type of dog Chyna was?
5    A.  She appears to be a brown brindle dog, pretty
6  solid build and muscular and probably falls into the
7  large category that civilians tend to lump as bully
8  breeds. I don't know what kind of dog she is.
9    Q.  Are there any specific breeds of dogs that are
10 considered more aggressive than others?
11   A.  Scientifically, no. All dogs have the
12 potential and the ability of showing aggression cluster
13 behaviors. There is no solid scientific data that shows
14 any particular breed or group of breeds is more or less
15 likely to bite or is more or less likely to respond with
16 those aggressive behaviors.
17   Q.  Are you aware of reasons why people tend to
18 consider pit bulls as more aggressive?
19   A.  A lot of that has to do I believe with the
20 myth and unsubstantiated claims by people over a period
21 of time that somehow these are bad dogs. And the
22 display of those dogs in situations where the owners
23 seem to be attempting to bolster their own social or
24 aggressive appearance by making people believe their

1  dogs are aggressive and dangerous and by encouraging the
2  dogs to show those kind of behaviors.
3    Q.  Are pit bulls considered more aggressive?
4    A.  Scientifically, no. There are people who
5  claim that but those claims, including my own research,
6  all those claims are unfounded. And my own research has
7  found that dogs labeled as pit bulls are not necessarily
8  more or less likely to show aggressive cluster
9  behaviors.
10   They are like any other dogs. You got good
11 ones, you got bad ones. I'm not going to defend them or
12 condemn them.
13   Q.  It looks like from your experience you have
14 rehabbed some fight dogs?
15   A.  Yes.
16   Q.  What breeds are mainly involved in that?
17   A.  The breeds that are involved in this country
18 most common in dog to dog fighting tend to be labeled as
19 pit bulls. They are not the only fighting dog, but they
20 are the most common in the U.S.
21   Q.  And what are some behavioral characteristics
22 that dogs generally have to cause significant injury or
23 death?
24   A.  The bigger the dog, the bigger the hole they

1  make when they bite. That's pretty much the common
2  thread. Any dog can cause death and has done so, from
3  Great Danes to Pomeranians.
4    However, typically if you have a big dog with
5  a big jaw, it has the ability to make a big hole. If
6  you have a little dog with a little jaw, it makes a
7  smaller hole. So it would have to either be lucky or
8  work harder to cause the same amount of damage.
9    Q.  Are officers trained on these types of
10 characteristics?
11   A.  In my training, yes. And in the trainings I'm
12 aware of from Chicago and into the California post
13 training, yes. We train them that the bigger dog is
14 likely to cause a bigger hole, but it's not necessarily
15 more likely to kill you.
16   Q.  In your opinion on this area, you refer to the
17 levels of force I believe in your report in context of
18 dogs having level of force. What do you mean by that?
19   A.  Which paragraph are you referring to? I would
20 like to look at what I wrote because I may -- usually
21 there are bite levels and then there are levels of force
22 --
23   Q.  I'm going to share the screen. I believe it's
24 paragraph 11. Right here.

1      A.      Okay.

2      Q.      It's paragraph 11 on Exhibit 2.

3      A.      Paragraph 11, the final sentence says,

4  "Studies have indicated pit bulls have no special levels

5  of force or behavioral characteristic to make them

6  anymore or less likely to cause significant injury or

7  death."

8          By level of force, I am referring to the myth

9  that dogs labeled as pit bulls have some kind of

10  incredible bite strength or bite force.  A pit bull, a

11  dog identified as a pit bull, I'm not sure what the

12  criteria was in the study, but Doctor Brady Barr of the

13  National Geographic Association and several others since

14  have done scientific testing regarding bite strength,

15  the amount of pressure a dog can put on a target.

16          And those range from small dogs that have

17  relatively smaller abilities to, for instance, a

18  Labrador that can inflict roughly around a 125 pounds

19  per square inch of pressure, to a human that can put in

20  about 170 pounds of pressure, to what was tested as pit

21  bulls which run about 238 pounds, to German Shepherds at

22  about 305 pounds, to Rottweilers at about 308 to 330

23  pounds, to other even larger, less common dogs like an

24  Anatolian Shepherd.  A dog called Ovcharka, it's a

1  Russian dogs that runs about 200 pounds, the body does.

2  And supposedly they run five, six, 700 pounds of

3  pressure.

4          There's a Turkish dog called a Kangal who is

5  reported as having extremely high bite pressure.  But

6  pit bulls are nothing special.  They are kind of right

7  in the middle of similarly sized dogs.

8      Q.      Do you train police officers on these levels

9  of force?

10      A.      Yes.

11      Q.      Now I'm focusing on opinion 12 I believe it

12  is.  Is it your opinion that the Boston police

13  department should have animal encounter training?

14      A.      Yes, absolutely.

15      Q.      And I believe I kind of completed paragraphs

16  12 and 13 of your report, which is Exhibit 2 for the

17  record, they kind of go hand in hand together.  Does

18  that make sense to you?

19      A.      Yes, it does.

20      Q.      Do you want me to leave this up or can I take

21  it down?

22      A.      I'm fine with taking it down if you would

23  like.

24      Q.      You did say that it's your opinion that the

1  Boston police department should have animal encounter

2  training, correct?

3      A.      Absolutely, yes.

4      Q.      What is the basis for that opinion?

5      A.      Because without animal, or specifically dog

6  encounter training, the Boston police department is not

7  only ignoring what has over the years become

8  increasingly the standard for best practices endorsed by

9  many groups, such as the National Sheriff's Association,

10  the International Association of Chiefs of Police, the

11  Department of Justice and others, so they are not

12  meeting best standards or expected standards.

13          And by doing that, they are needlessly

14  exposing their officers and the public to unnecessary

15  risk, both their officers from not understanding the

16  realities of dog encounters and proper and progressive

17  manners of defusing and dealing with these.

18          They are also exposing the public to

19  significant risk because the untrained officers seem to

20  in the many cases I've looked into be more likely to

21  proceed directly to deadly force, and that leads to

22  exposure of themselves, other officers and the public in

23  general to the collateral effects of use of deadly

24  force.

1      Q.      Are you aware of how many hours police

2  officers have to be trained at the Boston police

3  department academy?

4      A.      I'm not sure what Boston requires.  I know

5  that in Florida most -- when I went through minimum

6  standards in Florida, I believe I got 960 hours of

7  training.  In the state of Florida and I believe what's

8  standard around most of the country is 720 hours plus.

9          I'm not sure what the state of Massachusetts

10  Commission on Police Officers Standards and Training

11  require or exactly how many hours the city of Boston

12  requires for its officers.

13      Q.      As we sit here today, you're not aware of how

14  many hours the Boston police department officers have to

15  go through when they are in academy for training?

16      A.      No.  I would assume that it was at least the

17  national general standard of around 720 plus hours.

18      Q.      And are you aware of how much outside training

19  police officers in Massachusetts have to complete a

20  year?

21          MR. ABBAS:  A specific type of training or

22  general?

23          MS. DAVIDSON:  General officer training.

24  BY MS. DAVIDSON:

1  A.  I don't know.
2  Q.  Are the laws regarding the use of lethal force
3  on a dog different in Florida than in Massachusetts?
4  A.  In Florida, we do not have a specific law that
5  addresses police officers' use of force against dogs.
6  We do have a law that allows a police officer under
7  certain very limited circumstances if authorized by
8  their department to use deadly force to dispatch a
9  grievously injured or dying animal.
10  That's the only provision that the state of
11  Florida makes for shooting an animal outside of lawful
12  licensed hunting.  I don't know what Massachusetts says.
13  Q.  Did you research any of the Massachusetts laws
14  for this case?
15  A.  I looked through it, and I don't remember
16  seeing anything in the statutes about police
17  specifically and use of deadly force on animals.  But I
18  pretty much scanned that because I'm not saying that
19  Officer Smith's actions were against the criminal code.
20  That would be something that your prosecutors would have
21  to determine.
22  Q.  But sitting here today, you are not aware of
23  any laws in Massachusetts regarding the use of lethal
24  force on a dog?

1  A.  I don't recall any specifically, no.
2  Q.  Are you aware of the states that give dog
3  encounter training to their police officers?
4  A.  There are six states who are required by
5  legislation to do so.  However, many others, varying
6  from department to department, do give such training.
7  If I can remember correctly, California, Oregon,
8  Colorado, Texas, Louisiana.  And Tennessee because they
9  were the first one.  Those all require such training.
10  I know that such training is given on a
11  statewide level, for instance, in Nevada.  I know that
12  it's given in a lot of cases in Georgia.  I know that
13  there is, it's given in the state of New York in various
14  jurisdictions, including the New York police department.
15  There is some that is done, again varying from
16  department to department, through the Midwest, including
17  the Chicago police department is regularly trained and
18  retrained on dog encounters.  So there are other
19  jurisdictions in Florida.
20  I've trained the trainers for the Miami Dade
21  police department and the Holly Hill police department.
22  I understand that -- again, there are other
23  jurisdictions where it happens on, not a legislated but
24  on a responsible response scattering of departments that

1  --
2  Typically it's departments that have had an
3  incident and then aggressively respond to such an
4  incident by changing policies and training.
5  Q.  Is Massachusetts one of those states that it's
6  required by legislation?
7  A.  Not to the best of my knowledge, no.
8  Q.  Is Massachusetts one of those states that you
9  believe does it out of their responsibility?
10  A.  I believe there are jurisdictions in
11  Massachusetts that do that.  I don't know particularly
12  the cities.  I have fielded questions from various
13  departments, usually smaller ones, that wanted
14  information.
15  And I have referred them to the free training
16  available on the NSA DOJ website.  I've also referred
17  them to the Chicago Safe Humane in various places.
18  Q.  Is the Boston police department one of those
19  jurisdictions that has reached out?
20  A.  I don't ever recall having spoken directly to
21  the Boston police department.
22  Q.  I think we covered this in-depth earlier,
23  correct me if I'm wrong, but what is animal encounter
24  training?

1  A.  The law enforcement dog encounter training is
2  training that teaches the officers not to be experts but
3  how to quickly evaluate and assess a dog's behavior, to
4  understand the situations in which they are likely to
5  come in contact with dogs.
6  The means of controlling their own body
7  language, posture and actions to defuse contacts with
8  dogs and the tools available to them and methods of
9  using those tools to resolve any kind of interaction
10  with a dog in a peaceful and safe manner.
11  Q.  And that is a training that you have taught to
12  police officers?
13  A.  Yes.
14  Q.  Is it your opinion that Officer Smith should
15  have received animal encounter training after this
16  incident?
17  A.  Before and after.  But especially after,
18  absolutely.
19  Q.  And what is the basis of your opinion?
20  A.  Because Officer Smith was involved in a
21  situation where he had to, or not had to, where he chose
22  to use deadly force in a situation that in my opinion
23  was unnecessary and created a danger to other officers
24  and the public.

1    And that recognizing, even if it was a
2  situation where he had been correct, I believe that the
3  Boston police department having at least at that point
4  been made aware of the possibility of this happening
5  should have proactively stepped in and not only trained
6  the officers in general but perhaps sat down and had a
7  talk with Officer Smith directly to ensure that he had
8  the proper tools to do his job safely and properly in
9  the future.
10      Q.    Are you aware of any other police departments
11  that have officers take animal encounter training after
12  an incident with an animal like in this case occurred?
13      A.    Sure, Miami Dade and Nye County police
14  department, the Las Vegas police department.  There's a
15  number of departments around the country.  That's why I
16  was in Holly Hill, Florida.  That's why I was at two
17  different agencies in Louisiana.
18          That's why I've been involved in training in a
19  number of places, because the departments have responded
20  proactively and a lot of times honestly because of
21  public feedback and kickback that responded to train
22  their officers so that again the officers, the civilian
23  and the pets are safer.
24      Q.    What about after a lethal force against an

1  animal occurs, were some of those instances when the
2  other police departments made them take the training?
3      A.    Most of the trainings after a shooting have
4  been done where the deployment of a firearm resulted in
5  the dog's death.  There have been a few of them where it
6  has resulted in significant injury to the dog but the
7  dog didn't die and yet the departments also responded by
8  initiating more aggressive measures to train their
9  officers in dealing with these encounters.
10      Q.    I'm going to share the screen.  This should be
11  the last time.  I just have a question on your report on
12  Exhibit 2.  On page three of your report at paragraph,
13  item 12, you refer to non-police witnesses who stated
14  that Chyna was stationary, not charging when Smith
15  fired.  Do you know what two non-police witnesses you're
16  referring to?
17      A.    In this, I'm referring to Ms. Goode and the
18  gentlemen who was with her.  I believe both of them
19  stated, I know Ms. Goode did absolutely, that their
20  opinion was that Chyna was standing still.
21          I'd have to weigh that since they were a good
22  distance away and may or may not have seen everything
23  that happened.  Or maybe they did.  So I simply
24  mentioned that as being an issue that two non-police

1  witnesses said that.  I don't know if they did, if they
2  actually saw that or not.
3      Q.    Do you have any other opinions in this case
4  that we have not yet discussed?
5      A.    At this point, no.  I believe we have covered
6  everything.  Again, as I mentioned from the beginning,
7  if other evidence comes up, other testimony comes up, I
8  may have other or adapted opinions on specific portions
9  of this.
10      Q.    I am going to take a few minutes and make sure
11  that I've covered everything that I want to cover.
12          (Brief recess.)
13  BY MS. DAVIDSON:
14      Q.    In your experience with dog training, do you
15  believe that a person can train their dog to be
16  aggressive?
17      A.    Yes.  Their dog can be trained to show
18  offensive behavior.  Look at the K-9 units in the Boston
19  police department or anywhere else.
20      Q.    In your experience, do you believe that a
21  person can train a dog to be aggressive but then train
22  another dog to not be aggressive?
23      A.    Certainly.
24          MS. DAVIDSON:  Nothing further.  I don't

1  know if you have anything?
2          MR. ABBAS:  Just two questions I hope.
3  CROSS-EXAMINATION BY MR. ABBAS:
4      Q.    My name is Daniel Abbas.  I don't know that we
5  have spoken before, but I represent Shirley and John
6  Goode, the plaintiffs in this case.
7          There's been a lot of testimony and in
8  evidence describing the situation as a chaotic
9  environment when the shooting of Chyna occurred.  What
10  I'm asking is, I guess the environment being chaotic,
11  does that in any way negate or eliminate the
12  responsibility of Officer Smith to use any less drastic
13  means available to him to defend one's self or another?
14      A.    No.  I would in fact say that a chaotic
15  situation with a crowd and a lot of things going on, it
16  really behooves the officer to take more care and more
17  caution, simply because of the clear risk of collateral,
18  unintended damage.
19      Q.    I'm not agreeing or in any way suggesting that
20  Chyna was being aggressive, but let's say for the sake
21  of argument we stipulated or agreed that Chyna was being
22  aggressive.  If that were the case, would Officer Smith
23  have been required to use less drastic means available
24  to him before deciding to use deadly force?

1      A.   According to the Boston police department
2   policy, that seems to be an indication based on that
3   statement.  As far as requirement, as far as responsible
4   and reasonable action, he absolutely should have looked
5   for something else to do.  Again, because we have got
6   testimony there were children around, there were people,
7   it was chaotic and fireworks going off.
8           And I have personally been in a very similar
9   situation where my officers were placed under fire and
10  as a result we had to exercise extra restraint because
11  of the risk of injury to civilians and non-involved
12  persons.
13     Q.   I'm going to rephrase the question.  The city
14  of Boston has Rule 303 Section 6A.  I believe that rule
15  was cited in the report by the firearms investigative
16  team.  The rule describes when an officer is permitted
17  to essentially discharge their firearm.
18          6A says, "There's no less drastic means
19  available to defendant one's self or another from
20  unlawful attack which an officer has reasonable cause to
21  believe could result in death or great bodily injury."
22          Presuming the reasonable cause to believe that
23  the situation that Officer Smith was in could result in
24  death or great bodily injury, if we assume that, would

1   that, with that being said, without agreeing that was
2   the case, would Officer Smith by the fact that he was
3   carrying pepper spray have complied with that provision
4   of the city of Boston's rules?
5      A.   Are you saying would the use of pepper spray
6   have complied with that?
7      Q.   Yes.
8      A.   Yes, it is my opinion that had he deployed
9   pepper spray, understanding its high effectiveness and
10  low likelihood of significantly or even annoyingly
11  injuring much of anyone else, that that would have been
12  in compliance with that section of the Boston police
13  manual.
14     Q.   Do you consider OC spray or pepper spray to be
15  a less drastic means?
16     A.   Absolutely.  In police training, for instance,
17  they didn't shoot me, so I understood what it felt like
18  to get shot, but they did pepper spray me repeatedly.
19  So the effects of it, although they are very effective
20  on animals even more so than humans, the risk of any
21  injury down the road is extremely minimal.
22          Again, even if Officer Smith had done the room
23  deodorizer move with the pepper spray and pepper sprayed
24  everything within 25 feet, nobody would have gotten

1   hurt, including the dog.  They would have been annoyed
2   basically by the contact of the OC active ingredient,
3   but there would have been no what I would call injuries.
4      Q.   Essentially would you agree that even if Chyna
5   was trying to attack him, his use of deadly force in
6   that situation still was not appropriate under the rules
7   set out by the city of Boston?
8          MS. DAVIDSON:  Objection.
9   BY MR. ABBAS:
10     A.   I would agree with that statement due to the
11  high risk of collateral serious, if not fatal, injury.
12  The officers involved in shooting at dogs even when they
13  were attacking have indeed killed both civilians and
14  other police officers.
15          So the risk of shooting at a small, moving
16  target in a crowd of people in a chaotic situation with
17  children present, there's just too much going against
18  the use of deadly force in that situation.
19     Q.   Looking at the picture that was marked as
20  Exhibit 3.  If you look at the photograph, you can see
21  one clear entry wound on the side of the dog, correct?
22     A.   Yes.
23     Q.   And just to clarify, that entry wound, is that
24  the left side of the dog?

1      A.   Yes.
2          MR. ABBAS:  No further questions.
3   REDIRECT EXAMINATION BY MS. DAVIDSON:
4      Q.   In your experience, when someone has a beware
5   of a dog sign at their front door displayed, does that
6   lead you to believe that they could have a dog that's
7   aggressive?
8          MR. ABBAS:  Objection.
9   BY MS. DAVIDSON:
10     A.   Not particularly.  I'm aware of many people in
11  many neighborhoods that put up beware of dog signs
12  because they want to make people think that maybe that's
13  a bad idea to break into their house.
14          But they may not have a big dog, they may not
15  have an aggressive dog.  They may not have a dog at all.
16  I've seen more than a couple of those where, Oh, there
17  is no dog.  We just put that up to scare people away.
18     Q.   In my subpoena I sent to you and Attorney
19  Abbas, I had attached a Schedule A for documents to be
20  produced as well.  I know it's weird, but did you bring
21  any of those documents with you today?
22     A.   No, I think I've provided them all.  If
23  there's something you don't have, I will be glad to ASAP
24  send it to Mr. Abbas so that it's in your possession as

1 soon as he can get it to you.  Tell me what you want and

2 I'd be happy to send it.

3     Q.    Thank you.

4          MS. DAVIDSON:  I'm going to suspend for

02:54:06PM the fact that he said he might form more opinions based

6 on evidence.  I will suspend for today.

7          MR. ABBAS:  Sure.

8          MS. DAVIDSON:  Other than that, we are

9 done.

10         (Whereupon the deposition was suspended at

11 2:54 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

1              SIGNATURE PAGE

2

3     I, JAMES W. CROSBY, the witness herein, having

4 read the foregoing testimony of the pages of this

5 deposition, do hereby certify it to be a true and

6 correct transcript, subject to the corrections, if any,

7 shown on the attached page.

8              oOo

9

10

11     _____

12         JAMES W. CROSBY

13

14

15

16 Signed under the pains and penalties of perjury.

17

18

19

20

21

22

23

24

1          ERRATA SHEET

2     I wish to make the following changes, for the

3 following reasons:

4 PAGE LINE

5 ____ ____ CHANGE: _____

6        REASON: _____

7 ____ ____ CHANGE: _____

8        REASON: _____

9 ____ ____ CHANGE: _____

10        REASON: _____

11 ____ ____ CHANGE: _____

12        REASON: _____

13 ____ ____ CHANGE: _____

14        REASON: _____

15 ____ ____ CHANGE: _____

16        REASON: _____

17 ____ ____ CHANGE: _____

18        REASON: _____

19 ____ ____ CHANGE: _____

20        REASON: _____

21 ____ ____ CHANGE: _____

22        REASON: _____

23

   _____

24 JAMES W. CROSBY

1              CERTIFICATE

2 COMMONWEALTH OF MASSACHUSETTS    )
  PLYMOUTH COUNTY, ss.             )

3     I, PATRICIA M. HAYNES, a Certified Shorthand

4 Reporter and Notary Public within the Commonwealth of
  Massachusetts, do hereby certify:

5     That JAMES W. CROSBY, the witness whose

6 testimony is hereinbefore set forth, was properly
  identified and duly sworn by me.

7     That the foregoing proceedings were taken down

8 by me stenographically and thereafter transcribed under
  my direction and supervision, and that the within

9 transcript is a true record of such proceedings.

10    I further certify that I am not related to any

11 of the parties to this action by blood or marriage, and
  that I am in no way interested in the cause or outcome

12 of this action.

    IN WITNESS WHEREOF, I have hereunto set my

13 hand this   day of July, 2023.

14

15    _____

      PATRICIA M. HAYNES

16

17 My Commission Expires:  July 5, 2024

18

19

20

21 THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
   APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

22 UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
   CERTIFYING REPORTER.

23
24

**$**

**$1,000** [1] - 7:2
**$200** [1] - 6:24
**$5,000** [1] - 7:1
**$500** [1] - 7:5

**0**

**02127** [1] - 1:22
**02201** [1] - 2:4
**02421** [1] - 2:8

**1**

**1** [10] - 1:16, 2:4, 3:8, 20:3, 20:5, 68:13, 91:24, 98:22, 98:23, 120:4
**100** [2] - 37:3, 53:6
**101** [1] - 2:8
**107** [1] - 36:23
**109** [1] - 98:14
**10:00** [1] - 1:18
**11** [3] - 124:24, 125:2, 125:3
**11457-GAO** [1] - 1:3
**12** [4] - 22:13, 126:11, 126:16, 134:13
**125** [1] - 125:18
**13** [1] - 126:16
**13,000** [1] - 37:10
**136** [1] - 3:4
**140** [1] - 3:3
**146202F** [1] - 1:15
**15** [3] - 8:5, 88:2, 93:22
**170** [1] - 125:20
**1932** [1] - 69:17
**1977** [1] - 22:8
**1999** [1] - 22:21
**1:21-CV** [1] - 1:3

**2**

**2** [9] - 3:9, 57:21, 59:9, 92:1, 118:15, 118:16, 125:2, 126:16, 134:12
**2-1/2** [1] - 85:21
**20** [3] - 3:8, 8:5, 88:2
**200** [4] - 23:22, 28:22, 58:22, 126:1
**2011** [1] - 43:14
**2013** [1] - 5:15
**2015** [1] - 43:17
**2017** [1] - 19:20
**2019** [2] - 19:20, 19:22
**2023** [3] - 1:17, 16:2, 144:13

**2024** [1] - 144:17
**23** [2] - 1:17, 35:5
**238** [1] - 125:21
**24** [1] - 35:5
**25** [1] - 138:24
**26** [1] - 120:24
**2:54** [1] - 141:11

**3**

**3** [6] - 3:10, 98:9, 98:19, 100:3, 100:19, 139:20
**30** [2] - 36:24, 96:11
**30,000** [1] - 37:14
**303** [1] - 137:14
**305** [1] - 125:22
**308** [1] - 125:22
**330** [1] - 125:22
**34** [1] - 37:1
**363** [1] - 1:22

**4**

**4** [1] - 3:3
**40** [3] - 22:18, 36:24, 97:10
**45** [4] - 4:24, 80:11, 96:11, 96:15

**5**

**5** [16] - 66:17, 66:19, 67:9, 67:21, 68:4, 68:19, 68:21, 69:4, 70:8, 72:1, 72:7, 75:12, 121:24, 122:1, 144:17
**50-50** [1] - 10:3
**57** [1] - 3:9

**6**

**6** [1] - 118:17
**6,000** [2] - 44:15, 45:23
**6-1/2** [1] - 22:17
**60** [5] - 5:2, 5:3, 36:15, 37:21, 65:18
**615** [2] - 1:16, 2:4
**617-269-5448** [1] - 1:23
**6A** [2] - 137:14, 137:18

**7**

**7** [1] - 118:17
**700** [1] - 126:2
**720** [2] - 128:8, 128:17

**8**

**8** [2] - 16:1, 118:17
**81** [1] - 2:8

**9**

**90** [2] - 99:3, 122:1
**960** [1] - 128:6
**98** [1] - 3:10

**A**

**a.m** [1] - 1:18
**ABBAS** [24] - 4:19, 5:2, 51:13, 51:19, 62:9, 65:10, 67:23, 68:7, 70:11, 71:16, 89:18, 97:20, 98:4, 98:10, 103:12, 104:1, 104:6, 128:21, 136:2, 136:3, 139:9, 140:2, 140:8, 141:7
**Abbas** [10] - 2:7, 3:4, 6:19, 7:7, 8:9, 15:20, 19:9, 136:4, 140:19, 140:24
**abilities** [1] - 125:17
**ability** [4] - 47:18, 54:12, 122:12, 124:5
**able** [8] - 33:11, 48:1, 55:22, 56:15, 64:18, 64:24, 65:4, 85:21
**abnormal** [1] - 40:3
**absence** [1] - 42:12
**absent** [1] - 53:21
**absolutely** [14] - 27:15, 37:12, 47:8, 57:8, 63:20, 78:4, 95:22, 101:24, 126:14, 127:3, 132:18, 134:19, 137:4, 138:16
**Abuse** [1] - 14:24
**abuse** [1] - 41:17
**abused** [1] - 50:4
**academies** [3] - 23:13, 23:14, 45:11
**Academy** [2] - 14:11, 14:19
**academy** [13] - 22:8, 23:18, 44:13, 45:7, 45:14, 45:21, 46:1, 46:2, 46:3, 46:5, 46:9, 128:3, 128:15
**acceptable** [1] - 122:2
**accepted** [1] - 8:24
**accepting** [2] - 104:22, 105:2

**access** [1] - 16:3
**accidental** [3] - 41:23, 42:1
**accidently** [1] - 84:6
**accidents** [1] - 32:8
**accompanied** [3] - 79:19, 107:19, 117:3
**according** [4] - 5:14, 88:19, 121:15, 137:1
**account** [1] - 114:23
**accuracy** [1] - 90:5
**accurate** [2] - 5:5, 120:24
**accused** [1] - 32:13
**act** [1] - 67:16
**acting** [5] - 12:8, 33:2, 33:3, 47:21, 104:22
**action** [7] - 7:12, 7:15, 55:23, 108:2, 137:4, 144:10, 144:11
**Action** [1] - 1:3
**actions** [10] - 7:18, 29:10, 33:10, 40:6, 40:8, 58:19, 61:6, 107:5, 129:19, 132:7
**activation** [1] - 117:10
**active** [3] - 45:19, 82:5, 139:2
**actively** [9] - 13:20, 27:8, 28:2, 43:15, 83:19, 86:14, 102:9, 109:13, 114:13
**activity** [1] - 49:23
**actual** [6] - 8:22, 25:16, 42:10, 84:14, 90:13, 120:2
**adapted** [1] - 135:8
**added** [1] - 73:14
**addition** [2] - 23:15, 29:5
**additional** [2] - 48:16, 58:17
**additionally** [1] - 48:24
**address** [1] - 76:24
**addressed** [1] - 33:17
**addresses** [1] - 129:5
**addressing** [1] - 29:18
**adequate** [2] - 23:17, 74:23
**adequately** [2] - 68:13, 72:8
**adjoining** [1] - 11:18
**adoptability** [1] - 37:15
**adopted** [1] - 49:9
**adult** [3] - 66:9, 69:12, 86:14
**advance** [1] - 84:16
**advise** [2] - 47:3,

91:10
**affairs** [2] - 31:14, 31:24
**affect** [4] - 30:22, 54:23, 59:2, 103:6
**affected** [2] - 96:18, 120:15
**affects** [1] - 112:18
**affiliative** [3] - 56:2, 104:23, 105:4
**age** [1] - 4:3
**agencies** [7] - 35:17, 35:20, 37:7, 37:8, 40:14, 41:7, 133:17
**agency** [1] - 66:2
**Aggression** [1] - 16:14
**aggression** [17] - 6:2, 9:1, 16:20, 30:21, 35:21, 38:7, 54:21, 56:8, 56:10, 67:15, 67:17, 103:2, 107:14, 108:9, 108:17, 109:5, 122:12
**aggressive** [89] - 16:21, 17:4, 17:6, 30:12, 30:18, 30:20, 30:23, 37:19, 37:22, 38:2, 38:8, 38:17, 53:7, 54:17, 54:19, 55:4, 55:5, 56:1, 56:16, 61:6, 63:13, 63:18, 64:4, 64:18, 65:8, 66:5, 66:12, 66:13, 66:22, 67:8, 67:18, 68:2, 68:3, 68:9, 68:13, 68:15, 68:16, 70:10, 70:19, 70:22, 71:14, 72:3, 72:15, 73:7, 73:10, 76:18, 82:14, 83:4, 86:4, 86:21, 87:7, 102:23, 103:11, 103:17, 103:24, 104:16, 104:17, 107:1, 107:7, 107:10, 107:14, 108:2, 108:4, 108:6, 108:10, 108:14, 109:1, 118:1, 120:11, 122:10, 122:16, 122:18, 122:24, 123:1, 123:3, 123:8, 134:8, 135:16, 135:21, 135:22, 136:20, 136:22, 140:7, 140:15
**aggressively** [1] -

131:3
**ago** [2] - 35:5, 47:18
**agree** [11] - 20:19, 20:23, 64:2, 66:3, 71:12, 100:4, 100:19, 118:19, 119:6, 139:4, 139:10
**agreed** [1] - 136:21
**agreeing** [2] - 136:19, 138:1
**ahead** [2] - 57:2, 104:13
**aid** [1] - 33:20
**aiding** [1] - 46:24
**aim** [3] - 54:3, 97:3, 100:20
**aimed** [3] - 100:4, 100:16, 100:23
**AKC** [1] - 15:15
**Alabama** [1] - 39:3
**alarm** [1] - 11:6
**allegedly** [3] - 17:6, 37:22, 88:21
**allergic** [1] - 69:19
**allergies** [1] - 56:20
**Alliance** [1] - 15:6
**allow** [2] - 86:17, 102:22
**allowed** [1] - 25:19
**allows** [1] - 129:6
**almost** [1] - 22:1
**alone** [2] - 108:22, 109:6
**alternate** [1] - 73:3
**altogether** [1] - 29:14
**America** [1] - 15:14
**American** [3] - 13:6, 14:11, 14:19
**amount** [9] - 31:6, 43:7, 67:13, 71:12, 77:14, 104:4, 124:8, 125:15
**analogously** [1] - 64:24
**Analysis** [1] - 15:7
**analyze** [1] - 47:2
**analyzing** [1] - 70:22
**anaphylactic** [1] - 69:19
**Anatolian** [1] - 125:24
**AND/OR** [1] - 144:21
**Angeles** [1] - 84:22
**angle** [2] - 97:11, 99:15
**animal** [74] - 10:24, 11:3, 11:24, 13:18, 13:21, 16:22, 18:1, 21:8, 21:19, 21:22, 23:7, 26:18, 28:20, 30:3, 35:17, 37:7,

38:23, 40:14, 41:6, 41:8, 41:11, 41:13, 41:14, 42:2, 42:5, 42:13, 42:24, 45:12, 48:9, 48:14, 49:6, 49:10, 49:21, 49:22, 50:3, 50:4, 50:7, 50:8, 50:19, 51:4, 54:22, 56:16, 65:1, 65:8, 66:5, 69:5, 76:3, 76:7, 77:11, 77:12, 77:24, 78:3, 83:17, 85:23, 85:24, 86:1, 94:5, 97:4, 97:5, 102:17, 121:19, 126:13, 127:1, 127:5, 129:9, 129:11, 131:23, 132:15, 133:11, 133:12, 134:1
**Animal** [16] - 13:5, 14:12, 14:24, 15:2, 15:5, 15:6, 15:11, 19:3, 38:24, 39:1, 39:2, 39:3, 39:4, 47:10, 48:5
**animal's** [1] - 40:8
**animal-related** [1] - 50:3
**animals** [13] - 17:6, 23:21, 24:11, 28:14, 29:22, 30:12, 51:10, 51:17, 51:18, 54:15, 66:13, 129:17, 138:20
**Animals** [1] - 15:10
**annoyed** [1] - 139:1
**annoyingly** [1] - 138:10
**answer** [3] - 4:7, 57:8, 68:13
**answered** [1] - 57:17
**answers** [1] - 61:22
**ANY** [1] - 144:21
**apparent** [1] - 99:4
**appealed** [1] - 49:4
**appear** [1] - 101:8
**appearance** [3] - 81:7, 121:7, 122:24
**appearances** [1] - 9:20
**APPEARANCES** [1] - 2:1
**appeasement** [1] - 80:16
**applicable** [2] - 40:2, 68:18
**application** [1] - 44:1
**applied** [1] - 67:3
**applies** [1] - 9:18

**APPLY** [1] - 144:21
**apply** [2] - 40:3, 72:22
**appreciate** [4] - 29:19, 40:5, 57:1, 66:22
**appreciating** [1] - 65:16
**appreciation** [1] - 70:24
**approach** [5] - 75:9, 106:6, 106:10, 106:13, 109:4
**approaching** [5] - 67:16, 72:7, 75:4, 105:11, 105:14
**appropriate** [7] - 7:23, 26:15, 27:11, 33:20, 68:24, 97:21, 139:6
**appropriately** [2] - 12:8, 33:16, 66:2
**appropriateness** [2] - 32:6, 77:6
**approved** [3] - 6:7, 16:16, 19:21
**area** [12] - 24:21, 33:3, 34:5, 40:11, 42:20, 49:24, 51:2, 51:3, 81:18, 113:1, 115:8, 124:16
**areas** [1] - 21:23
**argument** [1] - 136:21
**arguments** [1] - 40:23
**arisen** [1] - 96:24
**Arizona** [1] - 37:4
**arm** [2] - 56:12, 87:20
**armed** [1] - 28:2, 85:24, 86:2
**armored** [1] - 54:2
**arms** [1] - 115:5
**arousal** [1] - 115:17
**arrest** [4] - 11:12, 77:15, 77:21, 79:4
**arrests** [1] - 32:6
**arrived** [1] - 33:11
**articles** [2] - 18:13, 19:2
**ASAP** [1] - 140:23
**asleep** [2] - 66:7, 107:22
**ASPCA** [1] - 50:12
**assess** [14] - 39:6, 43:23, 43:24, 63:13, 64:4, 65:4, 70:9, 70:18, 72:8, 72:14, 72:20, 73:2, 91:13, 132:3
**assessing** [1] - 71:13
**assessment** [9] - 49:13, 64:1, 64:12, 65:3, 66:1, 67:1, 70:15, 70:16, 73:15

**assessments** [2] - 65:13, 95:14
**assigned** [2] - 22:20, 31:23
**assignment** [2] - 119:9, 120:16
**assist** [1] - 49:8
**assistance** [1] - 49:18
**assistant** [1] - 50:16
**assisted** [1] - 50:10
**associated** [1] - 9:3
**ASSOCIATES** [1] - 1:21
**Association** [26] - 13:5, 14:8, 14:10, 14:20, 14:23, 15:1, 15:2, 15:4, 15:7, 15:12, 15:17, 16:18, 18:19, 19:3, 20:17, 30:3, 35:7, 39:1, 39:2, 39:3, 39:4, 45:1, 125:13, 127:9, 127:10
**associative** [1] - 56:2
**assortment** [2] - 40:12, 41:5
**assume** [3] - 128:16, 137:24
**assuming** [2] - 68:7, 76:21
**assumptions** [1] - 9:19
**attached** [3] - 16:8, 140:19, 142:7
**attack** [7] - 26:22, 27:4, 36:16, 69:17, 74:6, 137:20, 139:5
**attacked** [2] - 10:6, 27:7
**attacking** [2] - 27:8, 139:13
**attacks** [4] - 6:3, 9:16, 18:24, 35:24
**attempting** [1] - 122:23
**attend** [1] - 42:24
**attendance** [1] - 30:4
**attended** [2] - 13:13, 18:11
**attends** [1] - 30:9
**attention** [1] - 101:19
**attorney** [3] - 7:7, 50:16, 62:7
**Attorney** [3] - 7:7, 8:9, 140:18
**attorney's** [1] - 49:15
**attorneys** [1] - 50:13
**attracted** [1] - 101:20
**Australia** [1] - 18:1
**author** [5] - 6:6, 19:11,

19:13, 19:16, 19:17
**authorized** [2] - 86:2, 129:7
**automatically** [2] - 75:17, 77:19
**available** [17] - 7:18, 18:22, 23:24, 24:1, 25:5, 43:2, 44:22, 49:17, 60:18, 74:5, 87:15, 92:2, 131:16, 132:8, 136:13, 136:23, 137:19
**availed** [1] - 87:21
**Avenue** [1] - 2:8
**avert** [1] - 109:10
**avoid** [3] - 31:12, 105:16, 112:13
**avoidance** [2] - 103:3, 103:19
**aware** [26] - 21:6, 21:13, 21:21, 22:1, 30:9, 33:13, 42:22, 90:9, 90:17, 91:2, 92:10, 92:11, 94:20, 95:1, 106:13, 122:17, 124:12, 128:1, 128:13, 128:18, 129:22, 130:2, 133:4, 133:10, 140:10
**awareness** [3] - 52:11, 68:20, 80:7
**awful** [1] - 102:5
**awhile** [2] - 6:21, 21:2

# B

**bachelor's** [1] - 12:12
**backdrop** [5] - 27:1, 54:4, 93:12, 94:21, 95:17
**backed** [1] - 110:8
**background** [6] - 22:4, 34:14, 34:16, 36:9, 36:12, 37:19
**backwards** [2] - 74:23, 88:16
**backyard** [1] - 11:13
**bad** [4] - 94:24, 122:21, 123:11, 140:13
**bag** [1] - 84:11
**bags** [1] - 84:15
**balance** [1] - 83:21
**ball** [3] - 55:8, 121:10, 121:11
**Baltimore** [1] - 53:5
**band** [1] - 99:11
**barely** [1] - 99:17
**barked** [1] - 11:20

barking [2] - 55:5, 55:6
barks [1] - 75:13
Barr [1] - 125:12
barrier [1] - 85:6
barriers [1] - 52:11
based [28] - 9:20, 25:12, 25:17, 29:3, 32:10, 63:8, 63:14, 66:16, 70:7, 85:7, 90:2, 94:3, 94:15, 95:7, 105:15, 105:20, 106:24, 107:8, 108:3, 108:13, 108:24, 112:21, 113:6, 120:17, 121:20, 137:2, 141:5
basic [2] - 34:19, 65:16
basing [2] - 90:7, 90:8
basis [12] - 9:19, 43:3, 60:12, 60:16, 60:17, 74:15, 93:10, 101:14, 114:3, 119:21, 127:4, 132:19
bath [1] - 88:7
baton [11] - 52:17, 52:20, 52:21, 74:21, 77:4, 81:16, 81:21, 82:22, 83:1, 83:2, 92:6
bean [2] - 84:11, 84:15
became [3] - 29:24, 35:14, 35:22
become [4] - 102:23, 103:7, 103:24, 127:7
becoming [1] - 82:13
bed [2] - 11:10, 102:14
beginning [1] - 135:6
behalf [5] - 1:11, 6:13, 10:16, 11:23, 12:1
Behavior [6] - 13:5, 14:12, 15:5, 15:6, 15:7
behavior [61] - 5:15, 5:18, 7:16, 8:19, 9:1, 9:18, 13:1, 13:4, 14:5, 17:12, 30:14, 30:15, 31:1, 31:10, 32:15, 35:12, 35:24, 36:10, 36:14, 40:4, 46:11, 46:22, 47:7, 51:23, 51:24, 52:1, 54:19, 55:4, 55:22, 56:2, 57:10, 64:11, 64:22, 65:1, 65:16, 66:22, 67:16, 71:1, 72:9, 72:18, 72:20,

73:3, 75:14, 102:11, 103:6, 103:20, 106:19, 107:6, 113:17, 116:4, 117:22, 118:5, 118:6, 118:18, 119:16, 120:15, 121:8, 121:18, 132:3, 135:18
behavioral [3] - 120:16, 123:21, 125:5
behaviors [47] - 12:21, 30:21, 30:24, 36:17, 39:8, 40:6, 46:17, 46:18, 46:24, 47:1, 54:22, 55:18, 56:7, 66:21, 68:16, 68:17, 75:18, 103:3, 108:7, 108:10, 108:15, 108:16, 109:3, 109:8, 110:22, 111:7, 111:9, 111:10, 111:13, 111:19, 111:20, 112:1, 112:2, 112:3, 112:8, 114:11, 116:1, 116:21, 117:13, 117:21, 118:1, 118:4, 122:13, 122:16, 123:2, 123:9
behind [9] - 9:19, 11:5, 21:4, 52:12, 77:18, 79:5, 93:16, 99:15, 110:16
behooves [1] - 136:16
beings [2] - 36:16, 94:3
belly [1] - 112:11
belong [3] - 14:8, 14:9, 15:16
belt [1] - 91:3
bend [1] - 99:3
benefits [1] - 22:21
best [9] - 24:6, 46:8, 46:16, 59:19, 60:11, 77:8, 127:8, 127:12, 131:7
better [3] - 47:4, 69:7, 110:5
between [22] - 7:11, 8:3, 19:20, 28:18, 41:11, 47:3, 51:24, 52:17, 57:10, 58:11, 61:2, 66:11, 79:18, 80:24, 81:19, 85:14, 91:6, 93:21, 111:17, 118:5, 119:6
beveling [1] - 99:21

beware [2] - 140:4, 140:11
bid [1] - 50:6
big [4] - 124:4, 124:5, 140:14
bigger [7] - 75:6, 75:22, 76:5, 123:24, 124:13, 124:14
bills [2] - 21:10, 119:17
bisects [1] - 99:12
bit [15] - 6:21, 22:3, 25:21, 35:4, 38:20, 56:18, 65:7, 67:7, 69:1, 71:14, 75:6, 89:9, 110:9, 112:16, 117:19
bite [17] - 12:22, 16:19, 16:24, 18:20, 48:24, 52:19, 69:18, 76:15, 86:4, 122:15, 124:1, 124:21, 125:10, 125:14, 126:5
bite-related [1] - 12:22
bites [4] - 6:3, 9:1, 10:10, 16:23
biting [2] - 69:15, 86:15
bits [1] - 30:6
bitten [1] - 10:6
blades [1] - 80:10
blanket [1] - 99:9
blast [2] - 82:1, 85:8
blatantly [1] - 86:4
block [1] - 52:15
blog [1] - 19:1
blood [4] - 99:8, 99:9, 99:12, 144:10
Board [2] - 14:21, 15:11
bodily [3] - 62:20, 137:21, 137:24
body [26] - 17:12, 28:16, 28:17, 29:10, 40:5, 42:13, 52:4, 52:5, 63:23, 80:7, 80:10, 80:14, 81:4, 87:23, 91:13, 97:12, 100:5, 100:7, 100:14, 100:20, 100:23, 109:11, 109:18, 113:3, 126:1, 132:6
bolster [1] - 122:23
bolted [1] - 106:3
bones [1] - 97:8
boots [1] - 84:3
BOSTON [3] - 1:7, 1:22, 2:3

Boston [38] - 1:16, 1:17, 2:4, 7:14, 59:18, 61:10, 61:15, 61:19, 62:2, 62:22, 63:5, 69:23, 70:4, 70:5, 73:24, 74:2, 87:12, 90:18, 91:2, 91:5, 92:21, 97:15, 114:7, 126:12, 127:1, 127:6, 128:2, 128:4, 128:11, 128:14, 131:18, 131:21, 133:3, 135:18, 137:1, 137:14, 138:12, 139:7
Boston's [1] - 138:4
bothered [1] - 108:23
bothering [1] - 56:21
bottle [1] - 88:9
bottom [1] - 100:10
bowl [1] - 55:3
Brady [1] - 125:12
brand [1] - 83:8
break [2] - 68:12, 140:13
breakdown [1] - 121:24
breaks [1] - 10:3
breathe [1] - 110:5, 116:14
breathing [12] - 65:23, 66:9, 107:20, 108:9, 108:18, 108:19, 113:14, 116:21, 117:3, 117:8, 117:9, 118:9
bred [1] - 121:10
breed [17] - 9:18, 9:19, 15:15, 119:5, 119:9, 119:10, 120:4, 120:20, 120:22, 120:23, 121:2, 121:6, 121:13, 121:20, 121:21, 122:14
breeds [6] - 120:18, 122:8, 122:9, 122:14, 123:16, 123:17
bricks [1] - 53:18
Bridget [2] - 2:3, 4:12
bridget.davidson@ boston.gov [1] - 2:5
Brief [1] - 135:12
brief [3] - 57:14, 64:1, 79:21
briefly [1] - 76:14
brindle [1] - 122:5
bring [3] - 56:18, 88:8,

140:20
brown [1] - 122:5
build [1] - 122:6
bull [3] - 119:3, 119:5, 119:7, 119:12, 119:23, 120:11, 122:1, 125:10, 125:11
bullet [3] - 93:15, 98:20, 99:21
bullets [1] - 97:10
bulls [8] - 122:18, 123:3, 123:7, 123:19, 125:4, 125:9, 125:21, 126:6
bully [1] - 122:7
bunch [2] - 14:15, 84:22
bus [1] - 94:24
business [2] - 13:9, 13:11
busy [1] - 84:1
BY [26] - 4:9, 5:7, 20:6, 34:13, 51:20, 57:7, 57:22, 62:14, 65:11, 68:1, 68:11, 70:12, 71:23, 89:20, 93:2, 98:5, 98:13, 103:14, 104:11, 128:24, 135:13, 136:3, 139:9, 140:3, 140:9, 144:21

**C**

C-R-O-S-B-Y [1] - 4:15
calculated [1] - 103:3
caliber [1] - 97:10
California [3] - 43:16, 46:6, 124:12, 130:7
camps [1] - 84:23
Canada [2] - 18:2, 37:1
canine [5] - 9:1, 13:2, 17:12, 121:16
Canine [1] - 13:6
canines [2] - 43:6, 43:22
cannot [1] - 121:19
capable [2] - 66:14, 121:12
capacity [1] - 27:16
Capsicum [1] - 53:1
capture [2] - 53:15, 77:24
car [1] - 60:22
carbon [1] - 85:6
care [2] - 22:22, 136:16
Care [3] - 15:2, 47:10,

48:5
**career** [2] - 28:9, 95:14
**Caribbean** [1] - 36:24
**carry** [2] - 85:3, 91:3
**carrying** [2] - 74:20, 138:3
**case** [46] - 5:1, 6:14, 6:16, 6:23, 7:1, 7:9, 8:4, 8:12, 8:16, 10:9, 10:14, 10:22, 10:23, 11:17, 11:24, 12:7, 16:4, 19:8, 22:11, 39:11, 47:7, 54:22, 55:18, 58:2, 59:4, 59:10, 59:12, 61:9, 63:11, 69:23, 77:15, 85:6, 86:23, 94:8, 97:13, 102:13, 103:6, 103:16, 103:23, 114:19, 129:14, 133:12, 135:3, 136:6, 136:22, 138:2
**cases** [26] - 9:4, 9:7, 9:13, 10:8, 10:13, 10:21, 11:16, 11:21, 11:22, 12:6, 36:22, 38:12, 38:21, 39:24, 41:4, 41:13, 42:4, 44:20, 49:12, 49:19, 50:9, 50:19, 55:17, 127:20, 130:12
**catastrophic** [1] - 62:24
**catch** [2] - 11:1, 68:15
**category** [1] - 122:7
**cats** [1] - 65:21
**cattle** [1] - 21:24
**causation** [1] - 36:16
**caused** [3] - 93:13, 96:24, 119:24
**caution** [1] - 136:17
**cautioning** [1] - 53:9
**cease** [2] - 27:4, 47:1
**center** [7] - 43:19, 54:3, 97:7, 97:12, 100:5, 100:20, 100:23
**centers** [2] - 29:23, 41:16
**certain** [2] - 93:18, 129:7
**certainly** [3] - 10:22, 72:16, 135:23
**CERTIFICATE** [1] - 144:1
**certificates** [1] - 13:14
**Certification** [3] - 13:2, 14:2, 14:22

**certification** [1] - 14:4
**CERTIFICATION** [1] - 144:20
**certifications** [4] - 12:24, 13:8, 13:12, 13:23
**Certified** [2] - 1:13, 144:3
**certified** [14] - 5:14, 5:18, 8:19, 13:1, 13:3, 13:4, 13:15, 13:16, 13:18, 14:1, 14:2, 35:14, 46:11
**certify** [1] - 142:5, 144:4, 144:10
**CERTIFYING** [1] - 144:22
**chairs** [1] - 15:8
**challenge** [4] - 80:18, 80:24, 106:22, 106:23
**chance** [1] - 69:11
**change** [10] - 21:4, 27:6, 58:24, 72:20, 80:14, 80:15, 101:8, 110:22, 111:8, 115:2
**changed** [2] - 78:23, 87:23
**changes** [1] - 143:2
**changing** [3] - 47:14, 80:7, 131:4
**chaos** [4] - 89:2, 101:13, 107:24, 115:13
**chaotic** [20] - 93:6, 95:8, 95:13, 95:16, 95:19, 96:17, 101:3, 103:5, 103:10, 103:12, 103:15, 103:22, 104:2, 104:3, 104:14, 136:8, 136:10, 136:14, 137:7, 139:16
**characteristic** [1] - 125:5
**characteristics** [3] - 120:16, 123:21, 124:10
**charge** [1] - 22:12
**charges** [1] - 48:20
**charging** [14] - 57:13, 66:16, 67:9, 67:19, 67:20, 68:4, 69:4, 70:7, 70:17, 78:8,

91:11, 107:1, 107:4, 134:14
**CHARLES** [1] - 2:7
**Charles** [2] - 6:13, 8:7
**check** [3] - 33:9, 55:15, 61:21
**checking** [1] - 105:9
**checkpoints** [1] - 63:21
**Chelsea** [1] - 20:16
**chest** [1] - 97:7
**Chicago** [4] - 43:14, 124:12, 130:17, 131:17
**chickens** [1] - 50:5
**chief** [4] - 35:16, 35:17, 47:21, 49:17
**Chiefs** [1] - 127:10
**Chihuahua** [1] - 122:1
**child** [1] - 86:14
**child's** [1] - 113:17
**children** [4] - 94:24, 101:21, 137:6, 139:17
**choice** [1] - 95:1
**choices** [1] - 25:11
**chose** [2] - 95:11, 132:21
**Chyna** [45] - 7:12, 7:16, 7:20, 8:3, 59:15, 59:23, 60:2, 61:6, 62:17, 72:3, 73:6, 73:9, 73:18, 73:20, 74:12, 87:17, 88:21, 97:14, 98:20, 101:2, 101:8, 105:11, 105:13, 105:15, 105:18, 106:6, 106:10, 107:21, 111:15, 114:21, 115:4, 115:7, 119:3, 119:12, 119:23, 120:5, 120:10, 120:17, 122:4, 134:14, 134:20, 136:9, 136:20, 136:21, 139:4
**Chyna's** [6] - 7:21, 100:5, 100:7, 100:20, 118:17, 120:15
**circles** [2] - 41:24, 102:18
**circular** [2] - 99:7, 99:20
**circumstance** [3] - 64:2, 66:6, 72:23
**circumstances** [7] - 7:11, 27:20, 55:23,

66:4, 72:13, 72:21, 129:7
**cited** [1] - 137:15
**cities** [1] - 131:12
**Citizen** [1] - 13:7
**CITY** [2] - 1:7, 2:3
**city** [11] - 47:11, 47:24, 48:1, 48:6, 49:5, 70:4, 114:7, 128:11, 137:13, 138:4, 139:7
**City** [4] - 1:16, 2:4, 11:11
**city's** [1] - 48:13
**Civil** [2] - 1:3, 1:12
**civilian** [6] - 27:14, 75:7, 93:5, 95:18, 96:4, 133:22
**civilians** [8] - 54:15, 67:6, 94:13, 104:4, 120:23, 122:7, 137:11, 139:13
**claim** [1] - 123:5
**claimed** [1] - 58:21
**claims** [3] - 122:20, 123:5, 123:6
**clarify** [2] - 62:9, 139:23
**class** [12] - 16:13, 18:6, 23:9, 25:4, 28:24, 29:1, 43:1, 44:8, 46:3, 57:12, 57:13, 57:15
**classes** [14] - 16:7, 16:11, 16:14, 16:19, 16:20, 16:22, 17:1, 17:9, 23:4, 23:6, 24:12, 26:11, 43:1, 51:4
**classify** [1] - 37:20
**classroom** [3] - 25:1, 25:3, 25:4
**CLE** [3] - 30:4, 30:9, 41:6
**clean** [1] - 97:24
**clear** [10] - 59:8, 59:13, 63:17, 74:7, 79:8, 86:16, 87:2, 99:17, 136:17, 139:21
**Clearing** [2] - 24:1, 24:7
**clearly** [3] - 26:12, 69:24, 86:16
**clients** [3] - 6:13, 9:11, 38:6
**clients'** [2] - 35:8, 38:10
**clipboard** [2] - 60:24, 81:17

**close** [5] - 29:17, 37:13, 52:12, 73:1, 117:21
**closed** [6] - 66:7, 84:1, 105:22, 110:7, 113:13, 117:20
**closely** [1] - 42:17
**closer** [3] - 56:18, 81:4, 87:22
**closest** [1] - 52:19
**clothes** [1] - 91:7
**Club** [1] - 15:14
**club** [1] - 15:15
**Club's** [1] - 13:6
**cluster** [5] - 54:21, 56:1, 68:16, 122:12, 123:8
**co** [3] - 15:8, 19:11, 19:16
**co-author** [2] - 19:11, 19:16
**co-chairs** [1] - 15:8
**Coalition** [1] - 15:9
**coat** [1] - 56:12
**Coated** [1] - 15:14
**cock** [1] - 48:19
**code** [1] - 129:19
**coffee** [2] - 85:16, 85:17
**cold** [1] - 85:8
**collapsable** [2] - 52:21, 92:6
**collateral** [3] - 127:23, 136:17, 139:11
**collect** [1] - 50:24
**collection** [1] - 42:6
**College** [2] - 12:14, 12:17
**color** [2] - 97:18, 97:22
**Colorado** [4] - 10:22, 39:4, 46:6, 130:8
**colored** [1] - 99:12
**combined** [1] - 5:22
**comfort** [1] - 114:17
**coming** [2] - 72:5, 73:13
**command** [8] - 31:19, 33:2, 34:8, 79:14, 79:21, 79:22, 80:6
**commander** [1] - 22:18
**commanders** [1] - 34:8
**commands** [4] - 78:11, 78:14, 79:11, 88:15
**commencing** [1] - 1:18
**comment** [1] - 54:18

**Commission** [2] - 128:10, 144:17
**Committee** [2] - 14:24, 43:16
**common** [12] - 53:2, 102:17, 107:11, 109:11, 112:8, 116:16, 117:2, 119:17, 123:18, 123:20, 124:1, 125:23
**commonly** [1] - 30:23
**Commonwealth** [2] - 1:14, 144:4
**COMMONWEALTH** [1] - 144:2
**communicating** [1] - 109:5
**communication** [3] - 55:6, 55:10, 116:2
**communications** [1] - 7:6
**community** [1] - 24:8
**companion** [1] - 9:15
**company** [4] - 24:7, 25:6, 105:6
**comparisons** [1] - 24:13
**competing** [1] - 35:7
**competition** [2] - 34:23, 35:1
**competitions** [2] - 34:24, 35:9
**complain** [1] - 32:9
**complainants** [2] - 32:19, 34:4
**complaints** [7] - 16:24, 31:18, 31:22, 32:2, 32:3, 34:4, 50:20
**complete** [4] - 24:3, 26:7, 45:15, 128:19
**completed** [2] - 59:7, 126:15
**completely** [1] - 69:21
**complex** [1] - 107:14
**complexion** [1] - 78:23
**compliance** [2] - 91:24, 138:12
**complicated** [2] - 49:18, 49:19
**complications** [1] - 69:17
**complied** [2] - 138:3, 138:6
**Comply** [1] - 79:5
**component** [1] - 25:2
**concerns** [1] - 53:23
**conclusion** [2] - 90:2,

101:10
**condemn** [1] - 123:12
**condition** [3] - 33:19, 42:14, 116:17
**conditions** [2] - 42:12, 115:19
**conduct** [1] - 32:7
**conducted** [8] - 49:18, 53:12, 71:1, 77:7, 82:17, 83:8, 83:10, 91:23
**conducting** [1] - 36:9
**conferences** [8] - 16:8, 17:4, 17:20, 23:7, 30:1, 30:3, 30:4, 30:9
**confirm** [1] - 118:13
**confuse** [1] - 80:3
**confused** [1] - 57:11
**confusion** [1] - 82:4
**congestive** [1] - 116:18
**connected** [1] - 120:9
**consider** [6] - 58:18, 59:3, 72:3, 104:19, 122:18, 138:14
**considered** [9] - 31:5, 36:5, 36:6, 47:9, 67:13, 73:6, 117:5, 122:10, 123:3
**considering** [2] - 89:11, 107:23
**consist** [1] - 25:1
**consistent** [6] - 99:20, 100:24, 101:10, 108:20, 113:18, 118:18
**consultant** [12] - 5:15, 5:18, 8:19, 13:2, 13:4, 14:5, 46:12, 47:7, 47:9, 47:21, 48:3, 50:21
**consultants** [1] - 121:18
**Consultants** [2] - 13:5, 15:5
**consultations** [1] - 6:2
**consulted** [1] - 10:7
**consulting** [5] - 6:4, 6:9, 13:10, 47:6, 48:4
**contact** [11] - 11:14, 28:18, 37:10, 52:15, 72:17, 76:11, 82:5, 106:16, 106:20, 132:5, 139:2
**contacts** [1] - 132:7
**contained** [2] - 11:4, 19:15
**contains** [2] - 20:10,

20:13
**contaminated** [1] - 96:4
**contaminating** [1] - 53:10
**context** [2] - 71:19, 124:17
**continual** [1] - 29:9
**continue** [2] - 51:4, 54:11
**continued** [2] - 35:3, 35:15
**continues** [1] - 83:11
**continuing** [1] - 26:22
**continuum** [1] - 52:8
**contracted** [1] - 47:17
**contraindicated** [1] - 75:15
**contributed** [1] - 20:23
**contributing** [1] - 36:17
**contribution** [1] - 20:15
**Control** [8] - 15:2, 15:11, 19:3, 39:1, 39:2, 39:3, 39:4
**control** [24] - 10:24, 11:3, 13:19, 13:21, 16:22, 18:1, 30:3, 35:17, 37:7, 38:23, 40:14, 41:7, 42:24, 48:9, 48:14, 49:10, 51:4, 56:13, 77:24, 85:23, 85:24, 86:1, 102:18, 121:19
**CONTROL** [1] - 144:21
**control/police** [1] - 23:7
**controlled** [2] - 52:23, 70:5
**controlling** [1] - 132:6
**conversation** [2] - 89:22, 89:23
**convictions** [1] - 48:20
**convinced** [1] - 105:13
**cookies** [1] - 105:10
**copy** [2] - 16:1, 97:22
**cords** [1] - 117:10
**corner** [7] - 26:20, 86:13, 109:17, 110:6, 110:9, 111:16, 117:17
**cornered** [1] - 111:15
**correct** [16] - 5:9, 5:16, 5:17, 6:14, 6:15, 30:19, 71:5,

78:6, 98:18, 114:22, 119:4, 127:2, 131:23, 133:2, 139:21, 142:6
**corrections** [1] - 142:6
**correctly** [3] - 31:1, 76:23, 130:7
**council** [1] - 49:5
**Council** [2] - 13:2, 14:21
**counsel** [1] - 2:5
**Counsel** [2] - 2:9, 14:2
**count** [1] - 37:5
**countries** [1] - 36:2
**country** [7] - 43:18, 44:19, 49:8, 86:5, 123:17, 128:8, 133:15
**COUNTY** [1] - 144:2
**county** [1] - 9:8
**County** [4] - 23:12, 45:22, 45:23, 133:13
**couple** [6] - 17:22, 19:4, 23:2, 23:13, 37:1, 140:16
**course** [10] - 5:8, 20:11, 20:12, 23:24, 24:24, 25:5, 33:13, 44:22, 44:23, 121:2
**courses** [4] - 13:8, 41:6, 43:18, 50:15
**COURT** [1] - 1:1
**Court** [2] - 57:5, 71:21
**court** [6] - 9:9, 9:16, 9:17, 9:22, 56:23, 122:2
**courts** [3] - 9:8, 10:19, 67:3
**cover** [1] - 135:11
**covered** [3] - 131:22, 135:5, 135:11
**cowering** [1] - 109:18
**cranial** [1] - 99:14
**crawl** [1] - 102:14
**crawling** [1] - 112:11
**created** [1] - 132:23
**creature** [1] - 105:5
**creatures** [1] - 80:24
**credible** [2] - 25:24, 43:24
**credibly** [1] - 63:3
**crime** [2] - 42:9, 49:21
**crimes** [2] - 50:3, 50:7
**criminal** [7] - 31:20, 32:15, 34:3, 41:4, 41:13, 42:3, 129:19
**criteria** [2] - 41:2, 125:12
**critically** [1] - 120:7
**crosby** [1] - 4:10

**CROSBY** [7] - 1:10, 3:2, 4:2, 142:3, 142:12, 143:24, 144:5
**Crosby** [3] - 4:15, 5:8, 93:3
**Cross** [1] - 3:2
**CROSS** [1] - 136:3
**CROSS-EXAMINATION** [1] - 136:3
**crossing** [1] - 72:6, 105:18
**crowd** [3] - 106:1, 136:15, 139:16
**cruelly** [1] - 42:6
**cruelty** [10] - 41:4, 41:8, 41:12, 41:13, 41:15, 42:3, 49:12, 49:19, 50:1
**cry** [1] - 102:16
**CSR** [1] - 1:15
**cup** [1] - 85:16
**Curly** [1] - 15:13
**current** [4] - 6:6, 21:6, 21:13, 21:16
**curriculum** [3] - 6:6, 16:15, 19:17
**CV** [9] - 5:14, 8:22, 11:22, 14:15, 15:20, 18:16, 19:5, 19:6, 19:10

## D

**Dabbas@ uclawgroup.com** [1] - 2:9
**dad** [1] - 55:8
**Dade** [4] - 17:17, 44:13, 130:20, 133:13
**Dade's** [1] - 45:17
**damage** [3] - 42:1, 124:8, 136:18
**Dane** [1] - 122:1
**Danes** [1] - 124:3
**danger** [3] - 62:20, 95:4, 132:23
**dangerous** [19] - 9:7, 16:21, 16:23, 30:15, 38:21, 38:22, 39:11, 39:12, 39:16, 39:19, 39:20, 39:23, 40:11, 40:17, 40:19, 41:2, 49:1, 56:8, 123:1
**DANIEL** [1] - 1:7
**Daniel** [2] - 2:7, 136:4
**data** [3] - 69:22, 109:24, 122:13

**date** [7] - 6:19, 9:8, 28:4, 58:11, 58:12, 59:12
**dated** [1] - 16:1
**DAVIDSON** [42] - 4:9, 4:18, 4:20, 5:3, 5:7, 20:2, 20:6, 34:10, 34:13, 51:15, 51:20, 57:3, 57:7, 57:22, 62:11, 62:14, 65:11, 68:1, 68:9, 68:11, 70:12, 71:23, 89:20, 92:23, 93:2, 98:1, 98:5, 98:11, 98:13, 103:14, 104:5, 104:8, 104:11, 128:23, 128:24, 135:13, 135:24, 139:8, 140:3, 140:9, 141:4, 141:8
**Davidson** [4] - 2:3, 3:3, 4:8, 4:12
**days** [4] - 5:3, 7:4, 28:4, 79:16
**de** [15] - 28:13, 28:18, 28:20, 29:3, 29:11, 29:18, 30:15, 31:12, 52:6, 55:15, 78:10, 80:17, 80:21, 83:18, 85:12
**de-escalate** [8] - 28:18, 29:11, 30:15, 31:12, 52:6, 55:15, 83:18, 85:12
**de-escalation** [7] - 28:13, 28:20, 29:3, 29:18, 78:10, 80:17, 80:21
**deadly** [37] - 25:16, 25:22, 26:10, 26:12, 26:14, 26:17, 27:4, 43:8, 60:8, 63:7, 66:18, 67:11, 69:6, 69:10, 69:20, 69:24, 72:11, 73:15, 74:13, 77:8, 86:9, 86:20, 87:6, 93:4, 95:11, 97:4, 119:12, 119:13, 120:1, 127:21, 127:23, 129:8, 129:17, 132:22, 136:24, 139:5, 139:18
**deal** [1] - 21:24, 38:20, 42:21, 86:3, 86:6, 105:1, 118:7
**dealing** [16] - 16:21, 17:4, 17:10, 23:21, 24:10, 26:5, 28:20, 37:19, 38:21, 53:3,

55:13, 65:8, 66:5, 80:13, 127:17, 134:9
**deals** [2] - 38:18, 49:22
**death** [11] - 7:20, 26:1, 62:20, 63:4, 85:19, 123:23, 124:2, 125:7, 134:5, 137:21, 137:24
**decide** [2] - 76:7, 121:2
**deciding** [1] - 136:24
**decision** [5] - 45:10, 73:18, 73:19, 73:22, 119:24
**defect** [4] - 98:22, 99:8, 99:13, 99:17
**defend** [8] - 44:4, 66:23, 67:12, 74:6, 77:14, 87:15, 123:11, 136:13
**defendant** [2] - 12:1, 137:19
**defendants** [2] - 9:13, 11:24
**Defendants** [3] - 1:8, 1:11, 2:5
**defending** [1] - 70:22
**defense** [4] - 28:2, 54:24, 66:24, 95:11
**Defensive** [4] - 61:10, 61:16, 61:19, 62:2
**defensive** [11] - 29:13, 53:15, 56:5, 77:2, 109:3, 111:7, 111:9, 111:10, 111:13, 111:19, 112:2
**defer** [1] - 48:11
**deficits** [1] - 48:17
**defined** [4] - 39:14, 39:22, 41:15, 105:4
**definitely** [1] - 20:23
**definition** [2] - 7:23, 68:14
**definitive** [1] - 122:3
**deflect** [1] - 27:10
**deflected** [1] - 97:11
**defuse** [1] - 132:7
**defusing** [1] - 127:17
**degree** [4] - 12:12, 12:13, 12:17, 99:3
**degrees** [1] - 80:11
**deliberately** [2] - 81:10, 113:15
**demonstrate** [1] - 25:3
**denial** [1] - 41:20
**dense** [1] - 94:2
**deodorant** [1] - 96:1
**deodorizer** [1] - 138:23

**department** [49] - 5:22, 5:24, 12:3, 17:16, 23:12, 23:16, 31:15, 36:7, 45:10, 45:23, 53:5, 59:18, 61:10, 61:15, 61:19, 62:2, 62:5, 62:23, 63:5, 69:22, 74:2, 74:4, 84:22, 87:13, 88:7, 92:1, 97:15, 126:13, 127:1, 127:6, 128:3, 128:14, 129:8, 130:6, 130:14, 130:16, 130:17, 130:21, 131:18, 131:21, 133:3, 133:14, 135:19, 137:1
**Department** [10] - 6:7, 16:16, 17:17, 19:21, 44:18, 45:3, 47:10, 47:24, 48:5, 127:11
**department's** [7] - 26:13, 27:2, 27:12, 70:5, 73:24, 86:17, 94:18
**departments** [21] - 10:8, 16:15, 17:14, 17:20, 23:11, 25:5, 44:9, 44:18, 44:19, 45:2, 45:13, 46:9, 51:5, 130:24, 131:2, 131:13, 133:10, 133:15, 133:19, 134:2, 134:7
**deploy** [9] - 25:11, 53:8, 53:10, 61:3, 81:5, 84:6, 88:12, 89:8, 95:11
**deployed** [8] - 9:14, 10:12, 44:24, 82:3, 92:3, 95:21, 96:16, 138:8
**deploying** [2] - 28:3, 53:14
**deployment** [7] - 10:11, 26:3, 53:23, 72:11, 77:5, 81:24, 134:4
**deposes** [1] - 4:6
**DEPOSITION** [1] - 1:10
**deposition** [10] - 8:19, 15:24, 74:18, 94:8, 94:11, 97:23, 98:19, 114:19, 141:10, 142:5
**deprivation** [1] - 41:17
**depth** [1] - 131:22

**deputies** [2] - 23:15, 23:16
**describe** [5] - 12:10, 34:16, 36:12, 100:21, 102:11
**described** [7] - 31:3, 72:5, 93:7, 96:19, 100:24, 118:1, 118:8
**describes** [1] - 137:16
**describing** [3] - 54:19, 71:18, 136:8
**description** [1] - 98:23
**designation** [1] - 39:13
**despite** [1] - 117:20
**destroyed** [1] - 38:16
**detail** [1] - 38:20
**details** [1] - 10:20
**Detective** [3] - 89:16, 92:9, 92:14
**detectives** [2] - 33:12, 91:8
**deter** [2] - 85:21, 91:11
**determination** [3] - 16:22, 49:4, 64:21
**determine** [11] - 7:19, 40:8, 40:18, 41:1, 46:16, 56:16, 59:19, 64:16, 64:18, 95:3, 129:21
**determined** [2] - 73:9, 92:20
**deterrence** [1] - 91:15
**deterring** [1] - 53:7
**developing** [1] - 87:12
**development** [1] - 23:8
**diagnose** [1] - 36:19
**die** [2] - 69:18, 134:7
**died** [2] - 69:16, 69:18
**differ** [3] - 76:18, 78:2, 86:21
**difference** [5] - 51:24, 66:10, 66:11, 91:6, 118:5
**differences** [1] - 57:9
**different** [13] - 10:13, 25:11, 35:11, 35:16, 35:17, 42:16, 92:15, 107:6, 117:5, 117:6, 119:18, 129:3, 133:17
**differently** [1] - 69:2
**dilate** [1] - 109:23
**dilated** [1] - 109:21
**dioxide** [1] - 85:7
**dioxide-based** [1] - 85:7
**Direct** [1] - 3:2

**direct** [3] - 4:7, 52:9, 76:11
**DIRECT** [2] - 4:9, 144:21
**directed** [1] - 16:5
**direction** [8] - 25:14, 46:23, 53:20, 55:24, 60:20, 71:10, 102:19, 144:8
**DIRECTION** [1] - 144:21
**directions** [1] - 93:14
**directly** [19] - 23:22, 25:8, 25:10, 26:21, 29:2, 31:23, 32:12, 32:14, 33:10, 57:13, 72:17, 80:8, 80:23, 83:16, 83:20, 114:16, 127:21, 131:20, 133:7
**director** [1] - 85:24
**Directors** [2] - 14:21, 15:11
**disabling** [1] - 27:23
**disagreements** [1] - 20:24
**discharge** [12] - 27:18, 32:24, 73:18, 73:19, 73:22, 74:3, 90:18, 90:24, 95:15, 97:15, 104:6, 137:17
**discharged** [2] - 28:9, 99:24
**discharges** [1] - 100:2
**discharging** [1] - 94:17
**disciplinary** [1] - 32:19
**disclose** [1] - 62:22
**disclosed** [2] - 91:20, 92:16
**disclosing** [1] - 89:16
**discomfort** [1] - 82:4
**discontinued** [1] - 53:19
**discovery** [5] - 16:4, 61:18, 62:1, 90:22, 97:19
**discuss** [3] - 51:12, 55:16, 120:20
**discussed** [4] - 43:11, 54:17, 67:19, 135:4
**discussion** [1] - 62:13
**disorders** [1] - 115:19
**disparate** [1] - 50:12
**dispatch** [1] - 129:8
**dispel** [1] - 105:16
**dispersed** [1] - 45:4
**displacement** [2] - 103:3, 103:20

**display** [1] - 108:14, 108:15, 109:1, 109:3, 111:6, 112:1, 112:3, 112:8, 114:11, 116:1, 122:22
**displayed** [2] - 68:2, 140:5
**displaying** [8] - 30:24, 73:6, 73:10, 75:18, 107:9, 108:4, 108:5, 116:21
**displays** [3] - 56:4, 75:13, 111:20
**disposition** [1] - 54:7
**disqualified** [1] - 9:21
**distance** [7] - 71:24, 72:19, 72:24, 73:1, 81:20, 116:10, 134:22
**distress** [1] - 116:5
**DISTRICT** [1] - 1:1
**District** [1] - 1:2
**districts** [1] - 8:24
**divert** [2] - 101:4, 101:8
**diverted** [1] - 101:20
**diverting** [1] - 26:24
**diverts** [1] - 113:2
**division** [6] - 1:15, 31:15, 32:1, 47:21, 48:14, 50:21
**Doctor** [3] - 4:15, 5:8, 125:12
**doctoral** [2] - 12:16, 18:20
**Document** [2] - 20:4, 57:20
**document** [8] - 15:19, 20:11, 20:12, 21:2, 21:5, 61:13, 61:18
**documentation** [3] - 42:7, 42:8, 100:7
**documented** [1] - 121:14
**documenting** [2] - 42:9, 49:14
**documents** [10] - 15:22, 16:5, 21:17, 61:9, 94:7, 97:13, 103:16, 114:19, 140:19, 140:21
**Dodge** [1] - 89:4
**DOES** [1] - 144:20
**dog** [347] - 6:2, 6:3, 6:8, 7:12, 7:16, 7:20, 8:3, 9:7, 9:16, 9:17, 9:18, 10:4, 10:6, 10:10, 10:12, 10:13, 10:14, 10:24, 11:1,

11:4, 11:5, 11:8, 11:9, 11:13, 11:20, 12:21, 13:4, 14:1, 16:15, 16:19, 16:20, 16:23, 16:24, 17:8, 17:13, 18:20, 18:24, 22:2, 23:1, 23:5, 24:23, 25:8, 25:15, 26:11, 26:17, 26:21, 26:23, 26:24, 27:7, 27:8, 28:15, 28:18, 29:9, 29:12, 29:13, 29:20, 30:22, 34:14, 34:20, 34:23, 35:11, 35:12, 35:14, 35:24, 36:3, 36:21, 36:22, 38:5, 38:8, 38:21, 39:11, 39:12, 39:16, 39:17, 39:23, 40:3, 40:11, 40:18, 41:1, 41:4, 41:21, 42:1, 42:11, 42:14, 43:11, 43:24, 46:15, 46:18, 46:22, 46:24, 47:3, 48:18, 48:23, 48:24, 49:1, 50:1, 51:5, 51:7, 52:12, 52:15, 52:18, 52:22, 53:4, 53:7, 53:17, 53:19, 54:4, 54:8, 54:9, 54:20, 54:22, 55:6, 55:10, 55:13, 55:18, 56:3, 56:5, 56:10, 57:13, 58:21, 58:23, 59:14, 59:16, 59:17, 59:19, 60:20, 61:2, 63:13, 63:18, 63:22, 64:4, 64:18, 64:22, 65:16, 66:12, 66:16, 66:19, 66:20, 67:8, 67:20, 68:2, 68:7, 68:8, 68:9, 68:21, 69:3, 69:12, 69:15, 69:16, 69:18, 70:7, 70:9, 70:16, 70:19, 70:22, 71:1, 71:13, 71:14, 72:5, 72:14, 72:16, 72:23, 75:2, 75:4, 75:9, 75:10, 75:12, 75:21, 75:23, 76:10, 76:13, 76:18, 76:19, 76:21, 77:3, 77:22, 77:23, 78:1, 78:16, 78:17, 78:20, 78:21, 80:8, 80:9, 80:18, 80:23, 81:1, 81:7, 81:12, 81:13, 81:19, 81:20, 82:1, 82:3, 82:13, 83:17, 83:22, 83:24, 84:4, 84:14, 85:8, 85:9,

85:22, 86:4, 86:9, 86:13, 86:20, 86:22, 87:7, 87:20, 87:22, 88:1, 88:2, 88:4, 88:6, 88:8, 88:9, 88:14, 88:15, 88:17, 89:1, 89:4, 89:9, 89:13, 91:11, 91:14, 94:6, 97:5, 97:6, 98:20, 98:23, 99:1, 100:9, 100:10, 100:12, 100:16, 102:22, 103:10, 103:16, 103:19, 103:22, 104:14, 104:15, 105:7, 106:16, 106:21, 106:24, 107:7, 107:8, 107:9, 107:12, 107:17, 107:19, 108:3, 108:4, 108:5, 108:12, 108:13, 108:20, 108:24, 109:8, 109:10, 110:12, 110:13, 110:14, 110:22, 111:6, 111:11, 111:14, 111:20, 112:9, 112:14, 112:16, 112:17, 113:18, 113:23, 115:10, 115:12, 115:15, 115:24, 116:7, 116:9, 116:11, 116:13, 116:20, 117:8, 117:12, 117:16, 117:22, 117:24, 118:7, 118:18, 119:10, 120:2, 121:1, 121:3, 121:9, 121:13, 121:20, 121:24, 122:4, 122:5, 122:8, 123:18, 123:19, 123:24, 124:2, 124:4, 124:6, 124:13, 125:11, 125:15, 125:24, 126:4, 127:5, 127:16, 129:3, 129:24, 130:2, 130:18, 132:1, 132:10, 134:6, 134:7, 135:14, 135:15, 135:17, 135:21, 135:22, 139:1, 139:21, 139:24, 140:5, 140:6, 140:11,

140:14, 140:15, 140:17
**Dog** [10] - 3:8, 13:3, 14:3, 14:9, 14:22, 15:8, 18:17, 19:12, 20:7, 25:15
**dog's** [35] - 28:16, 30:14, 31:10, 36:10, 40:5, 40:24, 41:18, 51:23, 54:2, 55:23, 64:11, 72:9, 72:20, 73:2, 75:17, 82:4, 85:17, 88:8, 89:12, 97:11, 98:24, 99:3, 99:5, 99:16, 100:10, 100:14, 101:1, 102:11, 103:6, 112:18, 112:21, 113:6, 119:16, 132:3, 134:5
**dogs** [118] - 6:6, 9:2, 9:15, 15:15, 16:21, 16:23, 17:4, 17:10, 21:14, 21:15, 21:20, 21:22, 24:19, 25:9, 29:4, 30:19, 30:24, 34:19, 34:21, 35:1, 35:19, 36:6, 36:15, 36:18, 36:23, 37:1, 37:3, 37:5, 37:10, 37:14, 37:17, 37:18, 37:19, 37:21, 37:22, 37:24, 38:10, 38:11, 38:14, 38:17, 38:18, 38:22, 39:7, 46:15, 46:21, 47:4, 49:9, 50:5, 51:11, 54:10, 55:18, 55:20, 65:14, 65:19, 65:21, 66:14, 75:4, 75:7, 75:16, 76:21, 78:6, 78:18, 80:15, 80:24, 84:24, 85:15, 85:21, 86:4, 86:6, 94:1, 97:8, 101:23, 102:3, 102:6, 102:7, 102:9, 102:14, 102:18, 104:19, 105:1, 105:3, 107:21, 108:21, 109:19, 110:1, 111:3, 114:5, 114:11, 115:21, 116:3, 117:2, 119:18, 120:19, 122:9, 122:11, 122:21, 122:22, 123:1, 123:2, 123:7, 123:10, 123:14, 123:22, 124:18, 125:9, 125:16, 125:23, 126:1,

126:7, 129:5, 132:5, 132:8, 139:12
**DOJ** [3] - 18:19, 23:9, 131:16
**domestic** [3] - 6:5, 9:14, 117:2
**done** [17] - 12:9, 41:3, 44:8, 59:4, 59:9, 63:24, 64:13, 67:5, 87:18, 87:19, 88:12, 124:2, 125:14, 130:15, 134:4, 138:22, 141:9
**door** [5] - 55:16, 56:11, 105:22, 106:2, 140:5
**dorsal** [1] - 100:9
**double** [1] - 61:21
**down** [23] - 58:5, 58:12, 65:23, 77:18, 79:24, 80:2, 83:23, 84:5, 84:8, 84:10, 87:1, 89:5, 93:12, 106:22, 109:19, 110:13, 110:15, 113:11, 126:21, 126:22, 133:6, 138:21, 144:7
**downloaded** [1] - 44:24
**downwards** [1] - 99:10
**dozen** [2] - 10:17, 50:19
**dragging** [1] - 86:15
**drastic** [6] - 74:5, 87:15, 136:12, 136:23, 137:18, 138:15
**drawing** [1] - 87:20
**drive** [1] - 76:12
**driver's** [1] - 4:4
**drop** [1] - 53:18
**drops** [1] - 112:24
**due** [8] - 58:10, 61:4, 69:8, 69:14, 89:1, 115:12, 120:12, 139:10
**dues** [1] - 15:3
**duly** [2] - 4:5, 144:6
**during** [10] - 7:12, 7:15, 15:23, 22:20, 23:8, 23:17, 25:4, 26:11, 35:10, 35:18
**dying** [1] - 129:9

# E

**e-mail** [1] - 6:19
**ear** [1] - 99:16

**early** [1] - 28:4
**ears** [2] - 63:22, 111:21
**easiest** [1] - 79:6
**easily** [1] - 93:13
**easy** [2] - 63:21, 65:14
**editing** [1] - 19:14
**educated** [1] - 24:22
**education** [2] - 12:10, 35:15
**educational** [1] - 16:9
**effect** [2] - 77:15, 77:20
**effective** [12] - 8:1, 24:18, 53:6, 54:9, 60:7, 63:10, 78:17, 82:2, 85:4, 85:20, 88:3, 138:19
**effectively** [1] - 96:6
**effectiveness** [4] - 53:3, 53:9, 53:14, 138:9
**effects** [3] - 95:22, 127:23, 138:19
**efficient** [1] - 58:3
**effort** [1] - 102:20
**eight** [5] - 10:17, 24:24, 29:1, 29:5, 29:16
**either** [12] - 31:1, 37:6, 37:15, 39:13, 77:14, 99:12, 102:9, 102:13, 104:20, 106:22, 111:1, 124:7
**election** [1] - 47:13
**electrical** [3] - 77:7, 82:18, 83:10
**electronic** [3] - 53:13, 53:19, 83:7
**eliminate** [1] - 136:11
**ELLEN** [1] - 1:21
**elsewhere** [1] - 18:12
**emerged** [1] - 88:21
**employee** [2] - 20:17, 48:1
**EMS** [1] - 96:8
**Encounter** [5] - 3:8, 15:9, 18:17, 19:12, 20:7
**encounter** [21] - 7:10, 16:16, 23:5, 24:24, 26:18, 27:24, 28:15, 31:13, 45:12, 52:6, 65:24, 75:2, 126:13, 127:1, 127:6, 130:3, 131:23, 132:1, 132:15, 133:11
**encountering** [7] - 76:17, 76:19, 76:21, 77:3, 86:9, 86:20,

87:6
**encounters** [17] - 6:5, 6:8, 17:8, 21:8, 21:19, 21:22, 22:2, 23:1, 29:4, 29:20, 43:11, 53:4, 53:7, 53:8, 127:16, 130:18, 134:9
**encouraging** [1] - 123:1
**end** [3] - 29:9, 87:4, 99:15
**ended** [1] - 67:24
**endorsed** [1] - 127:8
**enforcement** [11] - 6:8, 16:15, 23:1, 23:5, 24:23, 28:9, 29:20, 38:19, 43:11, 53:2, 132:1
**Enforcement** [4] - 3:8, 18:17, 19:12, 20:7
**engage** [5] - 75:17, 76:14, 95:3, 101:15, 117:22
**engaged** [4] - 26:21, 27:9, 86:11, 86:14
**engaging** [2] - 69:10, 113:8
**enjoy** [1] - 55:21
**ensure** [1] - 57:18, 92:12, 133:7
**entail** [5] - 39:24, 42:4, 43:10, 43:22, 48:7
**entails** [2] - 40:1, 42:5
**entertainment** [1] - 121:23
**entire** [2] - 90:18, 114:7
**entitled** [1] - 87:5
**entry** [7] - 98:23, 99:19, 99:21, 100:13, 100:18, 139:21, 139:23
**environment** [7] - 30:22, 38:3, 54:23, 79:13, 93:8, 136:9, 136:10
**equipment** [1] - 91:8
**ERRATA** [1] - 143:1
**escalate** [9] - 28:18, 29:11, 30:15, 31:12, 52:6, 55:15, 80:20, 83:18, 85:12
**escalating** [1] - 74:12
**escalation** [8] - 28:13, 28:20, 29:3, 29:18, 78:10, 80:17, 80:21, 82:20
**especially** [7] - 54:9, 75:10, 75:16, 84:15,

85:20, 89:11, 132:17
**Esquire** [2] - 2:3, 2:7
**essential** [5] - 28:14, 29:7, 31:8, 70:15, 90:5
**essentially** [2] - 137:17, 139:4
**establish** [4] - 51:7, 61:1, 69:22, 121:8
**established** [2] - 39:13, 53:4
**evaluate** [2] - 40:23, 132:3
**evaluated** [4] - 36:14, 36:18, 37:17
**evaluating** [3] - 10:10, 37:2, 37:18
**evaluation** [2] - 31:10, 37:6
**evaluations** [1] - 36:10
**evaluator** [1] - 13:6
**eventually** [1] - 34:23
**evidence** [15] - 12:21, 18:23, 21:3, 42:7, 49:13, 50:24, 51:7, 58:13, 101:11, 105:15, 108:1, 135:7, 136:8, 141:6
**experienced** [1] - 50:14
**Expert** [1] - 3:9
**expert** [11] - 5:15, 5:19, 6:1, 6:2, 6:17, 6:23, 8:18, 9:1, 9:21, 47:7, 58:8
**experts** [1] - 132:2
**expire** [1] - 14:3
**expired** [2] - 13:23, 15:3
**Expires** [1] - 144:17
**explain** [4] - 26:12, 53:3, 53:22, 78:14
**explaining** [1] - 40:2
**explanation** [1] - 91:4
**exposed** [1] - 43:19
**exposing** [2] - 127:14, 127:18
**exposure** [2] - 94:21, 127:22
**expressed** [1] - 45:17
**expressing** [1] - 64:18
**expressions** [1] - 28:17
**extended** [1] - 106:21
**extending** [1] - 52:21
**extensive** [3] - 36:11, 43:2, 61:23
**extensively** [1] - 71:6
**external** [1] - 99:16
**extinguisher** [2] - 85:3, 85:7

**exactly** [5] - 34:11, 39:11, 46:11, 46:12, 128:11
**EXAMINATION** [3] - 4:9, 136:3, 140:3
**examination** [2] - 42:8, 42:11
**examinations** [1] - 42:18
**examine** [4] - 7:10, 7:15, 7:16, 58:14
**examining** [1] - 73:11
**example** [1] - 86:12
**examples** [1] - 71:19
**except** [2] - 4:21, 69:17
**excessive** [11] - 51:10, 51:16, 51:17, 59:22, 60:13, 62:16, 68:5, 68:23, 70:6, 72:12
**exclusively** [1] - 22:2
**exercise** [2] - 11:7, 137:10
**exerting** [1] - 110:4
**exertion** [1] - 116:15
**exhausted** [3] - 63:6, 70:2, 87:13
**Exhibit** [15] - 3:7, 20:2, 20:5, 57:21, 59:9, 98:9, 98:19, 100:3, 100:19,

118:14, 118:16, 125:2, 126:16, 134:12, 139:20
**exhibit** [2] - 57:19, 98:10
**expect** [1] - 64:12
**expectations** [1] - 54:14
**expected** [2] - 83:5, 127:12
**expenses** [1] - 7:1
**experience** [36] - 25:17, 35:15, 37:14, 48:17, 50:8, 61:5, 63:14, 66:13, 66:16, 67:4, 70:7, 76:20, 91:22, 94:3, 94:15, 95:7, 96:12, 102:9, 102:24, 103:18, 106:20, 106:24, 107:8, 108:3, 108:13, 108:24, 112:21, 113:6, 114:4, 117:10, 119:3, 123:13, 135:14, 135:20, 140:4

**F**

**face** [11] - 73:12, 82:1, 82:7, 82:12, 85:17, 88:9, 96:9, 96:13, 96:14, 100:11, 112:6
**faced** [1] - 95:8
**facing** [4] - 80:8, 88:20, 103:22, 104:14
**fact** [18] - 53:24, 58:10, 62:18, 63:9, 74:19, 80:20, 84:20, 89:11, 101:7, 101:15, 107:15, 119:6, 119:19, 119:22, 120:2, 136:14, 138:2, 141:5
**factored** [1] - 120:10
**factors** [5] - 40:6, 73:11, 73:14, 95:2, 103:24
**facts** [3] - 62:8, 62:15, 92:19
**factually** [1] - 119:19
**failed** [4] - 72:2, 72:8, 74:11, 90:3
**failing** [1] - 41:21
**failure** [2] - 5:4, 116:18
**fair** [3] - 18:13, 24:9, 25:17
**fairness** [1] - 59:3
**fall** [3] - 83:22, 84:8, 84:10
**falls** [1] - 122:6
**familiar** [9] - 8:12, 101:3, 104:19, 105:8, 105:12, 109:12, 113:19, 118:19, 118:22
**far** [17] - 8:5, 13:9, 16:2, 20:21, 21:1,

**extinguishers** [2] - 84:19, 84:21
**extra** [3] - 45:14, 45:15, 137:10
**extreme** [4] - 53:14, 86:23, 116:5
**extremely** [5] - 82:1, 85:3, 97:8, 126:5, 138:21
**eye** [2] - 106:16, 106:20
**eyeball** [1] - 70:14
**eyes** [9] - 63:22, 66:7, 80:23, 82:6, 96:10, 96:14, 109:10, 111:21, 113:1

21:2, 34:5, 36:19,
69:22, 83:19, 84:1,
99:20, 106:4,
107:24, 137:3
**fast** [1] - 106:4
**fatal** [4] - 6:3, 18:24,
35:24, 139:11
**fatalities** [3] - 9:17,
12:22, 18:21
**fear** [12] - 103:2,
103:19, 105:16,
111:13, 111:19,
115:16, 115:18,
116:5, 116:9,
116:19, 116:23,
118:5
**fearful** [7] - 104:17,
108:15, 108:20,
108:21, 109:19,
110:24
**featured** [1] - 59:17
**fed** [1] - 42:15
**Federal** [1] - 1:12
**federal** [7] - 8:24, 9:9,
9:16, 9:17, 10:18,
11:11, 67:3
**feedback** [1] - 133:21
**feet** [15] - 37:23,
66:17, 66:20, 67:9,
67:21, 68:4, 68:19,
68:21, 69:4, 70:8,
72:1, 72:7, 75:12,
88:2, 138:24
**felonies** [1] - 28:7
**felt** [2] - 12:8, 138:17
**fence** [3] - 11:18,
52:12
**few** [8] - 8:23, 19:2,
22:24, 23:23, 37:17,
50:11, 134:5, 135:10
**field** [8] - 22:14, 22:15,
22:19, 34:24, 35:13,
48:15, 48:16, 93:24
**fielded** [1] - 131:12
**fight** [3] - 80:19,
109:22, 123:14
**fighting** [17] - 36:22,
36:23, 37:24, 38:1,
38:14, 48:19, 50:2,
50:5, 50:6, 50:8,
50:19, 51:5, 51:7,
123:18, 123:19
**figure** [1] - 78:22
**file** [4] - 15:20, 62:1,
90:19, 90:21
**final** [2] - 29:24, 125:3
**fine** [3] - 96:11, 96:14,
126:22
**fire** [10] - 84:18, 84:20,
85:3, 85:7, 93:16,

93:24, 94:20, 94:22,
104:6, 137:9
**firearm** [18] - 27:18,
28:9, 32:23, 54:14,
73:18, 73:20, 73:22,
74:4, 83:14, 90:18,
90:24, 93:8, 94:17,
95:15, 97:15, 99:24,
134:4, 137:17
**firearms** [1] - 53:24,
86:2, 91:16, 137:15
**fired** [3] - 89:12,
89:14, 134:15
**fireworks** [18] - 89:2,
101:4, 101:23,
102:5, 102:8,
102:12, 102:22,
103:23, 104:2,
104:3, 104:4, 104:9,
104:15, 107:24,
111:3, 114:8,
115:13, 137:7
**firing** [1] - 114:8
**firm** [3] - 6:13, 8:6,
58:12
**first** [23] - 4:3, 6:19,
22:6, 32:10, 33:4,
33:5, 33:24, 36:1,
40:16, 48:8, 53:17,
58:7, 59:21, 69:5,
70:9, 75:3, 78:15,
87:10, 87:19, 91:12,
92:3, 116:23, 130:9
**fit** [1] - 45:5
**five** [4] - 28:11, 93:22,
116:11, 126:2
**fiving** [1] - 93:22
**flashlight** [1] - 61:1
**flat** [1] - 6:24
**flee** [3] - 109:13,
111:12, 118:23
**fleeing** [3] - 27:23,
112:5, 112:17
**flight** [3] - 109:22,
109:23, 111:12
**Florida** [24] - 5:21,
12:15, 12:18, 13:10,
13:17, 13:19, 15:7,
15:11, 19:3, 22:8,
23:11, 28:5, 32:22,
37:2, 39:1, 42:23,
128:5, 128:6, 128:7,
129:3, 129:4,
129:11, 130:19,
133:16
**Florida's** [1] - 18:22
**focus** [3] - 24:8, 26:6,
30:23
**focused** [4] - 21:22,
76:23, 101:20, 106:8

**focuses** [1] - 22:2
**focusing** [3] - 35:23,
112:7, 126:11
**fold** [1] - 118:20
**folded** [1] - 99:16
**followed** [1] - 60:20
**following** [4] - 67:24,
143:2, 143:3
**follows** [1] - 4:7
**food** [3] - 41:22, 55:2,
65:15
**foot** [3] - 83:21, 83:22,
84:5
**forbid** [1] - 33:23
**force** [107] - 6:5, 7:16,
9:2, 9:4, 9:14, 10:15,
11:24, 17:9, 22:23,
23:20, 24:10, 24:13,
24:15, 25:16, 25:19,
25:22, 26:3, 26:7,
26:10, 26:13, 26:14,
26:17, 27:4, 28:3,
31:23, 32:2, 32:5,
43:5, 43:7, 43:21,
44:4, 51:10, 51:17,
52:2, 52:8, 59:22,
60:2, 60:8, 60:9,
60:14, 62:17, 63:7,
66:18, 67:11, 67:13,
67:22, 68:6, 68:23,
68:24, 69:6, 69:10,
69:20, 69:24, 70:19,
72:11, 73:15, 74:12,
74:13, 76:13, 76:24,
77:9, 77:10, 77:14,
77:20, 77:22, 78:2,
78:9, 79:6, 82:19,
83:18, 86:9, 86:20,
87:6, 87:10, 89:9,
91:21, 92:21, 93:4,
95:9, 95:10, 95:11,
97:4, 119:12,
119:13, 120:1,
124:17, 124:18,
124:21, 125:5,
125:8, 125:10,
126:9, 127:21,
127:24, 129:2,
129:5, 129:8,
129:17, 129:24,
132:22, 133:24,
136:24, 139:5,
139:18
**foregoing** [2] - 142:4,
144:7
**FOREGOING** [1] -
144:20
**foreleg** [1] - 99:3
**Forensic** [4] - 14:10,
14:11, 14:19, 14:20

**forensic** [1] - 41:24
**forensics** [1] - 12:16
**Forensics** [1] - 16:14
**forgot** [1] - 58:17
**form** [13] - 4:21, 45:11,
46:22, 62:15, 65:10,
67:23, 70:11, 71:16,
73:3, 74:11, 103:12,
104:1, 141:5
**formed** [1] - 8:15
**forming** [1] - 17:5
**forms** [2] - 6:1, 70:1
**forth** [23] - 13:9,
13:13, 13:15, 17:13,
19:17, 28:17, 29:13,
32:19, 33:12, 34:20,
41:22, 46:14, 49:8,
50:2, 50:17, 50:24,
52:5, 54:16, 63:23,
99:21, 112:7,
112:20, 144:6
**forward** [2] - 81:11,
99:14
**four** [4] - 9:7, 22:18,
75:12, 121:3
**fractions** [1] - 71:11
**frankly** [1] - 36:20
**fraternity** [1] - 48:13
**fraught** [1] - 119:5
**free** [3] - 44:22, 45:2,
131:15
**Friday** [1] - 1:17
**friendly** [2] - 75:7,
105:2
**frightened** [18] -
29:12, 103:8,
108:11, 108:14,
109:6, 109:9, 110:1,
110:3, 110:8,
110:18, 111:22,
111:24, 112:4,
112:15, 113:18,
115:11, 118:18,
118:23
**frightening** [1] -
112:13
**FRITCH** [1] - 1:21
**front** [7] - 15:23, 16:3,
52:21, 88:20, 94:23,
96:9, 140:5
**frontally** [1] - 80:8
**fulfill** [1] - 92:21
**full** [6] - 4:14, 5:19,
22:21, 29:16, 79:19,
94:24
**full-time** [1] - 5:19
**fully** [2] - 83:1, 83:4
**funded** [1] - 45:3
**fur** [2] - 110:17,
111:21

**future** [1] - 133:9

## G

**gain** [7] - 75:18, 75:20,
77:4, 82:24, 110:10,
110:21
**garbage** [2] - 81:17,
83:2
**gate** [3] - 52:12,
112:18, 113:10
**gather** [1] - 109:24
**gathering** [2] - 49:13,
51:6
**gatherings** [1] - 41:7
**gear** [1] - 87:1
**gears** [1] - 22:3
**general** [10] - 6:3,
50:16, 71:10, 87:12,
120:6, 127:23,
128:17, 128:22,
128:23, 133:6
**generally** [9] - 16:12,
21:20, 41:15, 71:8,
80:16, 99:7, 100:23,
122:2, 123:22
**genes** [1] - 121:8
**genetic** [2] - 121:18,
121:22
**genetically** [1] - 121:7
**gentlemen** [1] -
134:18
**Geographic** [1] -
125:13
**Georgia** [2] - 17:22,
130:12
**German** [1] - 125:21
**given** [17] - 29:21,
44:8, 44:15, 44:21,
45:14, 59:15, 76:18,
88:15, 95:19,
100:17, 101:11,
104:9, 109:12,
110:14, 130:10,
130:12, 130:13
**glad** [1] - 140:23
**GOODE** [2] - 1:5
**goode** [1] - 134:17
**Goode** [4] - 4:13, 6:14,
134:19, 136:6
**Goode's** [1] - 114:18
**grabbed** [2] - 86:22,
86:24
**grabbing** [1] - 84:5
**grabs** [2] - 56:12,
83:22
**great** [4] - 84:12,
84:15, 137:21,
137:24
**Great** [2] - 122:1,

124:3
**gregarious** [1] - 105:5
**grievously** [1] - 129:9
**ground** [4] - 4:16, 81:12, 89:8, 91:13
**Group** [2] - 6:13, 8:7
**group** [3] - 17:21, 93:21, 122:14
**GROUP** [1] - 2:7
**groups** [6] - 17:19, 36:19, 50:12, 50:14, 61:20, 127:9
**growl** [3] - 108:21, 110:10, 116:3
**growling** [12] - 55:9, 69:3, 107:9, 107:18, 107:22, 116:1, 116:2, 116:21, 117:4, 117:8, 118:9
**guess** [3] - 24:22, 79:11, 136:10
**guessing** [1] - 6:22
**guide** [3] - 33:11, 50:22, 52:23
**guided** [1] - 49:1
**guidelines** [3] - 20:14, 20:15, 32:11
**guiding** [1] - 48:18
**gun** [3] - 71:4, 71:8, 71:9
**gunfire** [1] - 54:8
**guns** [1] - 55:15

## H

**habitual** [1] - 72:10
**habitually** [1] - 116:3
**hackles** [2] - 56:3, 110:21
**half** [3] - 57:16, 63:16, 116:11
**Hall** [2] - 1:16, 2:4
**hand** [4] - 60:24, 126:17, 144:13
**handled** [2] - 32:16, 40:22
**handling** [2] - 7:1, 37:15
**hands** [7] - 36:14, 77:18, 79:4, 79:5, 80:1, 81:3, 85:17
**hands-on** [1] - 36:14
**happy** [2] - 58:6, 141:2
**hard** [3] - 14:17, 93:13, 107:20
**harder** [1] - 124:8
**harm** [1] - 43:9
**harming** [1] - 66:14
**Hartwell** [1] - 2:8
**Haynes** [1] - 1:13

**HAYNES** [2] - 144:3, 144:15
**head** [11] - 7:13, 34:1, 34:6, 54:1, 84:6, 97:11, 100:10, 100:11, 101:1, 109:10, 113:11
**head-on** [1] - 100:10
**heading** [1] - 56:11
**heads** [2] - 53:20, 97:8
**healthy** [1] - 69:12
**hear** [1] - 66:8
**heard** [2] - 82:13, 89:21
**hearing** [4] - 40:23, 49:3, 90:13, 90:14
**heart** [1] - 116:18
**heaven** [2] - 33:23, 50:6
**heavily** [1] - 51:1, 54:2, 108:9, 108:18, 113:14, 116:14, 116:22, 117:8, 117:9
**heavy** [2] - 117:1, 118:8
**held** [2] - 39:9, 87:22
**helped** [1] - 104:2
**helping** [1] - 36:19
**hereby** [2] - 142:5, 144:4
**herein** [1] - 142:3
**hereinbefore** [1] - 144:6
**hereunto** [1] - 144:12
**Hi** [1] - 55:7
**hide** [2] - 102:9, 102:13
**high** [6] - 18:16, 53:3, 93:22, 126:5, 138:9, 139:11
**higher** [4] - 35:23, 54:5, 67:5, 93:15
**highly** [8] - 85:18, 107:12, 109:21, 117:2, 117:12, 117:17, 117:24, 121:5
**Hill** [3] - 23:11, 130:21, 133:16
**himself** [3] - 8:3, 70:23, 87:21
**hire** [1] - 9:11
**hired** [1] - 9:12
**histories** [1] - 86:4
**hit** [3] - 27:24, 84:6, 97:10
**hitting** [1] - 27:14
**hold** [4] - 12:24, 13:22, 16:6, 106:16
**holding** [1] - 89:8,

106:20
**hole** [5] - 99:13, 123:24, 124:5, 124:7, 124:14
**holiday** [1] - 102:3
**Holly** [3] - 23:11, 130:21, 133:16
**home** [5] - 52:8, 78:16, 87:3, 88:6, 105:19
**homeless** [1] - 84:23
**honestly** [4] - 5:12, 24:2, 47:12, 133:20
**honing** [1] - 10:14
**hope** [1] - 136:2
**horizon** [1] - 53:20
**horses** [2] - 21:24, 50:6
**hose** [1] - 85:15
**hospital** [1] - 48:13
**hospitals** [1] - 33:17
**hostile** [3] - 77:11, 77:12, 77:13
**hot** [1] - 116:11
**hour** [2] - 6:24, 7:5
**hourly** [1] - 6:24
**hours** [17] - 8:4, 24:20, 24:24, 28:23, 29:1, 29:3, 29:5, 29:14, 29:16, 29:17, 31:6, 128:1, 128:6, 128:8, 128:11, 128:14, 128:17
**House** [2] - 24:1, 24:7
**house** [4] - 11:6, 88:22, 106:2, 140:13
**household** [1] - 65:20
**households** [1] - 65:18
**houses** [2] - 65:20, 93:16
**huggy** [1] - 75:7
**human** [15] - 24:13, 27:22, 36:16, 41:12, 47:3, 52:2, 63:24, 65:23, 66:9, 77:15, 79:4, 94:3, 105:6, 105:9, 125:19
**Humane** [5] - 43:14, 49:7, 50:13, 131:17
**humans** [12] - 12:22, 18:21, 24:16, 24:19, 36:1, 64:24, 76:3, 77:13, 138:20
**hump** [1] - 39:4
**hundred** [2] - 23:2, 37:24
**hundreds** [1] - 36:18
**hunting** [1] - 129:12
**hurt** [2] - 88:10, 139:1

**hurts** [1] - 82:9
**hypothetical** [5] - 66:19, 67:7, 70:4, 71:17, 71:24
**hypothetically** [2] - 58:21, 111:15

## I

**idea** [4] - 45:1, 66:10, 78:8, 140:13
**identification** [6] - 20:4, 57:20, 98:8, 119:4, 120:22, 121:5
**identified** [7] - 4:4, 33:8, 38:2, 62:2, 121:21, 125:11, 144:6
**identify** [5] - 111:4, 119:3, 120:18, 120:21, 121:19
**identifying** [1] - 121:12
**ignoring** [1] - 127:7
**illustration** [2] - 26:19
**imagine** [2] - 66:6, 66:8
**immediate** [2] - 16:3, 72:10
**immediately** [6] - 53:18, 54:9, 86:11, 87:11, 87:21, 91:14
**imminent** [1] - 62:20
**impact** [3] - 83:3, 83:4, 84:14
**important** [2] - 41:9, 70:15
**improper** [2] - 70:6, 120:16
**improperly** [3] - 11:2, 118:2, 120:8
**improve** [1] - 35:15
**improvised** [1] - 85:14
**improvising** [1] - 85:18
**impulse** [1] - 53:19
**IN** [1] - 144:12
**in-depth** [1] - 131:22
**in-service** [2] - 45:20, 46:10
**inadequate** [1] - 100:8
**inadequately** [1] - 118:3
**inaugurated** [1] - 47:15
**inch** [1] - 125:19
**incident** [7] - 59:14, 59:17, 87:16, 131:3, 131:4, 132:16, 133:12

**incidents** [2] - 25:23, 95:10
**include** [4] - 19:8, 21:20, 30:11, 30:18
**included** [7] - 43:13, 43:15, 48:8, 61:18, 61:23, 62:1, 68:16
**includes** [3] - 30:13, 30:20, 44:10, 57:9, 57:11
**including** [17] - 17:18, 31:23, 38:5, 38:24, 42:22, 50:15, 53:24, 60:18, 73:11, 76:3, 83:14, 101:21, 119:6, 123:5, 130:14, 130:16, 139:1
**income** [3] - 6:1, 6:10
**incomplete** [1] - 100:7
**inconsistent** [2] - 73:20, 73:23
**incorporate** [2] - 45:20, 46:9
**incorporated** [2] - 29:8, 46:1
**incorrect** [2] - 65:13, 119:20
**incorrectly** [1] - 31:1
**increase** [1] - 109:19
**increasingly** [1] - 127:8
**incredible** [1] - 125:10
**indeed** [3] - 30:14, 120:3, 139:13
**index** [1] - 42:14
**indicate** [1] - 5:4
**indicated** [1] - 125:4
**indication** [2] - 108:8, 137:2
**indicative** [2] - 107:6, 111:13
**indirectly** [1] - 44:10
**individual** [2] - 12:3, 23:10
**inflict** [1] - 125:18
**inform** [2] - 90:3, 121:4
**information** [7] - 20:23, 40:18, 58:17, 70:15, 90:3, 90:21, 131:14
**informed** [1] - 120:8
**ingredient** [1] - 139:2
**ingredients** [1] - 82:5
**inherent** [1] - 69:8
**initial** [7] - 47:17, 62:22, 64:11, 64:12, 70:14, 74:19, 90:11
**initiating** [1] - 134:8

**injure** [1] - 54:12
**injured** [5] - 26:22, 62:19, 76:9, 86:3, 129:9
**injuries** [4] - 33:9, 42:12, 69:14, 139:3
**injuring** [3] - 28:1, 86:15, 138:11
**injury** [20] - 7:21, 26:1, 41:23, 42:1, 62:20, 63:4, 69:22, 85:19, 93:5, 95:17, 96:7, 123:22, 125:6, 134:6, 137:11, 137:21, 137:24, 138:21, 139:11
**innocent** [1] - 27:14
**input** [2] - 19:14, 19:15
**instance** [44] - 9:3, 10:4, 10:9, 10:22, 11:17, 19:2, 24:24, 26:23, 30:1, 32:13, 37:8, 41:20, 44:12, 45:17, 46:14, 47:2, 48:18, 52:11, 55:5, 56:10, 56:24, 58:15, 72:16, 77:16, 78:7, 80:8, 82:2, 84:16, 84:21, 86:23, 94:23, 96:17, 104:24, 107:21, 108:7, 109:16, 114:6, 114:24, 115:22, 117:20, 121:9, 125:17, 130:11, 138:16
**instances** [3] - 86:8, 86:19, 134:1
**instead** [10] - 58:22, 72:9, 77:20, 81:11, 82:23, 87:20, 88:15, 96:1, 103:2, 106:1
**institution** [1] - 16:10
**instructing** [1] - 40:4
**intended** [1] - 93:15
**intending** [1] - 81:13
**intentionally** [1] - 105:13
**intentions** [1] - 45:18
**interact** [4] - 25:8, 25:10, 30:12, 46:15
**interacted** [1] - 49:5
**interacting** [2] - 29:22, 47:4
**interaction** [1] - 132:9
**interactions** [2] - 32:5, 113:24
**interactive** [1] - 25:2
**interested** [3] - 35:22,

101:9, 144:11
**interject** [1] - 97:20
**internal** [9] - 31:14, 31:21, 31:24, 32:12, 32:15, 34:7, 62:23, 63:9, 74:17
**International** [5] - 13:4, 14:10, 14:20, 15:4, 127:10
**interpret** [2] - 28:15, 40:5
**interpretation** [1] - 17:12
**interpreting** [2] - 57:15, 64:23
**interrogatories** [1] - 4:7
**intersect** [1] - 108:16
**intersects** [1] - 42:17
**intervene** [1] - 85:14
**intervening** [2] - 63:11, 87:14
**intervention** [5] - 69:8, 74:24, 81:19, 82:24, 92:8
**interview** [7] - 32:17, 32:18, 33:8, 46:14, 74:17, 90:24
**interviews** [2] - 34:2, 42:10
**introduced** [2] - 58:13, 59:2
**investigate** [3] - 17:8, 32:4, 41:11
**investigated** [1] - 31:22
**investigating** [7] - 12:20, 18:24, 31:18, 35:23, 89:24, 90:9, 90:15
**investigation** [17] - 16:19, 16:23, 33:13, 34:2, 34:6, 34:9, 39:9, 48:19, 49:22, 50:10, 50:22, 90:6, 90:19, 90:24, 91:22, 92:15, 97:16
**investigations** [12] - 6:4, 32:24, 34:3, 34:7, 40:7, 40:21, 49:1, 49:2, 49:18, 49:21, 50:2, 91:22
**investigative** [1] - 137:15
**investigator** [2] - 62:23, 63:9
**investigators** [2] - 74:17, 74:20
**involve** [2] - 21:14, 37:19

**involved** [24] - 10:9, 12:21, 14:4, 32:21, 32:23, 33:10, 34:22, 36:15, 40:24, 41:1, 46:15, 46:16, 51:1, 59:14, 59:16, 59:20, 87:2, 97:1, 123:16, 123:17, 132:20, 133:18, 137:11, 139:12
**involving** [5] - 11:24, 21:19, 27:22, 33:21, 54:24
**IO** [1] - 90:23
**irregular** [1] - 102:2
**issue** [2] - 97:10, 134:24
**issued** [1] - 58:11
**issuer** [1] - 40:16
**issues** [1] - 49:6
**issuing** [1] - 106:23
**item** [2] - 74:10, 134:13
**itself** [10] - 29:1, 53:21, 55:5, 55:9, 67:17, 74:23, 107:6, 108:8, 113:4, 113:12

## J

**Jacksonville** [9] - 5:21, 5:22, 22:7, 31:24, 40:20, 47:11, 47:23, 48:6, 50:20
**JAMES** [7] - 1:10, 3:2, 4:2, 142:3, 142:12, 143:24, 144:5
**James** [1] - 4:15
**jaw** [1] - 124:5, 124:6
**job** [5] - 5:19, 33:6, 46:4, 77:24, 133:8
**John** [2] - 6:14, 136:5
**judges** [1] - 50:17
**judgment** [1] - 76:4
**July** [3] - 47:15, 144:13, 144:17
**jump** [1] - 111:16
**jumping** [1] - 60:22
**June** [2] - 1:17, 16:2
**jurisdiction** [7] - 11:16, 27:12, 39:22, 40:1, 40:9, 41:15, 42:19
**jurisdiction's** [1] - 40:2
**jurisdictions** [10] - 17:22, 17:23, 26:4, 37:2, 121:23, 130:14, 130:19, 130:23, 131:10,

131:19
**Justice** [7] - 6:7, 16:17, 19:21, 23:24, 24:7, 45:4, 127:11
**justified** [2] - 25:16, 83:1

## K

**K-9** [2] - 10:10, 135:18
**K-9s** [1] - 36:5
**Kangal** [1] - 126:4
**keep** [5] - 14:17, 52:22, 79:21, 81:4, 81:20
**keeping** [2] - 17:13, 41:19
**Kennel** [1] - 13:6
**kept** [2] - 7:3, 42:13
**kick** [2] - 83:17, 83:19
**kickback** [1] - 133:21
**kicking** [3] - 83:20, 83:22, 83:24
**kill** [4] - 37:22, 38:14, 78:1, 124:15
**killed** [8] - 11:9, 37:21, 50:4, 69:12, 69:14, 76:9, 84:9, 139:13
**killing** [2] - 11:5, 36:15
**kind** [23] - 10:14, 28:6, 30:21, 31:12, 40:22, 50:1, 79:17, 81:8, 83:3, 95:9, 95:10, 108:18, 118:14, 118:20, 119:5, 119:9, 122:8, 123:2, 125:9, 126:6, 126:15, 126:17, 132:9
**kinds** [2] - 25:11, 39:9
**Kingdom** [1] - 18:2
**kit** [2] - 20:10, 20:19
**knowledge** [5] - 24:6, 31:11, 46:8, 46:13, 131:7
**knowledgeable** [1] - 67:1
**known** [6] - 7:12, 19:11, 79:15, 102:5, 102:17, 107:21
**knows** [1] - 113:24

## L

**label** [1] - 117:7
**labeled** [5] - 47:20, 98:14, 123:7, 123:18, 125:9
**labored** [2] - 117:3, 118:9

**Labrador** [2] - 121:10, 125:18
**lack** [2] - 61:5, 95:16
**ladder** [2] - 82:19, 83:11
**language** [7] - 17:12, 28:16, 28:17, 29:10, 52:5, 91:13, 132:7
**lap** [1] - 68:8
**large** [4] - 47:5, 48:12, 64:8, 122:7
**larger** [2] - 75:17, 125:23
**Las** [3] - 17:18, 44:17, 133:14
**last** [7] - 6:21, 6:22, 18:14, 85:2, 87:6, 91:16, 134:11
**law** [17] - 1:15, 6:7, 6:12, 8:6, 16:15, 23:1, 23:5, 24:23, 28:8, 29:20, 38:19, 39:13, 43:11, 53:2, 129:4, 129:6, 132:1
**LAW** [1] - 2:7
**Law** [3] - 3:8, 18:17, 19:12
**lawful** [2] - 4:3, 129:11
**laws** [8] - 26:14, 27:12, 39:7, 40:2, 40:3, 129:2, 129:13, 129:23
**lead** [1] - 140:6
**leads** [1] - 127:21
**least** [10] - 29:2, 37:21, 60:8, 77:14, 88:8, 94:19, 106:13, 120:14, 128:16, 133:3
**leave** [3] - 108:22, 109:6, 126:20
**leaving** [1] - 114:13
**LEDT** [6] - 23:9, 29:1, 29:6, 29:7, 29:24, 44:8
**left** [7] - 88:20, 88:22, 89:12, 99:1, 99:3, 99:16, 139:24
**legal** [8] - 6:9, 7:23, 28:5, 30:4, 30:9, 39:18, 40:16, 41:6
**legality** [1] - 32:6
**legally** [3] - 39:14, 39:21, 41:2
**legislated** [1] - 130:23
**legislation** [4] - 21:7, 21:14, 130:5, 131:6
**legislature** [1] - 46:8
**legs** [1] - 99:10
**lengths** [1] - 28:24

**less** [37] - 9:4, 9:14, 17:9, 24:17, 26:3, 30:16, 32:16, 34:3, 44:2, 52:16, 57:16, 62:24, 63:16, 64:14, 71:1, 73:15, 74:5, 74:12, 76:11, 76:24, 81:5, 81:6, 87:10, 87:14, 87:23, 89:8, 91:14, 92:20, 122:14, 122:15, 123:8, 125:6, 125:23, 136:12, 136:23, 137:18, 138:15

**lethal** [13] - 9:14, 26:3, 44:2, 52:16, 76:24, 81:5, 87:10, 89:8, 92:20, 129:2, 129:23, 133:24

**level** [9] - 32:17, 35:8, 84:13, 95:5, 105:24, 124:18, 125:8, 130:11

**levels** [7] - 35:23, 38:1, 124:17, 124:21, 125:4, 126:8

**Lexington** [1] - 2:8

**library** [1] - 18:23

**license** [2] - 4:4, 13:10

**licensed** [2] - 42:19, 129:12

**licenses** [2] - 12:23, 13:22

**licensing** [1] - 13:9

**lieutenant** [4] - 5:20, 5:24, 22:17, 31:17

**life** [2] - 27:5, 86:18

**light** [1] - 99:12

**likelihood** [2] - 96:24, 138:10

**likely** [22] - 36:21, 51:23, 78:21, 93:4, 103:2, 103:7, 103:8, 104:17, 104:18, 108:1, 110:7, 111:10, 111:19, 120:14, 122:15, 123:8, 124:14, 124:15, 125:6, 127:20, 132:4

**limited** [4] - 76:14, 90:2, 95:23, 129:7

**limits** [1] - 47:24

**LINE** [1] - 143:4

**line** [7] - 32:20, 93:16, 93:24, 94:20, 94:22, 99:2, 99:6

**linked** [1] - 121:7

**list** [2] - 12:23, 14:6

**listed** [5] - 18:15, 19:5, 58:3, 65:19, 74:8

**listen** [1] - 90:23

**literally** [1] - 11:3

**literature** [4] - 19:15, 20:10, 20:14, 105:4

**live** [2] - 25:10, 39:12

**lives** [1] - 12:9

**living** [1] - 66:9

**local** [6] - 26:14, 39:7, 39:14, 40:1, 47:24, 49:6

**location** [3] - 55:2, 96:20, 112:18

**look** [21] - 6:18, 7:17, 14:14, 37:6, 37:14, 38:5, 39:7, 40:17, 52:5, 52:14, 80:23, 80:24, 102:16, 118:12, 120:6, 121:1, 121:10, 121:20, 124:20, 135:18, 139:20

**looked** [6] - 20:21, 21:16, 120:17, 127:20, 129:15, 137:4

**looking** [21] - 11:18, 36:16, 51:6, 61:21, 78:17, 89:4, 99:1, 100:3, 100:18, 112:12, 113:18, 114:12, 114:21, 114:24, 115:1, 115:5, 115:11, 118:16, 118:19, 139:19

**looks** [5] - 104:21, 109:14, 113:2, 121:9, 123:13

**loose** [1] - 84:24

**Los** [1] - 84:22

**losing** [1] - 115:3

**loud** [5] - 85:5, 102:4, 102:7, 102:12, 102:22

**Louisiana** [3] - 17:23, 130:8, 133:17

**low** [2] - 56:17, 138:10

**lower** [4] - 109:17, 112:6, 113:15, 117:7

**lowest** [1] - 72:5

**lucky** [1] - 124:7

**lump** [1] - 122:7

**Lunch** [1] - 93:1

# M

**mail** [1] - 6:19

**maintain** [1] - 52:17

**maintained** [1] - 8:2

**maintenance** [1] - 41:9

**major** [3] - 12:12, 36:22, 48:19

**majority** [4] - 6:1, 37:11, 64:6, 64:8

**Management** [1] - 15:6

**management** [3] - 32:17, 47:21, 50:21

**mandated** [1] - 46:7

**manifestation** [1] - 115:18

**manner** [3] - 26:5, 104:23, 132:10

**manners** [2] - 34:19, 127:17

**Manual** [5] - 3:8, 61:11, 61:16, 61:20, 62:3

**manual** [7] - 18:18, 19:17, 20:12, 44:14, 61:14, 62:6, 138:13

**map** [1] - 121:7

**mark** [2] - 20:2, 57:19

**marked** [9] - 20:4, 57:20, 58:8, 59:9, 98:8, 98:18, 100:3, 100:19, 139:19

**Market** [1] - 32:14

**marriage** [1] - 144:10

**Maryland** [3] - 17:24, 18:4, 18:5

**mass** [2] - 54:3, 97:7

**Massachusetts** [22] - 1:2, 1:15, 1:17, 2:4, 2:8, 9:6, 18:9, 18:10, 18:11, 21:6, 21:12, 21:17, 128:9, 128:19, 129:3, 129:12, 129:13, 129:23, 131:5, 131:8, 131:11, 144:4

**MASSACHUSETTS** [2] - 1:22, 144:2

**master** [1] - 12:13

**master's** [2] - 18:21, 42:22

**material** [1] - 44:20

**materials** [1] - 16:4

**matter** [10] - 4:13, 47:16, 63:19, 64:4, 64:13, 64:14, 64:19, 66:1, 66:24, 105:7

**mayor** [2] - 47:13, 47:14

**mayor's** [1] - 49:5

**mean** [10] - 12:1, 50:2, 54:19, 60:4, 60:6, 66:6, 106:19, 113:21, 116:10, 124:18

**MEANS** [1] - 144:21

**means** [17] - 42:14, 63:11, 74:5, 83:14, 87:15, 89:13, 91:15, 92:7, 103:8, 105:5, 105:16, 114:1, 132:6, 136:13, 136:23, 137:18, 138:15

**meant** [1] - 22:18

**measures** [1] - 134:8

**mechanics** [1] - 77:6

**medical** [5] - 12:15, 12:18, 115:18, 116:17

**Medicine** [2] - 12:14, 12:17

**meet** [1] - 41:21

**meeting** [1] - 127:12

**member** [13] - 14:11, 14:12, 14:14, 14:21, 14:23, 14:24, 15:1, 15:4, 15:13, 35:6, 65:5, 74:4, 83:15

**membranes** [2] - 82:6, 82:7

**mental** [1] - 56:4

**mention** [2] - 58:17, 90:11

**mentioned** [7] - 18:3, 60:24, 78:10, 86:12, 94:1, 134:24, 135:6

**mentioning** [1] - 74:19

**mentions** [2] - 74:18, 74:21

**mere** [1] - 52:3

**message** [1] - 55:14

**met** [5] - 39:18, 40:8, 41:1, 104:21, 104:22

**method** [1] - 77:5

**methods** [9] - 8:2, 9:4, 17:10, 30:17, 35:12, 53:13, 76:24, 87:14, 132:8

**Metro** [2] - 17:17, 44:18

**Miami** [5] - 17:17, 44:12, 45:17, 130:20, 133:13

**mic** [1] - 56:18

**mid** [2] - 32:17

**middle** [1] - 126:7

**midst** [1] - 93:6

**Midwest** [1] - 130:16

**might** [13] - 55:7, 57:11, 59:2, 66:4, 88:7, 105:8, 111:6, 117:16, 117:19, 117:22, 118:3, 141:5

**mile** [2] - 116:11

**mind** [1] - 105:24

**minimal** [2] - 26:7, 138:21

**minimize** [1] - 94:21

**minimized** [1] - 27:15

**minimum** [6] - 43:7, 44:3, 77:20, 77:22, 93:19, 128:5

**minus** [2] - 23:22, 28:22

**Minute** [1] - 32:14

**minute** [3] - 19:10, 65:7, 77:19

**minutes** [3] - 96:11, 96:15, 135:10

**misappreciate** [1] - 66:11

**misinformed** [1] - 120:7

**misinterpreted** [1] - 61:5

**mislead** [1] - 89:15

**miss** [1] - 14:16

**missed** [1] - 94:1

**mission** [2] - 26:6, 26:8

**misspoke** [1] - 58:23

**mistaken** [2] - 117:4, 118:3

**mixed** [1] - 121:6

**mode** [2] - 109:22, 110:20

**moderated** [1] - 76:14

**modern** [1] - 119:17

**modification** [1] - 46:22

**module** [2] - 29:9, 29:16

**mom** [2] - 79:17, 79:18

**moment** [4] - 14:16, 21:12, 64:1, 73:8

**moments** [1] - 101:22

**morning** [2] - 4:10, 4:11

**Morning** [1] - 34:12

**most** [26] - 17:16, 21:21, 33:4, 38:4, 38:15, 39:22, 46:8, 58:3, 75:3, 76:13, 79:15, 79:16, 84:2, 86:1, 103:2, 104:17, 110:7, 116:16, 116:18, 121:23, 123:18, 123:20, 128:5, 128:8, 134:3

**mostly** [3] - 103:19,

116:9, 121:22
**motions** [1] - 4:21
**mouth** [7] - 63:23, 82:7, 108:7, 108:8, 110:2, 111:21, 113:13
**move** [4] - 80:2, 113:4, 138:23
**moved** [1] - 88:16
**movement** [1] - 63:23
**movements** [1] - 81:11
**moving** [9] - 54:1, 73:13, 81:4, 81:11, 89:13, 112:18, 113:9, 113:10, 139:15
**MR** [24] - 4:19, 5:2, 51:13, 51:19, 62:9, 65:10, 67:23, 68:7, 70:11, 71:16, 89:18, 97:20, 98:4, 98:10, 103:12, 104:1, 104:6, 128:21, 136:2, 136:3, 139:9, 140:2, 140:8, 141:7
**MS** [42] - 4:9, 4:18, 4:20, 5:3, 5:7, 20:2, 20:6, 34:10, 34:13, 51:15, 51:20, 57:3, 57:7, 57:22, 62:11, 62:14, 65:11, 68:1, 68:9, 68:11, 70:12, 71:23, 89:20, 92:23, 93:2, 98:1, 98:5, 98:11, 98:13, 103:14, 104:5, 104:8, 104:11, 128:23, 128:24, 135:13, 135:24, 139:8, 140:3, 140:9, 141:4, 141:8
**mucus** [1] - 82:6
**multiple** [4] - 17:20, 21:10, 86:5, 120:21
**municipal** [1] - 5:23, 8:23, 9:8
**muscular** [1] - 122:6
**myth** [3] - 119:17, 122:20, 125:8

## N

**NAI** [1] - 41:24
**name** [12] - 4:12, 4:14, 7:14, 23:4, 59:14, 59:15, 59:16, 59:17, 59:19, 79:20, 83:8, 136:4
**names** [2] - 11:21,

11:22
**national** [3] - 35:8, 50:14, 128:17
**National** [1] - 14:23, 15:1, 15:2, 15:9, 16:17, 18:19, 20:17, 30:2, 38:24, 44:24, 125:13, 127:9
**natural** [1] - 61:7
**nature** [2] - 94:6, 95:16
**nearly** [2] - 53:6, 69:13
**necessarily** [9] - 13:14, 56:8, 56:9, 60:10, 80:19, 105:7, 107:13, 123:7, 124:14
**necessary** [11] - 7:2, 26:7, 43:7, 44:4, 73:16, 77:9, 77:14, 77:20, 77:22, 83:14, 83:15
**need** [7] - 32:22, 34:11, 50:23, 50:24, 52:13, 52:14, 60:9
**needed** [4] - 33:13, 49:20, 67:14, 81:5
**needless** [5] - 60:2, 60:4, 60:13, 62:16, 63:3
**needlessly** [3] - 11:2, 11:19, 127:13
**needs** [3] - 41:21, 94:19, 120:5
**negate** [1] - 136:11
**negative** [1] - 52:6
**negligible** [1] - 96:6
**negotiating** [1] - 80:21
**neighbor's** [1] - 11:20
**neighborhoods** [1] - 140:11
**nets** [1] - 68:14
**Nevada** [4] - 11:15, 17:19, 23:14, 130:11
**never** [7] - 53:16, 68:23, 74:18, 74:21, 85:22, 90:9, 90:16
**New** [3] - 11:11, 130:13, 130:14
**news** [1] - 49:6
**next** [18] - 22:22, 52:7, 52:24, 57:17, 60:21, 72:17, 75:21, 80:4, 81:15, 81:21, 81:23, 82:16, 82:19, 83:12, 83:13, 96:11, 106:2
**night** [1] - 104:10
**nobody** [2] - 88:10, 138:24
**noise** [1] - 85:5

**noises** [5] - 102:4, 102:7, 102:12, 102:21, 102:22
**non** [9] - 41:23, 42:1, 51:24, 52:16, 134:13, 134:15, 134:24, 137:11
**non-accidental** [3] - 41:23, 42:1
**non-involved** [1] - 137:11
**non-lethal** [1] - 52:16
**non-police** [3] - 134:13, 134:15, 134:24
**non-threat** [1] - 51:24
**nonaggressive** [1] - 66:12
**noncompliant** [1] - 80:13
**none** [4] - 56:7, 86:5, 90:10, 101:17
**nonlethal** [7] - 9:4, 17:10, 24:18, 30:16, 44:2, 74:12, 91:15
**nonthreatening** [3] - 57:10, 84:7, 105:9
**nonvisible** [1] - 100:14
**normal** [5] - 4:17, 40:3, 61:7, 64:17, 113:2
**normally** [1] - 58:1
**nose** [1] - 82:6
**NOT** [1] - 144:20
**Notary** [3] - 1:14, 4:5, 144:4
**notary** [1] - 5:6
**note** [1] - 74:3
**noted** [2] - 57:5, 71:21
**nothing** [4] - 4:6, 110:19, 126:6, 135:24
**notice** [1] - 58:7
**noticed** [1] - 101:18
**NSA** [2] - 45:3, 131:16
**number** [16] - 8:22, 12:6, 28:21, 35:4, 35:11, 37:4, 38:10, 38:23, 39:4, 44:10, 61:2, 93:14, 107:5, 115:16, 133:15, 133:19
**Nye** [4] - 23:12, 45:22, 45:23, 133:13

## O

**oath** [1] - 5:9
**obedience** [5] - 17:1,

34:19, 34:23, 35:3, 36:4
**object** [8] - 52:19, 52:22, 81:16, 81:22, 82:22, 83:3, 96:2, 109:17
**objection** [9] - 65:10, 67:23, 70:11, 71:16, 89:18, 103:12, 104:1, 139:8, 140:8
**objections** [1] - 4:21
**objectively** [1] - 88:4
**objects** [3] - 52:14, 85:14, 94:20
**observation** [2] - 102:24, 114:4
**observations** [1] - 40:7
**observe** [1] - 72:5
**observed** [2] - 65:14, 72:23
**observing** [1] - 89:9
**OC** [21] - 53:1, 60:18, 62:21, 74:18, 74:22, 77:5, 78:7, 81:24, 82:5, 82:14, 82:16, 88:12, 89:17, 90:10, 90:12, 91:20, 92:5, 92:10, 92:16, 138:14, 139:2
**occasions** [2] - 10:1, 38:23
**occupied** [1] - 93:18
**occur** [1] - 107:14
**occurred** [3] - 7:12, 133:12, 136:9
**occurring** [1] - 51:8
**occurs** [1] - 134:1
**odds** [1] - 96:24
**OF** [7] - 1:7, 1:10, 2:3, 144:2, 144:20, 144:21, 144:21
**offensive** [4] - 29:12, 56:5, 118:6, 135:18
**offers** [1] - 114:17
**office** [7] - 5:21, 5:23, 31:24, 34:18, 45:24, 49:5, 49:15
**Officer** [51] - 4:13, 7:11, 7:17, 59:22, 60:1, 60:13, 61:22, 62:16, 62:19, 72:2, 73:5, 73:17, 73:19, 73:22, 74:11, 87:17, 88:12, 88:19, 89:15, 90:12, 90:23, 91:19, 92:4, 92:10, 92:16, 93:3, 94:8, 95:20, 96:16, 97:23, 98:3, 99:23, 100:4,

100:20, 100:24, 101:9, 105:11, 105:21, 119:2, 119:11, 119:13, 120:10, 129:19, 132:14, 132:20, 133:7, 136:12, 136:22, 137:23, 138:2, 138:22
**officer** [106] - 6:11, 10:12, 10:23, 10:24, 11:4, 12:2, 12:4, 12:7, 13:16, 13:19, 13:21, 22:4, 22:6, 22:7, 22:14, 26:1, 26:20, 27:7, 27:11, 27:16, 27:24, 28:1, 28:5, 31:16, 32:13, 33:3, 36:5, 40:23, 47:23, 49:3, 57:14, 58:16, 63:12, 63:17, 64:3, 64:9, 64:23, 65:2, 65:6, 65:12, 66:4, 66:7, 66:17, 66:18, 66:21, 66:23, 67:5, 67:9, 67:10, 67:12, 67:20, 67:21, 68:4, 68:5, 68:20, 68:22, 69:4, 69:5, 69:6, 69:7, 69:11, 69:14, 69:16, 69:18, 70:8, 70:9, 70:21, 71:5, 71:13, 71:15, 72:14, 72:17, 72:20, 73:1, 73:2, 77:24, 80:10, 82:17, 83:20, 83:22, 85:21, 85:23, 86:13, 86:23, 86:24, 89:24, 90:3, 90:4, 90:9, 90:15, 91:5, 91:10, 91:24, 94:15, 94:16, 94:19, 95:7, 95:18, 96:4, 97:3, 106:7, 128:23, 129:6, 136:16, 137:16, 137:20
**officer's** [5] - 28:16, 33:10, 40:17, 58:19, 94:4
**officers** [150] - 10:9, 10:23, 11:2, 11:6, 11:8, 16:22, 17:7, 17:11, 17:19, 17:21, 18:1, 18:8, 18:11, 21:7, 21:23, 22:13, 22:15, 22:19, 22:20, 22:23, 23:2, 23:17, 23:19, 24:1, 24:2, 24:5, 24:14, 24:21, 25:9, 25:10, 25:18, 26:9, 26:16, 27:9,

28:12, 28:19, 29:1, 29:11, 29:15, 29:21, 30:5, 30:7, 30:8, 30:12, 30:24, 31:7, 31:18, 32:3, 32:18, 33:1, 33:18, 36:6, 38:23, 39:6, 40:4, 40:10, 40:21, 41:1, 42:20, 42:24, 43:4, 43:23, 44:5, 44:11, 44:16, 44:17, 45:4, 45:6, 45:19, 45:24, 48:15, 48:16, 51:9, 51:11, 51:16, 51:21, 53:10, 54:16, 56:15, 57:15, 63:15, 65:20, 66:14, 68:23, 69:9, 70:18, 74:16, 75:1, 75:5, 76:17, 77:2, 78:11, 79:10, 79:16, 79:20, 79:23, 80:1, 80:22, 83:17, 84:3, 84:9, 84:18, 84:23, 85:2, 85:12, 86:1, 86:9, 86:19, 87:5, 87:9, 89:3, 90:11, 91:2, 91:7, 91:8, 93:5, 93:20, 101:5, 101:17, 106:8, 118:7, 120:18, 121:4, 121:19, 124:9, 126:8, 127:14, 127:15, 127:19, 127:22, 128:2, 128:12, 128:14, 128:19, 130:3, 132:2, 132:12, 132:23, 133:6, 133:11, 133:22, 134:9, 137:9, 139:12, 139:14

**Officers** [2] - 43:17, 128:10
**officers'** [1] - 129:5
**official** [1] - 13:11
**officials** [1] - 11:11
**often** [7] - 33:4, 54:23, 64:21, 76:13, 84:24, 85:19, 110:13
**Oleoresin** [1] - 53:1
**omitted** [1] - 74:19, 90:4, 90:15
**once** [4] - 54:7, 74:18, 85:22, 111:12
**oncoming** [1] - 23:16
**one** [60] - 10:9, 11:2, 11:16, 11:17, 13:24, 14:16, 15:8, 27:9, 27:23, 29:18, 33:4,

33:23, 34:1, 36:23, 36:24, 37:8, 37:10, 37:12, 38:19, 40:16, 40:20, 46:2, 55:1, 57:3, 57:11, 59:5, 62:18, 68:3, 69:13, 69:17, 72:22, 77:13, 78:20, 79:24, 83:21, 84:3, 84:12, 84:15, 85:2, 98:2, 98:12, 98:16, 100:22, 102:13, 103:5, 103:15, 103:23, 104:15, 115:17, 116:23, 118:13, 118:21, 121:16, 130:9, 131:5, 131:8, 131:18, 139:21
**one's** [7] - 43:8, 74:6, 77:14, 83:15, 87:15, 136:13, 137:19
**ones** [9] - 33:22, 42:21, 98:2, 112:3, 117:15, 123:11, 131:13
**online** [3] - 16:7, 23:24, 44:22
**oOo** [1] - 142:8
**open** [7] - 13:20, 16:4, 67:23, 106:3, 108:7, 108:8, 110:5
**operating** [2] - 11:19, 42:19
**operations** [3] - 48:9, 48:10, 49:11
**opinion** [50] - 7:19, 21:4, 27:3, 58:11, 58:24, 59:21, 60:1, 60:12, 60:16, 62:16, 72:2, 72:4, 72:8, 73:17, 73:19, 73:21, 74:8, 74:10, 74:11, 74:15, 89:15, 90:7, 92:17, 93:3, 93:10, 95:20, 101:2, 101:6, 101:14, 113:17, 114:3, 118:17, 118:21, 119:2, 119:11, 119:21, 120:9, 120:10, 120:14, 124:16, 126:11, 126:12, 126:24, 127:4, 132:14, 132:19, 132:22, 134:20, 138:8
**opinions** [7] - 8:15, 58:1, 59:2, 118:14, 135:3, 135:8, 141:5
**opportunity** [1] -

58:14
**option** [5] - 60:10, 60:11, 83:24, 84:12, 91:16
**options** [5] - 7:17, 60:7, 60:17, 63:7, 92:2
**order** [3] - 44:3, 92:21, 117:22
**ordinance** [1] - 39:14
**ordinances** [1] - 39:8
**Oregon** [1] - 130:7
**organism** [1] - 54:4
**organization** [1] - 38:5
**organizations** [2] - 14:6, 14:15
**orientation** [1] - 109:11
**otherwise** [3] - 53:17, 101:20, 102:14
**outcome** [3] - 88:5, 92:15, 144:11
**output** [1] - 56:17
**outside** [6] - 45:14, 47:7, 57:12, 106:11, 128:18, 129:11
**Ovcharka** [1] - 125:24
**overfed** [1] - 42:15
**oversaw** [1] - 48:15
**overseeing** [4] - 33:19, 48:8, 48:9, 48:10
**overwork** [1] - 41:16
**own** [12] - 24:24, 25:6, 28:16, 34:20, 35:8, 75:19, 98:24, 106:23, 122:23, 123:5, 123:6, 132:6
**owner** [4] - 10:5, 40:24, 46:18, 88:8
**owners** [9] - 17:1, 42:10, 46:14, 46:17, 46:21, 46:24, 78:19, 115:10, 122:22

**P**

**p.m** [1] - 141:11
**package** [1] - 20:9
**page** [3] - 119:1, 134:12, 142:7
**Page** [1] - 1:13
**PAGE** [2] - 142:1, 143:4
**pages** [1] - 142:4
**painful** [3] - 82:8, 82:11, 96:13
**pains** [2] - 4:23, 142:16
**panic** [1] - 102:18

**panicked** [1] - 108:19
**pant** [1] - 109:19
**panting** [8] - 107:9, 107:15, 107:17, 108:17, 116:8, 116:12, 116:21, 117:14
**paperwork** [1] - 16:2
**paragraph** [5] - 124:19, 124:24, 125:2, 125:3, 134:12
**paragraphs** [1] - 126:15
**parallels** [1] - 24:16
**parent** [1] - 15:14
**part** [15] - 14:7, 20:9, 25:7, 28:14, 29:7, 31:8, 40:13, 55:17, 56:1, 56:2, 80:6, 92:13, 107:14, 107:15, 121:16
**participated** [1] - 43:15
**particular** [7] - 12:20, 23:10, 39:7, 55:24, 56:5, 113:8, 122:14
**particularly** [3] - 24:19, 131:11, 140:10
**parties** [2] - 84:7, 144:10
**parts** [2] - 33:12, 43:1
**party** [1] - 109:5
**pass** [2] - 54:5, 94:5
**pass-through** [1] - 54:5
**passed** [2] - 21:10, 44:21
**past** [6] - 10:1, 15:13, 73:14, 81:1, 89:10, 89:13
**pat** [1] - 57:3
**patent** [1] - 99:8
**path** [1] - 101:8
**PATRICIA** [2] - 144:3, 144:15
**Patricia** [1] - 1:13
**patrolman** [1] - 22:9
**pay** [1] - 88:7
**PD's** [1] - 92:22
**peaceful** [1] - 132:10
**pedigree** [2] - 121:14, 121:21
**penalties** [2] - 4:24, 142:16
**people** [39] - 28:6, 30:7, 33:16, 33:24, 37:21, 37:22, 38:14, 45:23, 46:15, 50:15, 54:10, 58:15, 69:13,

75:5, 77:17, 84:9, 89:2, 93:22, 93:23, 94:20, 96:20, 97:1, 102:4, 104:8, 107:5, 108:21, 109:18, 117:7, 119:6, 121:1, 122:17, 122:20, 122:24, 123:4, 137:6, 139:16, 140:10, 140:12, 140:17
**people's** [1] - 35:1
**pepper** [17] - 53:1, 81:24, 87:22, 88:3, 95:21, 95:22, 95:23, 96:5, 96:16, 96:18, 138:3, 138:5, 138:9, 138:14, 138:18, 138:23
**per** [6] - 6:24, 7:2, 7:5, 59:21, 78:2, 125:19
**perceive** [2] - 30:14, 30:24, 55:12, 56:14, 81:2, 102:20, 105:8, 107:5, 111:3, 114:9, 119:15
**perceived** [8] - 54:24, 75:16, 75:22, 76:12, 114:17, 115:12, 115:13, 119:23
**perceives** [2] - 75:11, 111:1, 114:2
**perceiving** [2] - 76:23, 78:24
**percent** [6] - 53:6, 65:18, 120:24, 121:24, 122:1
**perception** [3] - 25:24, 29:10, 120:3
**perceptions** [1] - 9:18
**perfectly** [1] - 27:3
**perhaps** [10] - 44:24, 46:18, 52:23, 60:21, 81:1, 84:5, 97:21, 114:7, 115:7, 133:6
**period** [12] - 34:7, 35:10, 35:18, 45:19, 47:17, 70:14, 71:2, 72:4, 72:24, 73:1, 106:21, 122:20
**periods** [1] - 54:11
**perjury** [2] - 4:24, 142:16
**Perkins** [2] - 89:16, 92:9
**Perkins'** [2] - 92:14, 92:17
**permanent** [2] - 49:17, 96:7
**permissible** [1] - 74:4

**permitted** [1] - 137:16
**person** [36] - 10:5, 19:14, 26:2, 38:5, 44:4, 55:2, 64:10, 64:17, 64:20, 65:17, 67:16, 69:12, 80:13, 86:16, 96:2, 101:3, 101:12, 104:19, 105:12, 106:11, 107:4, 113:8, 113:9, 113:19, 113:20, 113:21, 113:23, 114:12, 114:14, 114:15, 117:9, 118:4, 118:19, 118:22, 135:15, 135:21
**person's** [1] - 27:5
**personal** [3] - 8:15, 75:4, 75:8
**personally** [2] - 45:10, 137:8
**personnel** [3] - 33:5, 46:4, 50:14
**persons** [1] - 137:12
**pet** [2] - 65:14, 65:15
**pets** [3] - 24:18, 65:24, 133:23
**Ph.D** [1] - 12:17
**photograph** [2] - 99:18, 139:20
**Photograph** [2] - 3:10, 98:8
**photographic** [1] - 42:7
**photographs** [6] - 59:18, 88:23, 97:14, 97:17, 97:18, 97:22
**photos** [1] - 97:22
**physical** [6] - 9:20, 12:21, 41:17, 42:11, 52:11, 101:11
**physiological** [1] - 115:17
**pick** [2] - 55:22, 79:9
**picture** [5] - 98:20, 99:2, 100:3, 100:18, 139:19
**pictures** [2] - 98:21, 100:8
**piece** [1] - 81:18
**pieces** [1] - 68:12
**pilot** [1] - 23:8
**pit** [18] - 119:3, 119:4, 119:7, 119:12, 119:17, 119:23, 120:11, 122:1, 122:18, 123:3, 123:7, 123:19, 125:4, 125:9,

125:10, 125:11, 125:20, 126:6
**place** [15] - 39:15, 78:15, 82:10, 100:16, 109:13, 111:18, 112:12, 113:20, 113:22, 114:1, 114:8, 114:12, 116:6, 119:9
**placed** [1] - 137:9
**placement** [1] - 54:13
**places** [12] - 38:24, 39:18, 39:19, 39:22, 45:8, 45:9, 79:16, 83:20, 114:6, 131:17, 133:19
**plain** [1] - 91:7
**plaintiff** [1] - 114:18
**Plaintiff** [1] - 2:9
**plaintiff's** [1] - 10:2
**Plaintiffs** [1] - 1:5
**plaintiffs** [4] - 8:13, 9:12, 10:16, 136:6
**plans** [3] - 17:5, 38:13, 84:15
**play** [3] - 55:8, 56:3, 84:2
**pleasure** [1] - 47:14
**plenty** [2] - 54:10, 104:24
**plug** [1] - 115:2
**plus** [9] - 7:1, 7:2, 22:13, 22:19, 23:8, 23:22, 28:22, 128:8, 128:17
**PLYMOUTH** [1] - 144:2
**pocket** [1] - 92:6
**point** [14] - 10:18, 24:23, 31:19, 59:6, 73:5, 82:10, 82:21, 82:23, 83:3, 83:13, 101:12, 105:23, 133:3, 135:5
**pointed** [1] - 71:10
**pointing** [1] - 46:22
**points** [1] - 18:16
**pole** [1] - 11:1
**police** [168] - 5:20, 5:23, 6:5, 6:11, 7:12, 7:15, 9:2, 9:13, 10:8, 10:10, 10:23, 12:3, 13:16, 13:24, 16:14, 17:7, 17:8, 17:10, 17:11, 17:14, 17:18, 17:19, 17:21, 17:24, 18:8, 21:7, 22:4, 22:6, 22:7, 22:8, 22:23, 23:11, 24:1, 24:4, 24:8, 25:18,

26:16, 27:7, 27:16, 27:24, 28:5, 28:12, 29:21, 30:3, 30:5, 30:11, 31:6, 31:15, 32:3, 33:22, 36:5, 36:6, 40:10, 41:10, 42:20, 42:24, 43:3, 43:4, 44:5, 44:9, 44:16, 44:19, 45:2, 45:6, 45:13, 45:19, 47:23, 50:19, 50:22, 51:5, 53:5, 54:15, 56:15, 57:13, 59:18, 61:10, 61:15, 61:19, 62:2, 62:22, 63:5, 63:12, 63:17, 64:3, 64:9, 64:23, 65:2, 65:6, 65:12, 65:20, 66:2, 66:4, 66:14, 66:17, 67:5, 67:9, 67:10, 67:12, 67:20, 68:4, 68:5, 69:9, 69:13, 69:16, 70:5, 70:8, 70:18, 71:5, 73:20, 73:24, 74:2, 75:5, 79:13, 79:15, 79:20, 84:22, 85:12, 85:20, 86:8, 87:12, 90:18, 91:2, 91:5, 91:10, 93:19, 94:15, 95:7, 96:4, 97:10, 97:15, 126:8, 126:12, 127:1, 127:6, 128:1, 128:2, 128:14, 128:19, 129:5, 129:6, 129:16, 130:3, 130:14, 130:17, 130:21, 131:18, 131:21, 132:12, 133:3, 133:10, 133:13, 133:14, 134:2, 134:13, 134:15, 134:24, 135:19, 137:1, 138:12, 138:16, 139:14
**Police** [6] - 15:8, 17:17, 43:16, 44:18, 127:10, 128:10
**police-related** [1] - 17:8
**policies** [7] - 27:2, 61:23, 61:24, 69:24, 86:17, 94:18, 131:4
**policy** [8] - 63:5, 70:6, 73:24, 74:2, 84:21, 87:13, 92:22, 137:2
**Pomeranians** [1] - 124:3

**poodle** [1] - 68:8
**poor** [1] - 93:11
**porch** [5] - 105:23, 111:16, 111:17, 111:18, 115:5
**portion** [5] - 6:9, 20:16, 25:5, 57:12, 61:17
**portions** [2] - 100:14, 135:8
**position** [10] - 11:12, 48:2, 63:22, 75:10, 80:7, 80:14, 87:23, 92:19, 113:12, 114:14
**positioning** [2] - 28:17, 52:4
**positions** [4] - 16:6, 22:12, 56:6, 93:20
**positive** [1] - 113:24
**possess** [1] - 44:3
**possession** [5] - 60:18, 63:10, 82:17, 121:14, 140:24
**possibilities** [2] - 27:13, 95:1
**possibility** [7] - 54:5, 95:17, 96:21, 96:22, 96:23, 101:6, 133:4
**possible** [10] - 26:6, 53:11, 58:10, 64:3, 64:9, 89:1, 106:5, 109:24, 114:16, 118:2
**post** [1] - 124:12
**posts** [1] - 19:1
**posture** [9] - 80:9, 109:18, 112:6, 112:22, 112:24, 113:4, 113:7, 113:16, 132:7
**postures** [1] - 40:5
**potential** [4] - 65:4, 77:1, 80:12, 122:12
**potentially** [8] - 31:20, 39:20, 58:23, 65:6, 76:12, 76:22, 83:21, 93:23
**pound** [1] - 58:22
**pounds** [7] - 125:18, 125:20, 125:21, 125:22, 125:23, 126:1, 126:2
**power** [1] - 115:3
**practice** [1] - 48:13
**practices** [4] - 65:2, 73:20, 83:5, 127:8
**predicated** [1] - 67:1
**predominant** [2] - 119:9, 120:22

**prefer** [1] - 84:2
**preference** [1] - 81:23
**preferential** [1] - 76:6
**preferred** [1] - 26:5
**preferring** [1] - 109:23
**preliminary** [2] - 58:8, 58:24
**prepare** [1] - 91:14
**prepared** [1] - 87:24
**preparing** [1] - 89:8
**presence** [6] - 7:22, 42:12, 52:3, 52:7, 79:22, 90:10
**present** [15] - 5:16, 30:7, 33:18, 61:8, 63:9, 65:19, 80:9, 81:6, 91:23, 92:5, 101:17, 105:3, 106:14, 139:17
**presentation** [1] - 44:14
**presentations** [1] - 44:9
**presented** [8] - 7:20, 17:2, 25:12, 43:3, 50:15, 61:13, 92:19, 95:4
**presenting** [4] - 11:9, 49:14, 52:4, 66:20
**presents** [1] - 114:9
**president** [1] - 15:13
**President's** [1] - 14:24
**pressure** [5] - 125:15, 125:19, 125:20, 126:3, 126:5
**presuming** [1] - 137:22
**pretty** [6] - 13:11, 74:7, 76:21, 122:5, 124:1, 129:18
**prevent** [2] - 5:11, 52:6
**previous** [2] - 28:21, 48:17
**primarily** [1] - 21:22
**primary** [2] - 6:10, 20:11
**principles** [3] - 51:6, 52:1, 65:16
**private** [1] - 38:6
**proactively** [2] - 133:5, 133:20
**problem** [4] - 46:19, 52:13, 77:1, 88:2
**problematic** [3] - 46:17, 47:1, 121:5
**problems** [6] - 35:20, 35:21, 36:19, 38:7, 46:20, 119:5
**Procedure** [1] - 1:12

**procedures** [1] - 18:23
**proceed** [3] - 52:24, 53:12, 127:21
**proceeded** [2] - 14:4, 34:22
**proceedings** [2] - 144:7, 144:9
**process** [2] - 47:13, 48:23
**processes** [2] - 29:23, 48:12
**produced** [4] - 18:18, 60:7, 98:2, 140:20
**product** [1] - 29:24
**production** [1] - 4:4
**Professional** [6] - 13:3, 14:3, 14:9, 14:22, 15:16, 35:6
**professional** [5] - 14:1, 14:6, 35:14, 48:11, 64:22
**professionals** [2] - 120:23, 121:16
**program** [4] - 20:16, 22:16, 22:20, 42:23
**Program** [1] - 13:7
**programs** [1] - 46:22
**progress** [2] - 21:11
**progression** [2] - 55:17, 76:13
**progressive** [1] - 127:16
**promoted** [2] - 22:10, 22:16
**proof** [1] - 122:3
**proper** [10] - 27:1, 41:18, 42:6, 43:5, 46:23, 49:13, 53:23, 67:14, 127:16, 133:8
**properly** [11] - 4:3, 10:12, 30:13, 33:7, 42:15, 48:21, 49:14, 72:8, 119:14, 133:8, 144:6
**proportional** [1] - 68:24
**proportionate** [1] - 7:24
**prosecuting** [1] - 50:14
**prosecutors** [3] - 30:5, 30:8, 129:24
**protect** [8] - 30:17, 43:8, 75:11, 83:15, 84:4, 86:10, 86:11
**protecting** [3] - 75:19, 76:2, 76:7
**protection** [3] - 55:1, 55:3, 70:1
**protective** [2] - 85:1,

87:1
**Protective** [2] - 47:10, 48:5
**protocols** [1] - 38:11
**provide** [1] - 62:5
**provided** [13] - 43:14, 59:18, 61:12, 63:6, 66:2, 73:23, 90:20, 90:21, 97:18, 97:19, 97:22, 98:21, 140:22
**provides** [1] - 70:15
**provision** [2] - 129:10, 138:3
**provisions** [1] - 1:12
**proximity** [1] - 96:19
**psychology** [1] - 12:13
**public** [11] - 30:17, 32:5, 32:7, 41:7, 65:5, 83:16, 127:14, 127:18, 127:22, 132:24, 133:21
**Public** [3] - 1:14, 4:5, 144:4
**publication** [8] - 18:16, 19:4, 19:11, 19:13, 19:16, 19:19, 20:20, 20:22
**publications** [1] - 18:14
**published** [2] - 19:7, 20:8
**pull** [3] - 56:13, 71:7, 118:14
**pulling** [1] - 71:9
**pupils** [2] - 109:21, 109:23
**puppies** [2] - 55:2, 86:3
**pure** [1] - 121:9
**purpose** [2] - 51:23, 75:18
**purposes** [1] - 121:23
**pursuant** [1] - 1:11
**push** [1] - 113:11
**pushing** [1] - 86:24
**put** [10] - 74:8, 77:18, 79:4, 80:2, 104:10, 118:12, 125:15, 125:19, 140:11, 140:17
**putting** [2] - 18:7, 56:9

**Q**

**qualification** [1] - 119:8
**questions** [4] - 61:4, 131:12, 136:2, 140:2
**quick** [5] - 27:10,

64:15, 64:21, 66:1, 76:14
**quickly** [5] - 31:10, 65:5, 95:2, 107:20, 132:3
**quite** [8] - 8:23, 21:2, 22:24, 35:3, 35:11, 38:9, 47:5, 50:11

**R**

**raft** [1] - 101:21
**railing** [1] - 111:17
**Raise** [2] - 79:5, 80:1
**ran** [7] - 34:4, 37:7, 40:14, 88:24, 101:18, 101:22, 115:4
**range** [7] - 25:13, 25:14, 27:17, 28:10, 47:5, 88:3, 125:16
**ranged** [1] - 22:12
**ranging** [1] - 29:12
**rapid** [4] - 107:17, 108:19, 117:1, 118:8
**rapidly** [8] - 54:1, 64:10, 67:17, 75:4, 75:9, 109:13, 113:4, 113:10
**rate** [2] - 6:24
**rates** [1] - 6:23
**rather** [4] - 48:12, 112:11, 112:19, 115:8
**reach** [1] - 81:17
**reached** [4] - 11:3, 105:23, 117:21, 131:19
**react** [1] - 102:7
**reacting** [1] - 102:12
**reaction** [3] - 69:19, 103:1, 120:5
**read** [6] - 4:23, 21:2, 57:3, 94:14, 114:23, 142:4
**reading** [1] - 90:8
**reads** [2] - 57:5, 71:21
**real** [1] - 25:10
**realities** [2] - 120:2, 127:16
**realize** [1] - 65:7
**realized** [1] - 48:17
**really** [3] - 81:11, 94:24, 136:16
**rear** [1] - 100:11
**reason** [2] - 47:22, 106:12, 110:24
**REASON** [9] - 143:6, 143:8, 143:10, 143:12, 143:14,

143:16, 143:18, 143:20, 143:22
**reasonable** [16] - 7:22, 25:24, 27:3, 54:14, 64:10, 64:17, 64:20, 65:17, 67:1, 67:5, 67:14, 71:2, 73:3, 137:4, 137:20, 137:22
**reasonably** [1] - 12:8
**reasons** [2] - 122:17, 143:3
**reassurance** [1] - 102:16
**receive** [2] - 23:17, 62:1
**received** [4] - 10:10, 69:15, 119:19, 132:15
**receiving** [2] - 5:4, 21:7
**recent** [1] - 17:16
**recess** [3] - 34:12, 93:1, 135:12
**reckless** [2] - 93:4, 93:9
**recognition** [1] - 31:9
**recognize** [2] - 46:19, 51:23
**recognized** [2] - 65:17, 89:6
**recognizing** [2] - 42:5, 133:1
**recommendations** [3] - 32:20, 38:13, 77:8
**recommended** [3] - 26:4, 77:10, 88:3
**recommending** [2] - 36:20
**record** [14] - 4:14, 4:20, 34:11, 44:23, 59:13, 62:12, 62:13, 79:8, 90:4, 92:13, 92:23, 97:24, 126:17, 144:9
**recorded** [2] - 57:6, 71:22
**recording** [2] - 89:22, 90:14
**records** [1] - 6:18
**Recross** [1] - 3:2
**recumbent** [1] - 98:23
**red** [1] - 99:11
**REDIRECT** [1] - 140:3
**Redirect** [1] - 3:2
**reduce** [1] - 46:24
**refer** [5] - 15:23, 58:6, 83:6, 124:16, 134:13
**referenced** [1] - 19:2
**referred** [6] - 13:24,

20:8, 32:11, 100:5, 131:15, 131:16
**referring** [8] - 15:18, 15:19, 78:6, 83:6, 124:19, 125:8, 134:16, 134:17
**reflect** [1] - 100:1
**refuge** [1] - 101:13
**refused** [1] - 12:6
**regarding** [11] - 6:5, 9:2, 17:3, 17:4, 21:21, 38:18, 63:21, 87:17, 125:14, 129:2, 129:23
**regular** [2] - 43:3, 47:6
**regularly** [1] - 130:17
**regulations** [2] - 26:14, 92:1
**rehabbed** [1] - 123:14
**rehabilitatable** [1] - 36:21
**rehabilitated** [4] - 38:8, 38:9, 38:15, 38:16
**rehabilitation** [1] - 17:5
**rehiring** [1] - 48:2
**reinforcing** [1] - 46:23
**related** [8] - 12:22, 17:8, 18:20, 39:9, 50:3, 54:23, 108:9, 144:10
**relation** [1] - 41:3
**relationship** [2] - 41:11, 47:2
**relatively** [1] - 125:17
**released** [2] - 19:21, 19:22
**reliably** [1] - 121:19
**relying** [2] - 62:15, 62:18
**remedy** [1] - 96:7
**remember** [7] - 7:13, 20:24, 61:12, 88:19, 120:13, 129:15, 130:7
**remove** [1] - 103:3
**repeat** [3] - 51:14, 104:12, 104:13
**repeated** [1] - 50:11
**repeatedly** [4] - 11:9, 16:13, 91:12, 138:18
**rephrase** [3] - 32:22, 51:13, 137:13
**replaced** [1] - 49:16
**report** [21] - 3:9, 16:1, 57:18, 58:4, 58:7, 58:8, 59:6, 59:8, 59:9, 59:11, 89:24, 90:8, 90:10, 104:7,

117:1, 118:16, 124:17, 126:16, 134:11, 134:12, 137:15
**reported** [2] - 7:15, 126:5
**REPORTER** [1] - 144:22
**Reporter** [2] - 1:14, 144:4
**reporter** [3] - 56:23, 57:5, 71:21
**reports** [4] - 59:4, 63:8, 74:16, 90:11
**represent** [3] - 4:12, 62:9, 136:5
**represented** [1] - 59:16
**REPRODUCTION** [1] - 144:21
**request** [1] - 34:24
**require** [3] - 38:15, 128:11, 130:9
**required** [8] - 7:3, 45:11, 85:2, 87:9, 91:3, 130:4, 131:6, 136:23
**requirement** [2] - 21:9, 137:3
**requirements** [4] - 40:9, 41:18, 91:5, 92:21
**requires** [2] - 128:4, 128:12
**rescue** [3] - 36:19, 37:3, 38:3
**rescues** [1] - 49:7
**research** [3] - 123:5, 123:6, 129:13
**researchers** [1] - 121:18
**reserve** [2] - 4:20, 58:18
**residence** [1] - 88:21
**resolve** [1] - 132:9
**resort** [1] - 87:6
**resource** [3] - 45:3, 76:7, 76:8
**resources** [3] - 55:1, 55:3, 75:11
**respiration** [3] - 107:18, 109:20, 117:2
**respirations** [1] - 118:8
**respond** [2] - 122:15, 131:3
**responded** [4] - 10:23, 133:19, 133:21, 134:7

**response** [17] - 16:24, 26:15, 27:10, 53:17, 60:8, 61:7, 63:15, 72:10, 73:4, 75:21, 76:6, 82:4, 82:9, 107:7, 107:16, 115:21, 130:24
**responses** [2] - 7:21, 25:14
**responsibility** [4] - 22:15, 66:21, 131:9, 136:12
**responsible** [4] - 31:17, 33:4, 130:24, 137:3
**restraint** [1] - 137:10
**restricted** [1] - 25:23
**result** [4] - 115:17, 137:10, 137:21, 137:23
**resulted** [3] - 119:24, 134:4, 134:6
**retained** [10] - 6:12, 6:16, 7:8, 7:10, 8:13, 8:16, 9:22, 10:4, 10:5, 10:7
**retired** [6] - 5:20, 5:24, 22:21, 34:18, 47:23, 48:1
**retirement** [2] - 6:10, 13:16
**retrained** [1] - 130:18
**retraining** [1] - 36:20
**retreat** [1] - 82:10
**retreated** [2] - 110:6, 117:17
**retreating** [1] - 88:16
**Retriever** [3] - 15:14, 15:16, 35:7
**retrievers** [1] - 35:8
**reveal** [1] - 88:23
**revealed** [1] - 92:5
**reverted** [1] - 72:9
**review** [6] - 10:8, 12:7, 19:15, 20:10, 20:14, 29:9, 33:10, 61:9, 61:10, 61:15, 90:17, 94:8, 97:13, 97:14, 114:18
**reviewed** [6] - 61:17, 90:18, 90:21, 97:17, 103:16, 114:19
**reviewing** [1] - 94:7
**rhinoceros** [1] - 78:8
**ricochet** [2] - 27:14, 54:6, 93:14, 93:24
**ricochets** [1] - 95:1
**Rider** [1] - 20:16
**rider** [1] - 20:24
**ring** [1] - 36:23

**rings** [1] - 38:1
**rinse** [1] - 96:14
**rises** [1] - 95:5
**risk** [10] - 54:15, 76:8, 96:6, 127:15, 127:19, 136:17, 137:11, 138:20, 139:11, 139:15
**risks** [2] - 69:9, 95:6
**rival** [1] - 55:13
**road** [2] - 93:13, 138:21
**robbing** [1] - 32:14
**roof** [1] - 58:16
**rookies** [1] - 22:19
**room** [4] - 96:1, 109:12, 111:11, 138:22
**Room** [2] - 1:16, 2:4
**rose** [1] - 31:19
**Rottweilers** [1] - 125:22
**roughly** [4] - 23:19, 24:20, 99:20, 125:18
**round** [1] - 54:7
**rounds** [5] - 89:12, 97:9, 100:15, 100:17, 100:18
**rub** [1] - 96:10
**Rule** [1] - 137:14
**rule** [2] - 137:14, 137:16
**Rules** [1] - 1:12
**rules** [6] - 4:16, 26:13, 27:12, 92:1, 138:4, 139:6
**ruling** [1] - 69:20
**rumbling** [1] - 117:7
**run** [25] - 23:2, 26:23, 27:24, 57:2, 63:15, 76:6, 77:23, 85:8, 88:6, 89:5, 89:10, 91:18, 101:16, 102:10, 102:19, 103:8, 103:20, 106:9, 106:14, 110:11, 112:12, 114:16, 116:11, 125:21, 126:2
**running** [16] - 28:6, 55:24, 88:17, 89:3, 105:15, 106:1, 106:2, 110:4, 112:7, 112:9, 112:19, 113:3, 113:9, 116:10, 117:14
**runs** [3] - 56:11, 76:10, 126:1
**rural** [1] - 21:23
**Russian** [1] - 126:1

# S

**sack** [1] - 53:18
**sadly** [2] - 120:1, 120:7
**Safe** [2] - 43:14, 131:17
**safe** [25] - 8:1, 17:13, 26:24, 27:13, 37:15, 49:9, 60:7, 63:10, 95:3, 95:16, 109:13, 113:19, 113:20, 113:21, 113:23, 113:24, 114:12, 115:2, 115:14, 118:19, 118:22, 132:10
**safely** [6] - 8:2, 21:23, 26:8, 47:4, 87:2, 133:8
**safer** [3] - 73:3, 102:20, 133:23
**safety** [5] - 11:12, 53:23, 113:12, 114:15, 114:17
**sake** [1] - 136:20
**SAME** [1] - 144:21
**sat** [2] - 49:3, 133:6
**satisfactorily** [1] - 4:3
**save** [3] - 12:9, 27:4, 86:17
**saw** [6] - 37:12, 73:8, 87:20, 89:6, 94:11, 135:2
**scan** [1] - 94:19
**scanned** [2] - 94:12, 129:18
**scans** [2] - 61:23, 97:18
**scapular** [1] - 99:5
**scare** [3] - 101:23, 102:5, 140:17
**scared** [2] - 108:23, 113:7
**scarier** [1] - 76:5
**scaring** [1] - 115:23
**scary** [4] - 76:16, 102:21, 103:4, 106:15
**scattering** [1] - 130:24
**scenarios** [2] - 25:11, 29:12
**scene** [20] - 33:7, 34:8, 42:9, 50:18, 93:7, 95:8, 95:13, 95:16, 95:19, 96:18, 101:4, 103:5, 103:10, 103:13, 103:15, 103:22, 104:2, 104:14,

107:24, 115:13
**Schedule** [1] - 140:19
**school** [1] - 94:24
**science** [4] - 12:13, 12:15, 12:19, 120:21
**Science** [2] - 14:10, 14:20
**Sciences** [1] - 14:19
**scientific** [4] - 9:19, 46:13, 122:13, 125:14
**scientifically** [3] - 119:20, 122:11, 123:4
**Scientists** [1] - 14:12
**sclera** [1] - 113:1
**screen** [7] - 19:23, 19:24, 57:18, 57:23, 98:16, 124:23, 134:10
**SEAN** [1] - 1:5
**search** [2] - 48:22, 84:16
**searched** [1] - 11:6
**second** [11] - 40:20, 57:16, 61:24, 62:12, 63:16, 71:2, 71:11, 82:1, 92:24, 99:19, 115:3
**secondly** [1] - 68:18
**seconds** [6] - 63:19, 64:5, 64:13, 64:14, 64:19, 65:7
**section** [3] - 15:9, 18:16, 138:12
**Section** [1] - 137:14
**secured** [2] - 11:1, 33:7
**see** [18] - 14:18, 15:18, 19:24, 45:4, 57:23, 68:20, 76:11, 76:15, 88:17, 92:1, 98:6, 98:19, 99:17, 105:10, 109:21, 117:18, 117:19, 139:20
**seeing** [2] - 98:15, 98:22, 129:16
**seek** [1] - 109:12
**seeking** [6] - 105:16, 113:11, 115:8, 117:18, 118:22, 118:23
**seem** [6] - 43:19, 62:19, 103:16, 105:3, 122:23, 127:19
**sees** [1] - 56:10
**segment** [2] - 25:7, 63:5

seized [1] - 36:23
seizure [2] - 48:22, 115:19
self [9] - 28:2, 43:8, 74:6, 75:19, 77:15, 83:15, 87:15, 136:13, 137:19
self-defense [1] - 28:2
seminars [8] - 13:13, 16:8, 17:2, 23:6, 23:7, 35:11, 41:6, 44:9
send [2] - 140:24, 141:2
sending [1] - 19:9
sends [1] - 80:16
sense [2] - 63:17, 126:18
sent [2] - 16:1, 140:18
sentence [1] - 125:3
separate [3] - 20:11, 20:12, 61:14
sequestered [1] - 33:8
sergeant [2] - 22:10, 92:18
Sergeant [3] - 89:16, 92:9, 92:14
sergeants [1] - 22:18
serious [6] - 7:21, 43:8, 62:20, 63:4, 85:19, 139:11
seriously [2] - 26:22, 101:7
served [4] - 15:10, 22:9, 22:17, 69:7
service [2] - 45:20, 46:10
Services [2] - 47:10, 48:5
serving [1] - 11:12
session [1] - 21:16
set [6] - 30:21, 46:24, 61:23, 139:7, 144:6, 144:12
setting [1] - 38:11
seven [1] - 22:13
several [8] - 11:15, 22:9, 35:2, 36:22, 37:1, 37:24, 55:20, 125:13
severe [2] - 26:1, 35:20
shake [3] - 102:15, 115:15, 115:21
shaking [7] - 86:15, 86:24, 115:16, 115:18, 115:19, 115:20, 116:22
shall [1] - 4:22
shape [1] - 99:21

share [4] - 19:23, 57:18, 124:23, 134:10
sharp [1] - 102:2
SHEET [1] - 143:1
shelter [7] - 38:2, 41:17, 41:22, 48:9, 49:11, 109:12, 117:18
Shepherd [1] - 125:24
Shepherds [1] - 125:21
sheriff [2] - 5:23, 44:18
Sheriff's [9] - 14:23, 15:1, 16:17, 18:19, 20:17, 30:2, 45:1, 47:23, 127:9
sheriff's [4] - 5:21, 31:24, 34:18, 45:24
sheriffs [1] - 23:12
shift [1] - 111:12
shifting [1] - 22:3
Shirley [7] - 6:14, 114:18, 114:24, 115:1, 115:9, 115:14, 136:5
SHIRLEY [1] - 1:5
Shirley's [1] - 115:5
shoot [7] - 28:6, 77:17, 77:19, 85:16, 86:6, 120:5, 138:17
shooters [1] - 33:22
shooting [14] - 12:2, 33:21, 34:4, 54:1, 58:16, 93:12, 94:23, 101:1, 129:11, 134:3, 136:9, 139:12, 139:15
shootings [1] - 34:5
short [1] - 70:14
Shorthand [2] - 1:13, 144:3
shot [22] - 11:4, 11:9, 11:13, 11:19, 26:24, 27:13, 27:15, 33:23, 54:5, 54:11, 54:13, 59:22, 60:2, 62:17, 85:22, 86:16, 86:18, 100:10, 100:11, 100:23, 138:18
shotgun [1] - 84:11
shots [3] - 89:14, 94:4, 100:22
shoulder [2] - 81:1, 99:5
show [17] - 8:22, 53:8, 55:21, 56:8, 56:9, 57:9, 72:18, 97:21, 103:1, 103:2,

103:19, 110:9, 117:12, 121:3, 123:2, 123:8, 135:17
showed [2] - 12:7, 120:1
showing [19] - 30:15, 46:18, 55:16, 56:16, 63:18, 64:11, 67:8, 69:3, 70:9, 81:10, 107:17, 108:6, 111:8, 112:2, 113:1, 113:3, 113:13, 113:15, 122:12
shown [3] - 96:5, 111:11, 142:7
shows [5] - 34:23, 99:8, 109:8, 112:24, 122:13
side [12] - 10:2, 10:4, 87:20, 88:22, 89:13, 98:24, 99:1, 100:6, 100:16, 139:21, 139:24
sides [1] - 100:9
sidewalk [1] - 72:6
sideways [1] - 88:16
sight [1] - 11:8
sign [4] - 4:23, 67:17, 116:5, 140:5
signal [1] - 80:17
SIGNATURE [1] - 142:1
Signed [1] - 142:16
significant [8] - 96:7, 97:1, 97:9, 116:10, 123:22, 125:6, 127:19, 134:6
significantly [1] - 138:10
signing [1] - 5:6
signs [1] - 140:11
SILVER [1] - 1:22
similar [6] - 111:21, 111:23, 112:3, 117:11, 117:18, 137:8
similarly [2] - 11:15, 126:7
simple [2] - 65:5, 65:13
simply [20] - 7:4, 48:23, 52:4, 61:7, 65:14, 67:16, 70:14, 78:15, 101:12, 102:21, 105:15, 106:14, 112:7, 113:3, 115:1, 115:8, 118:11, 118:23, 134:23, 136:17
simulator [2] - 25:6,

25:7
single [3] - 55:4, 55:22, 67:15
sings [1] - 59:1
sit [10] - 25:15, 52:8, 78:18, 78:19, 78:21, 78:22, 79:2, 79:24, 102:15, 128:13
site [2] - 7:3, 33:5
sitting [2] - 37:23, 129:22
situation [47] - 7:24, 25:12, 26:19, 27:2, 27:6, 43:23, 52:23, 53:21, 55:15, 56:14, 61:7, 66:8, 67:2, 67:14, 67:15, 69:11, 69:15, 70:3, 73:21, 76:1, 78:24, 87:1, 87:11, 95:15, 103:4, 106:15, 107:12, 107:23, 111:1, 111:2, 111:11, 112:13, 113:5, 115:9, 116:20, 117:5, 118:23, 132:21, 132:22, 133:2, 136:8, 136:15, 137:9, 137:23, 139:6, 139:16, 139:18
situations [13] - 24:14, 25:7, 25:13, 26:18, 30:16, 37:16, 64:9, 80:12, 95:12, 95:13, 122:22, 132:4
six [5] - 11:4, 22:13, 93:19, 126:2, 130:4
size [2] - 94:2, 94:5
sized [1] - 126:7
skillful [1] - 57:15
skull [2] - 54:2, 97:8
slight [1] - 97:10
slightly [5] - 63:16, 87:23, 99:14, 110:10, 118:10
slow [1] - 77:18
small [3] - 97:2, 125:16, 139:15
smaller [7] - 17:9, 45:22, 54:4, 81:6, 124:7, 125:17, 131:13
smile [1] - 55:22
smiling [1] - 55:19
Smith [51] - 4:13, 7:11, 7:17, 59:22, 60:1, 60:13, 62:16, 62:19, 72:2, 73:6, 74:11, 87:17, 88:12, 89:15,

90:1, 90:3, 90:12, 90:16, 91:19, 92:4, 92:10, 92:16, 92:20, 95:20, 96:16, 99:23, 100:4, 100:20, 100:24, 101:9, 101:16, 101:17, 101:18, 101:19, 105:12, 105:14, 105:21, 119:2, 119:11, 119:13, 120:10, 132:14, 132:20, 133:7, 134:14, 136:12, 136:22, 137:23, 138:2, 138:22
SMITH [1] - 1:7
Smith's [12] - 7:21, 61:22, 73:17, 73:19, 73:22, 88:19, 90:23, 93:4, 94:8, 97:23, 98:3, 129:19
snakes [1] - 21:24
snapping [1] - 117:22
snarling [1] - 107:9
snoring [1] - 107:22
social [2] - 55:13, 122:23
Societies [1] - 49:7
society [1] - 66:10
Society [4] - 14:13, 15:6, 49:7, 50:13
solid [2] - 122:6, 122:13
someone [34] - 33:3, 44:1, 50:3, 54:12, 56:1, 56:9, 57:11, 58:21, 64:16, 70:5, 75:6, 75:10, 77:17, 79:1, 86:11, 88:17, 89:6, 94:23, 96:3, 96:8, 104:20, 104:21, 104:22, 106:17, 107:1, 110:20, 111:15, 113:23, 114:17, 115:2, 118:2, 121:12, 140:4
sometimes [8] - 10:3, 10:5, 14:17, 45:16, 78:17, 87:11, 115:21, 116:2
somewhat [2] - 113:11, 120:14
somewhere [5] - 84:13, 85:10, 88:18, 93:21, 109:14
soon [3] - 53:18, 114:10, 141:1
sorry [1] - 25:9

**sort** [8] - 34:2, 49:23, 52:9, 55:1, 69:8, 84:3, 111:4, 118:6
**sorts** [1] - 37:16
**sound** [3] - 117:7, 117:11, 118:9
**sounds** [5] - 107:18, 107:22, 108:11, 117:3, 118:9
**Southeastern** [1] - 39:2
**space** [14] - 8:2, 52:17, 61:1, 75:4, 75:6, 75:8, 75:18, 75:20, 77:4, 82:24, 106:3, 110:10, 110:11, 110:21
**spacing** [1] - 102:2
**speaking** [2] - 41:7, 80:12
**special** [3] - 110:19, 125:4, 126:6
**specific** [11] - 15:18, 15:19, 21:14, 24:10, 26:19, 79:23, 121:13, 122:9, 128:21, 129:4, 135:8
**specifically** [12] - 6:3, 9:3, 12:15, 51:10, 61:13, 66:14, 92:12, 97:6, 120:13, 127:5, 129:17, 130:1
**spectrum** [1] - 49:10
**speculate** [1] - 92:17
**speculation** [3] - 71:17, 71:20, 89:19
**speeding** [1] - 32:8
**spend** [2] - 29:17, 70:21
**spends** [1] - 71:13
**spent** [1] - 24:21
**spiders** [1] - 21:24
**spine** [1] - 99:5
**spoken** [2] - 131:20, 136:5
**sponsored** [1] - 16:17
**sprained** [1] - 82:8
**spray** [30] - 53:1, 53:2, 60:19, 62:21, 77:5, 78:7, 81:24, 82:5, 82:14, 82:16, 87:22, 87:24, 88:3, 88:13, 89:17, 91:20, 92:10, 92:16, 95:21, 95:23, 96:5, 96:17, 96:18, 138:3, 138:5, 138:9, 138:14, 138:18, 138:23
**sprayed** [5] - 82:14, 88:2, 96:8, 96:12,

138:23
**spraying** [2] - 96:1, 96:2
**squad** [1] - 22:12
**square** [1] - 125:19
**Square** [2] - 1:16, 2:4
**squeeze** [1] - 111:17
**ss** [1] - 144:2
**staff** [5] - 16:9, 17:17, 37:16, 46:1, 49:20
**staircase** [1] - 72:6
**stance** [1] - 87:23
**stand** [5] - 21:4, 52:5, 75:3, 91:12, 118:10
**standard** [10] - 39:18, 52:20, 67:2, 67:6, 69:23, 84:21, 97:9, 127:8, 128:8, 128:17
**Standards** [2] - 43:17, 128:10
**standards** [4] - 39:8, 127:12, 128:6
**standing** [8] - 72:17, 79:24, 80:1, 81:12, 93:20, 112:10, 112:19, 134:20
**start** [5] - 22:6, 51:22, 52:1, 78:15, 80:21
**started** [7] - 22:7, 34:19, 34:20, 35:1, 35:5, 35:20, 35:22
**Staston** [1] - 88:23
**state** [18] - 4:14, 8:23, 10:18, 13:10, 13:16, 13:19, 21:12, 26:14, 28:5, 39:13, 49:14, 56:4, 115:17, 117:1, 128:7, 128:9, 129:10, 130:13
**statement** [6] - 90:1, 90:4, 90:15, 90:16, 137:3, 139:10
**statements** [2] - 52:9, 120:12
**States** [6] - 25:23, 36:1, 36:2, 50:13, 65:19, 86:1
**states** [11] - 21:10, 38:15, 39:5, 43:4, 46:6, 69:24, 74:22, 130:2, 130:4, 131:5, 131:8
**STATES** [1] - 1:1
**statewide** [1] - 130:11
**stationary** [4] - 109:16, 110:6, 112:23, 134:14
**status** [4] - 13:19, 47:14, 47:19, 48:11
**statutes** [1] - 129:16

**statutory** [3] - 40:8, 40:23, 47:24
**stay** [1] - 117:23
**stenographically** [1] - 144:8
**step** [6] - 40:22, 52:8, 52:16, 53:1, 82:19, 83:13
**stepped** [2] - 74:22, 133:5
**stern** [1] - 79:12, 79:22
**sticking** [1] - 110:16
**still** [14] - 13:20, 22:11, 23:24, 35:4, 47:9, 47:18, 49:17, 64:17, 75:3, 95:20, 118:10, 120:4, 134:20, 139:6
**stipulated** [1] - 136:21
**stipulations** [1] - 4:17
**stop** [2] - 82:9, 88:14
**stopped** [1] - 115:4
**stops** [3] - 75:13, 76:11, 82:3
**store** [1] - 65:15
**stranger** [1] - 78:24
**strategies** [6] - 31:11, 52:15, 60:19, 60:23, 61:3, 62:21
**stray** [2] - 84:24, 95:23
**street** [10] - 22:11, 44:15, 65:15, 65:23, 72:7, 88:24, 89:5, 105:18, 106:2, 106:4
**Street** [1] - 88:23
**STREET** [1] - 1:22
**streets** [1] - 7:14
**strength** [2] - 125:10, 125:14
**stress** [8] - 107:16, 108:1, 108:10, 115:21, 116:9, 116:15, 116:18, 116:23
**stressed** [9] - 107:11, 108:4, 108:5, 108:11, 109:6, 117:2, 117:12, 117:17, 117:24
**stressing** [1] - 115:23
**strike** [4] - 4:22, 83:1, 84:14
**strongly** [2] - 83:1, 107:16
**stuck** [1] - 92:6
**studies** [4] - 53:4, 96:5, 120:21, 121:15
**Studies** [1] - 125:4
**study** [1] - 125:12

**stuff** [1] - 49:20
**stupid** [1] - 108:23
**subject** [3] - 38:22, 43:20, 142:6
**subjects** [2] - 35:12, 39:9
**submitted** [1] - 59:11
**subpoena** [1] - 140:18
**substance** [1] - 82:11
**substantial** [1] - 58:13
**succeeded** [1] - 76:15
**successfully** [1] - 38:9
**sudden** [1] - 85:7
**suddenly** [3] - 58:22, 72:18, 102:19
**suggesting** [1] - 136:19
**Suite** [1] - 2:8
**super** [1] - 119:18
**superior** [1] - 8:23
**supervised** [1] - 32:4
**supervision** [1] - 144:8
**supervisor** [1] - 22:14
**supervisors** [1] - 32:18
**supervisory** [1] - 33:5
**supposed** [1] - 94:16
**supposedly** [1] - 126:2
**surface** [2] - 82:7, 93:13
**surfaces** [1] - 100:10
**surroundings** [1] - 109:24
**survival** [3] - 54:23, 75:16, 76:8
**survive** [1] - 87:3
**suspect** [1] - 80:13
**suspects** [1] - 28:2
**suspend** [2] - 141:4, 141:6
**suspended** [1] - 141:10
**sustenance** [1] - 41:17
**SWAT** [2] - 11:16, 91:8
**sworn** [2] - 4:5, 144:6
**symptoms** [1] - 117:18
**system** [1] - 25:6

## T

**tactic** [3] - 80:4, 81:15, 82:16
**tactical** [1] - 91:8
**Tactics** [4] - 61:11, 61:16, 61:19, 62:3
**tactics** [7] - 28:13,

28:20, 63:1, 77:2, 78:10, 81:8, 85:11
**tail** [11] - 63:23, 73:12, 110:12, 110:14, 110:15, 111:21, 112:14, 112:17, 112:19, 112:20, 113:10
**tails** [1] - 56:6
**target** [10] - 54:2, 81:6, 82:23, 94:1, 94:5, 95:4, 96:2, 125:15, 139:16
**targeting** [1] - 95:23
**targets** [1] - 27:22
**tased** [1] - 53:17
**TASER** [2] - 83:9, 84:14
**TASERs** [1] - 53:13, 83:6
**taught** [26] - 16:13, 17:1, 17:7, 17:9, 17:11, 17:14, 17:18, 17:21, 17:22, 17:24, 18:4, 18:8, 18:10, 23:12, 24:12, 30:6, 38:22, 44:5, 44:7, 45:6, 51:3, 69:9, 80:11, 81:15, 83:17, 132:11
**teach** [28] - 16:7, 16:12, 16:13, 16:14, 16:19, 16:20, 16:21, 26:16, 42:6, 45:11, 51:4, 52:10, 54:13, 63:20, 77:2, 77:4, 77:5, 77:6, 77:8, 78:11, 78:13, 79:10, 79:21, 80:6, 80:22, 81:3, 83:20, 97:11
**teaches** [1] - 132:2
**teaching** [4] - 16:6, 18:4, 21:23, 39:6
**team** [4] - 11:16, 90:24, 97:16, 137:16
**technically** [6] - 30:21, 47:19, 48:1, 48:10, 54:21, 83:10
**techniques** [5] - 24:17, 25:4, 30:6, 30:10, 44:2
**teeth** [9] - 55:16, 55:21, 56:9, 56:13, 69:3, 81:10, 100:11, 110:9, 113:15
**ten** [4] - 10:17, 18:14, 22:10, 22:13
**tend** [5] - 101:23, 117:7, 122:7, 122:17, 123:18

**tendencies** [21] - 56:16, 63:13, 63:19, 64:19, 67:9, 67:18, 68:2, 68:10, 68:13, 68:15, 70:10, 73:7, 73:10, 102:23, 103:11, 103:17, 107:10, 108:4, 108:6, 108:14, 109:2

**tendency** [2] - 68:3, 107:2

**tends** [2] - 85:8, 110:15

**Tennessee** [2] - 46:6, 130:8

**term** [3] - 39:21, 53:2, 82:20

**terminate** [1] - 31:12

**terms** [4] - 26:17, 80:18, 81:13, 108:22

**territory** [1] - 85:1

**tested** [1] - 125:20

**testified** [14] - 8:18, 8:23, 9:5, 9:16, 9:17, 9:24, 10:1, 10:16, 11:23, 12:1, 51:15, 89:3, 93:21, 111:5

**testify** [1] - 12:5

**testifying** [2] - 5:12, 7:4

**testimony** [14] - 5:5, 57:6, 71:22, 88:20, 90:13, 90:14, 100:1, 101:11, 105:21, 135:7, 136:7, 137:6, 142:4, 144:6

**testing** [2] - 121:22, 125:14

**Texas** [2] - 11:6, 130:8

**THE** [4] - 144:20, 144:21, 144:21

**themselves** [12] - 28:18, 30:17, 44:1, 44:4, 53:11, 56:7, 66:23, 67:13, 85:14, 86:10, 110:4, 127:22

**thereafter** [1] - 144:8

**thesis** [2] - 18:20, 18:21

**thick** [3] - 54:3, 94:2, 97:8

**thinking** [1] - 13:8

**third** [1] - 68:22

**thirds** [1] - 99:7

**THIS** [1] - 144:20

**thorax** [1] - 97:7

**thousands** [1] - 44:10

**thread** [1] - 124:2

**threat** [37] - 7:20, 11:9, 26:1, 31:1, 43:24,

51:24, 54:24, 55:7, 55:10, 55:12, 55:17, 57:16, 63:4, 65:2, 65:5, 69:20, 70:24, 75:11, 75:16, 75:20, 75:21, 75:23, 76:12, 76:22, 76:23, 79:1, 80:9, 81:2, 81:14, 91:11, 105:3, 111:4, 113:16, 114:2, 114:9, 116:6

**threaten** [1] - 54:12

**threatened** [6] - 109:1, 110:23, 111:6, 111:8, 112:2, 112:22

**threatening** [9] - 31:13, 56:14, 57:10, 72:18, 81:7, 87:24, 88:4, 111:2, 115:9

**threatens** [1] - 75:13

**threats** [4] - 26:5, 29:10, 63:24, 64:24

**three** [12] - 9:7, 28:1, 29:3, 29:17, 37:9, 58:15, 74:10, 81:24, 100:1, 118:20, 121:3, 134:12

**throughout** [1] - 45:16

**throw** [3] - 55:8, 85:17, 121:10

**tier** [1] - 80:4

**tiger** [1] - 58:22

**tight** [1] - 110:7

**tissue** [2] - 99:12, 99:13

**titled** [1] - 61:19

**titles** [1] - 35:16

**TO** [1] - 144:21

**today** [15] - 5:9, 5:12, 10:15, 15:23, 67:19, 87:16, 104:15, 128:13, 129:22, 140:21, 141:6

**toddler** [1] - 56:11

**together** [8] - 18:7, 42:17, 43:22, 74:9, 103:23, 104:10, 118:20, 126:17

**tone** [2] - 79:12, 79:14

**took** [8] - 11:1, 22:22, 34:8, 35:10, 37:8, 37:9, 44:14, 72:24

**tool** [5] - 20:9, 20:19, 53:15, 84:2, 84:7

**tools** [11] - 24:18, 44:2, 52:17, 81:5, 84:15, 85:18, 91:23, 92:5, 132:8, 132:9, 133:8

**top** [9] - 7:13, 11:17,

33:14, 58:16, 67:19, 81:17, 99:4, 100:9, 104:9

**topic** [1] - 12:20

**topics** [1] - 17:3

**tortured** [1] - 50:3

**totality** [1] - 51:7

**totally** [1] - 69:21

**touch** [1] - 55:11

**towards** [8] - 17:13, 28:3, 74:12, 88:22, 99:10, 101:5, 109:13

**track** [1] - 14:17

**tracks** [1] - 82:3

**train** [21] - 45:18, 46:3, 51:2, 51:3, 51:21, 56:15, 70:18, 75:1, 85:11, 86:8, 86:19, 118:7, 120:18, 120:20, 124:13, 126:8, 133:21, 134:8, 135:15, 135:21

**trained** [40] - 22:23, 23:15, 23:20, 26:9, 28:6, 28:12, 28:19, 31:7, 40:10, 42:20, 44:12, 44:13, 44:15, 44:17, 45:24, 46:1, 48:21, 48:24, 51:9, 51:11, 51:16, 64:16, 64:23, 67:4, 71:4, 78:19, 78:21, 82:18, 84:18, 118:3, 119:14, 119:15, 119:16, 120:2, 124:9, 128:2, 130:17, 130:20, 133:5, 135:17

**trainer** [4] - 14:1, 17:3, 34:14, 35:14

**Trainer's** [1] - 35:7

**trainers** [5] - 17:2, 17:3, 44:13, 121:17, 130:20

**Trainers** [5] - 13:3, 14:3, 14:9, 14:22, 15:16

**Training** [7] - 3:8, 15:9, 18:18, 19:12, 20:7, 43:17, 128:10

**training** [105] - 11:7, 16:16, 17:16, 17:24, 21:7, 22:1, 22:14, 22:16, 22:19, 23:1, 23:3, 23:5, 23:6, 23:14, 23:17, 24:3, 24:4, 24:15, 24:21, 24:23, 25:1, 26:11, 28:15, 29:3, 29:6,

29:7, 29:15, 29:16, 29:21, 29:24, 30:11, 30:18, 31:6, 31:9, 34:19, 35:1, 35:3, 35:11, 35:12, 35:24, 36:3, 38:13, 38:18, 38:21, 39:23, 39:24, 41:3, 42:3, 43:2, 43:5, 43:10, 43:12, 43:13, 43:15, 43:21, 43:23, 44:15, 45:12, 45:14, 45:20, 46:2, 46:4, 46:7, 46:10, 48:16, 48:18, 49:19, 51:22, 61:5, 65:3, 66:1, 76:17, 76:18, 76:20, 76:22, 78:14, 118:4, 119:19, 124:11, 124:13, 126:13, 127:2, 127:6, 128:7, 128:15, 128:18, 128:21, 128:23, 130:3, 130:6, 130:9, 130:10, 131:4, 131:15, 131:24, 132:1, 132:2, 132:11, 132:15, 133:11, 133:18, 134:2, 135:14, 138:16

**trainings** [16] - 17:15, 18:12, 21:19, 21:21, 23:8, 23:10, 24:9, 29:20, 30:10, 31:2, 42:22, 45:15, 49:24, 50:12, 124:11, 134:3

**transcribed** [1] - 144:8

**transcript** [5] - 4:23, 89:23, 94:9, 142:6, 144:9

**TRANSCRIPT** [1] - 144:20

**transfer** [1] - 65:1

**transition** [1] - 47:16

**transmitting** [1] - 55:14

**transported** [2] - 33:17, 33:18

**trapped** [2] - 109:15, 112:23

**travel** [3] - 7:1, 7:3, 16:7

**traveled** [1] - 99:9

**treated** [1] - 42:6

**treatment** [2] - 17:5, 41:21

**treats** [1] - 37:23

**trial** [6] - 4:22, 7:2, 7:3, 7:4, 8:19, 58:12

**tried** [1] - 74:21

**tries** [2] - 75:24, 119:22

**trigger** [2] - 71:8, 71:9

**trouble** [1] - 67:24

**true** [2] - 142:5, 144:9

**trusted** [2] - 101:3, 105:12

**truth** [3] - 4:5, 4:6

**truthful** [1] - 5:5

**try** [11] - 61:3, 69:1, 78:22, 82:10, 82:11, 94:20, 102:10, 102:14, 103:8, 110:9, 121:2

**trying** [9] - 49:8, 74:18, 75:11, 84:1, 101:2, 106:14, 110:21, 115:22, 139:5

**Turkish** [1] - 126:4

**turn** [3] - 56:18, 109:10, 109:11

**turned** [3] - 31:20, 44:13, 56:22

**turning** [2] - 54:9, 112:6

**turns** [1] - 80:10

**two** [20] - 7:14, 11:7, 17:22, 28:4, 29:3, 35:17, 37:7, 74:8, 79:23, 81:24, 85:2, 98:12, 99:7, 100:17, 103:23, 119:6, 133:16, 134:15, 134:24, 136:2

**two-thirds** [1] - 99:7

**type** [10] - 10:14, 16:11, 39:24, 77:10, 78:2, 78:14, 109:3, 111:7, 122:4, 128:21

**types** [12] - 9:11, 10:13, 31:2, 32:3, 78:9, 85:11, 115:15, 115:24, 116:7, 116:13, 117:24, 124:9

**typical** [2] - 63:15, 82:9

**typically** [29] - 9:11, 24:15, 25:22, 26:4, 33:1, 41:16, 47:6, 52:19, 53:16, 53:20, 75:9, 75:12, 75:24, 76:10, 82:2, 82:9, 102:7, 106:19, 108:17, 109:18, 111:14, 112:17, 114:5, 114:11, 114:16, 116:4,

116:18, 124:4, 131:2

## U

**U.S** [2] - 6:7, 123:20
**unable** [1] - 109:12
**uncomfortable** [4] - 55:11, 56:4, 105:23, 107:12
**uncommon** [1] - 103:1
**uncontrolled** [1] - 10:24
**UNDER** [1] - 144:21
**under** [16] - 4:23, 5:9, 18:15, 31:18, 33:1, 42:13, 56:13, 70:3, 72:13, 79:4, 102:14, 129:6, 137:9, 139:6, 142:16, 144:8
**underfed** [1] - 42:14
**underlying** [1] - 116:17
**underneath** [1] - 99:6
**understandable** [3] - 48:4, 83:5, 100:17
**understood** [2] - 56:22, 138:17
**undertrained** [1] - 120:7
**uneasy** [1] - 102:15
**uneducated** [1] - 120:1
**unexpected** [1] - 102:3
**unexperienced** [1] - 11:8
**unfortunately** [2] - 79:10, 100:6
**unfounded** [1] - 123:6
**unholstered** [1] - 71:10
**uniform** [1] - 91:5
**uniformed** [1] - 91:6
**unintended** [1] - 136:18
**unintentionally** [1] - 84:9
**uninvolved** [1] - 84:7
**UNITED** [1] - 1:1
**United** [7] - 18:1, 25:23, 36:1, 50:13, 65:19, 86:1
**units** [1] - 135:18
**university** [1] - 16:9
**University** [4] - 12:14, 12:18, 18:22, 42:23
**unknowledgeable** [1] - 120:15
**unlawful** [3] - 49:23, 74:6, 137:20

**UNLESS** [1] - 144:21
**unless** [7] - 21:3, 31:19, 66:7, 77:23, 113:9, 116:9, 121:2
**unlikely** [3] - 85:19, 113:13, 113:14
**unnecessarily** [1] - 53:11
**unnecessary** [3] - 72:12, 127:14, 132:23
**unreasonable** [1] - 69:21
**unsubstantiated** [1] - 122:20
**unsupported** [1] - 69:21
**untrained** [1] - 127:19
**unusual** [2] - 94:4, 103:1
**unwilling** [1] - 106:22
**up** [32] - 19:9, 21:3, 22:18, 26:23, 32:20, 38:11, 46:24, 52:16, 53:1, 56:3, 56:18, 56:22, 58:5, 60:22, 75:12, 76:15, 79:9, 81:3, 82:19, 83:11, 86:22, 99:7, 109:17, 110:21, 112:10, 118:12, 118:14, 126:20, 135:7, 140:11, 140:17
**upcoming** [1] - 18:6
**updated** [2] - 19:6, 19:9
**upper** [1] - 113:15
**UPPER** [1] - 2:7
**Upper** [2] - 6:13, 8:7
**uprights** [1] - 111:17
**upward** [2] - 99:3, 99:14
**uses** [3] - 30:22, 54:22, 77:13

## V

**vaccine** [1] - 69:19
**valid** [1] - 7:20
**value** [1] - 76:1
**varies** [3] - 26:3, 39:15, 67:14
**variety** [1] - 104:20
**various** [21] - 16:7, 16:8, 17:3, 17:18, 17:20, 22:12, 23:6, 29:11, 35:12, 35:19, 36:18, 38:1, 38:24, 43:1, 56:6, 61:20, 93:20, 130:13,

131:12, 131:17
**varying** [4] - 28:24, 54:11, 130:5, 130:15
**vast** [3] - 37:11, 64:6, 64:8
**Vegas** [3] - 17:18, 44:18, 133:14
**vehicle** [3] - 27:23, 60:21, 60:22
**vehicles** [1] - 32:7
**ventral** [1] - 100:9
**ventrally** [1] - 99:10
**verbal** [6] - 60:20, 78:11, 78:13, 79:10, 80:6, 81:9
**versus** [2] - 4:13, 13:8
**vest** [1] - 92:7
**veterinarian** [1] - 42:8
**veterinarians** [4] - 42:18, 48:12, 49:11, 121:17
**Veterinary** [4] - 12:14, 12:17, 14:10, 14:20
**veterinary** [6] - 12:15, 12:16, 12:18, 41:20, 41:24, 42:18
**vicious** [1] - 39:19
**victim** [4] - 26:21, 27:6, 40:24, 49:23
**video** [1] - 57:13
**videos** [3] - 53:8, 57:9, 63:14
**view** [2] - 73:5, 104:5
**Violence** [1] - 15:10
**violence** [1] - 41:12
**Virginia** [1] - 50:16
**Virtra** [1] - 25:6
**virulent** [1] - 75:22
**visible** [4] - 42:12, 99:4, 99:15, 99:19
**visual** [3] - 85:5, 120:22, 121:4
**vocal** [2] - 25:14, 117:10
**vocalization** [1] - 55:9
**vocalize** [1] - 116:4
**vocalizes** [1] - 55:6
**vocalizing** [1] - 108:19
**voice** [5] - 52:7, 56:20, 79:11, 79:14, 79:17
**volume** [1] - 56:17
**VS** [1] - 1:6

## W

**wag** [1] - 112:14
**wagging** [1] - 112:20
**wags** [1] - 110:12
**waive** [1] - 5:6
**walk** [1] - 25:21

**walking** [2] - 65:14, 65:23
**walks** [1] - 86:13
**wants** [1] - 116:6
**warn** [1] - 54:8
**warning** [5] - 75:13, 110:9, 110:20, 116:4, 117:21
**warnings** [1] - 109:4
**warrant** [2] - 11:12, 84:17
**wash** [4] - 88:9, 96:9, 96:13
**watch** [2] - 22:17, 91:13
**water** [3] - 41:22, 85:16, 88:9
**ways** [5] - 47:4, 86:6, 107:6
**weapon** [6] - 77:7, 82:18, 83:3, 83:4, 83:10, 84:14
**weapons** [2] - 53:13, 83:8
**wearing** [2] - 84:3, 91:7
**website** [1] - 131:16
**weigh** [1] - 134:21
**weighed** [1] - 101:7
**weird** [2] - 74:9, 140:20
**welfare** [1] - 41:18
**well-trained** [1] - 67:4
**WHEREOF** [1] - 144:12
**whine** [1] - 102:16
**white** [1] - 113:1
**whole** [3] - 4:6, 14:16, 115:9
**wide** [1] - 112:24
**widely** [3] - 19:22, 79:15, 102:5
**wind** [1] - 95:24
**wipe** [1] - 82:11
**wish** [1] - 143:2
**WITNESS** [1] - 144:12
**Witness** [1] - 3:2
**witness** [9] - 5:15, 5:19, 6:2, 7:4, 9:22, 62:10, 97:21, 142:3, 144:5
**witnesses** [7] - 4:22, 32:18, 33:8, 42:10, 134:13, 134:15, 135:1
**wondering** [1] - 58:9
**word** [4] - 30:20, 54:17, 89:22, 89:23
**words** [3] - 25:15, 76:14, 87:9, 121:1

**worry** [1] - 54:6
**worse** [3] - 88:5, 96:3
**worth** [3] - 76:8, 95:5, 105:9
**wound** [8] - 98:23, 99:8, 99:10, 99:19, 99:22, 100:13, 139:21, 139:23
**wounded** [1] - 33:16
**wounds** [1] - 98:20
**wrap** [1] - 52:7
**wrapped** [1] - 31:5
**write** [1] - 19:19
**written** [4] - 18:13, 19:2, 19:20, 90:10
**wrote** [2] - 20:22, 124:20

## Y

**yard** [2] - 11:18, 96:9
**year** [9] - 6:20, 6:21, 6:22, 37:10, 45:16, 47:18, 47:20, 48:8, 128:20
**years** [15] - 18:14, 22:9, 22:10, 22:17, 35:2, 35:4, 35:5, 37:4, 37:9, 37:17, 40:12, 84:23, 85:21, 114:5, 127:7
**yelled** [1] - 88:14
**yelling** [2] - 26:23, 27:10
**yelping** [1] - 88:6
**York** [3] - 11:11, 130:13, 130:14
**young** [1] - 93:22
**yourself** [6] - 52:4, 52:15, 52:18, 81:19, 91:14, 96:3

## Z

**zero** [3] - 69:13, 96:6, 96:21
**ZOOM** [1] - 1:10